WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Harvey R. Miller
Lori R. Fife
Shai Y. Waisman

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                                                    :
**In re**                                           :        **Chapter 11 Case No.**
                                                    :
**STEVE & BARRY'S**                                 :
**MANHATTAN LLC, <u>et al.</u>,**                   :        \_\_\_ - _____ (  )
                                                    :
          **Debtors.**                              :        **(Jointly Administered)**
                                                    :
-----------------------------------------------------------------x

**DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363(b) OF**
**THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6003 AND 6004 FOR**
**AUTHORIZATION (i) TO PAY WAGES, COMPENSATION, AND EMPLOYEE**
**BENEFITS, AND (ii) OF FINANCIAL INSTITUTIONS TO HONOR**
**AND PROCESS CHECKS AND TRANSFERS RELATED TO SUCH OBLIGATIONS**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

    Steve & Barry's Manhattan LLC and its debtor affiliates, as debtors and debtors

in possession (collectively, "<u>Steve & Barry's</u>" or the "<u>Debtors</u>"), respectfully represent:

<u>**Background**</u>

    1.  On the date hereof (the "<u>Commencement Date</u>"), the Debtors each

commenced with this Court a voluntary case under chapter 11 of title 11 of the United States

Code (the "<u>Bankruptcy Code</u>").  The Debtors are authorized to operate their businesses and

manage their properties as Debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      Contemporaneously herewith, the Debtors filed a motion seeking joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

### Steve & Barry's Business

3.      Steve & Barry's is a specialty retailer of apparel and accessories that provides consumers with quality low-priced apparel.  Founded in 1985, Steve & Barry's has grown exponentially from an original store in Philadelphia, Pennsylvania to 276 stores located throughout the United States.   Many Steve & Barry's retail locations serve economically challenged areas that other retailers have abandoned because of household income levels, population trends or crime rates.  During the course of its expansion, Steve & Barry's has diversified its business beyond its original line of university apparel, and its products currently fall broadly into three categories: (i) licensed university apparel and lifestyle brands, (ii) private-label casual clothing and accessories for men, women and children, and (iii) exclusive celebrity branded lines of apparel and accessories.

4.      Steve & Barry's offers quality apparel and accessories at dramatically lower prices than typically found for similar goods from other specialty retailers, and in a more upscale, customer-friendly store design.  Steve & Barry's achieves this by operating stores with low occupancy costs, and by relying mostly upon word of mouth and news stories, rather than paid print or other advertising, resulting in significant cost savings.  Steve & Barry's keeps its costs low by maintaining overseas offices and purchasing most merchandise directly from their sources without intermediaries.  The savings realized through each strategy are then passed on to

Steve & Barry's customers in the form of low prices.  Almost all items in Steve & Barry's retail locations are priced at $9.98 or less.

5.       As of May 31, 2008, Steve & Barry's (including nondebtor affiliates) consolidated assets totaled approximately $693.5 million and recorded consolidated liabilities totaled approximately $638 million.   Consolidated revenues for the twelve months ended May 31, 2008, were approximately $656.6 million.  Steve & Barry's currently employs, either directly or through its non-debtor affiliates, approximately 8,600 domestic employees and 1,100 international employees.  Approximately 7,300 of the domestic employees are part-time hourly employees and 1,300 are full-time salaried employees.

### Jurisdiction and Venue

6.       This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

7.       By this Motion, the Debtors seek authorization, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, to pay their current employees (the "Employees") for work performed prepetition, and to honor certain other prepetition employee-related obligations.  The Debtors seek this authority to minimize the personal hardship that the Employees would suffer if they are not paid when due, and to maintain the morale of their essential workforce during this critical time.  The Employee Obligations (as defined below) that the Debtors seek authority to pay include:  wages, salaries, reimbursement obligations, federal and state withholding taxes and other amounts withheld (e.g. garnishments, Employees' share of insurance premiums, taxes and 401(k) contributions), Employee health benefits, insurance benefits, paid time off, severance benefits, short- and long-term disability

coverage and all other Employee benefits that the Debtors have historically provided in the ordinary course of business (collectively, and as more fully described herein, the "Employee Obligations"), and to pay all fees and costs incident to the foregoing, including amounts to third-party administrators. Because of the potential for irreparable harm if the Employee Obligations are not paid or otherwise satisfied when due, the Debtors seek immediate authority to pay all such obligations.

8.    In addition, the Debtors seek authorization for applicable banks and other financial institutions (collectively, the "Banks") to receive, process, and pay any and all checks, electronic fund transfers, and automatic payroll transfers drawn on the Debtors' payroll and/or general disbursement accounts (collectively, the "Disbursement Accounts"), to the extent that such checks or transfers relate to any of the prepetition Employee Obligations.

**The Debtors' Prepetition Employee Obligations**

9.    As discussed above, the Debtors primary operations consist of retail stores, where they sell various lines of apparel. Domestically, the Debtors' operations consist primarily of 276 retail stores located throughout the country in 33 states, a distribution center located in Columbus, Ohio, a main corporate office headquarters located in Port Washington, New York, and an office and showroom located in New York City (collectively, the "Domestic Operations"). The Debtors, primarily through their non-debtor affiliate Universal Worldwide Private Limited ("UWPL"), also maintain international offices, including a large support office in Mumbai, India, a support office in Shanghai, China, and various other small offices in Kenya, Thailand, Bangladesh, Jordan and Pakistan (collectively, the "International Operations").

10.    In connection with the Domestic Operations, the Debtors currently employ approximately 8,619 employees, of which 1,279 are full-time salaried employees (the "Salaried

Employees") and 7,340 are part-time hourly employees[1] (the "Hourly Employees" and together

with the Salaried Employees, the "Domestic Employees").  The Domestic Employees can further

be classified into three main groups:  (1) store employees, both salaried ("Salaried Store

Employees") and hourly ("Hourly Store Employees," and together with the Salaried Store

Employees, the "Store Employees"), (2) distribution center employees, both salaried ("Salaried

DC Employees") and hourly ("Hourly DC Employees" and together with Salaried DC

Employees, the "DC Employees"), and (3) employees who work in the company's office

headquarters ("New York Office Employees").

   11. In connection with the International Operations, there are approximately

1,076 full-time employees overseas, of which approximately 950 work out of the office in

Mumbai, India, 97 work out of the office in Shanghai, China, and 26 work out of the office in

Pakistan.  The remaining international offices are staffed by no more than a few employees at

any given time.  UWPL, a non-debtor, is the primary employer of employees located in the

international offices.  Approximately 126 employees, however, are employed by the Debtors.

The employees operating out of the office in China are employed by Steve & Barry's GLC LLC

(the "GLC Employees"), and 29 employees operating out of the offices in Jordan and Pakistan

are employed by Pro Air LLC (the "Pro Air Employees," and together with the GLC Employees,

the "International Employees," and together with the Domestic Employees, the "Employees").

   12. In the ordinary course of their businesses, the Debtors incur payroll and

various other obligations, including benefit obligations, to their Employees for the performance

of services.  As is the case with any large retailer, the Debtors have numerous obligations in

respect of their Employees relating to the period prior to the Commencement Date.  As is also

---

[1] Hourly Employees are not guaranteed to work a minimum number of hours per week.  As such,
all Hourly Employees are considered part-time employees.

the case with any retailer, maintaining the Debtors' workforce with minimal interruption is critical to servicing the Debtors' retail customers.

## I. Payroll and Related Obligations

### A. Compensation Obligations

#### (i) Domestic Employee Compensation Obligations

13.     As noted above, the Debtors pay their Domestic Employees on either an hourly or a salaried basis.  The Debtors' average monthly gross payroll for all Domestic Employees is approximately $12,120,000.

14.     All Domestic Employees are paid on a bi-weekly basis, four (4) days in arrears for those Employees with direct deposit and five (5) days in arrears for all others (the "Domestic Employee Compensation Obligations").  As of the Commencement Date, the accrued and unpaid prepetition Domestic Employee Compensation Obligations, inclusive of the Employees' portion of federal, state, and local income taxes,[2] is approximately $3,200,000 for services rendered through July 8, 2008.  The Domestic Employee Compensation Obligations with respect to each Employee for this prepetition period do not exceed the $10,950 cap under section 507(a)(4) of the Bankruptcy Code.

15.     The obligations relating to the Trust Fund Taxes withheld from the Domestic Employee Compensation Obligations are remitted to the appropriate taxing authorities (collectively, the "Taxing Authorities") at the time the Domestic Employee Compensation Obligations are satisfied.

16.     In addition, in the ordinary course of processing payroll checks for their Employees, the Debtors withhold certain amounts for various garnishments (such as tax levies,

---

[2] The prepetition amounts relating to federal, state, and local income taxes (the "Trust Fund Taxes") for the Employees aggregate to approximately $600,000.

child support, and other court-ordered garnishments) (the "Garnishments").  The Debtors withhold, on average, $31,500 per pay period on account of the Garnishments.  As of the Commencement Date, the Debtors have withheld from Employees' wages, but have not yet remitted, approximately $18,000 on account of the Garnishments (the "Garnishments Obligation").

17.     The Domestic Employee Compensation Obligations include payments due to an Insider (as that term is defined under the Bankruptcy Code).  The compensation of Andrew Todd, the Debtors' President, is included in the Debtors' Domestic Employee Compensation Obligations.[3]  Like the other prepetition Employee Obligations, the amount owed to Mr. Todd does not exceed the cap under section 507(a)(4) of the Bankruptcy Code.

(ii)     International Employee Compensation Obligations

18.     As noted above, the Debtors employ approximately 126 International Employees in connection with their International Operations.  All International Employees are salaried employees paid at the end of each month (the "International Employee Compensation Obligations" and together with the Domestic Employee Compensation Obligations, the "Employee Compensation Obligations").  The Debtors' average monthly gross payroll for their International Employees is approximately $167,587.

19.     As of the Commencement Date, the accrued and unpaid prepetition International Employee Compensation Obligations, inclusive of all amounts owed on account of statutorily mandated employee benefits, is approximately $44,690.  The International Employee Compensation Obligation with respect to each Employee for this prepetition period does not exceed the $10,950 cap under section 507(a)(4) of the Bankruptcy Code.

---

[3] Steven Shore and Barry Prevor do not receive a salary from the company.

### B.    Reimbursement Obligations

20.    The Debtors customarily reimburse their Employees for a variety of business expenses incurred in the ordinary course of employment.  These reimbursable expenses include, among other things, travel expenses, equipment and other goods purchased by such Employees for the benefit of the Debtors' businesses  (the "Reimbursement Obligations").  Employees pay from their own funds for such expenses, and then are reimbursed upon the Employee's submission of a claim itemizing the business expenses.  As of the Commencement Date, accrued and unpaid prepetition Reimbursement Expenses are approximately $142,000.

21.    There is no way to determine the precise amount of Reimbursement Obligations at any moment in time, as employees always have reimbursements that have yet to be submitted to the Debtors.  As there is no way to accurately gauge the amount of Reimbursement Obligations at any given time, the Debtors seek authorization to satisfy all Reimbursement Obligations.  Subsequent to the Commencement Date, the Debtors anticipate that the prepetition Reimbursement Obligations might change as Employees submit reimbursement requests for expenses incurred prior to the Commencement Date, but such change is likely to be relatively small.

### C.    Payroll Administration

22.    The Debtors employ ADP as their payroll administrator to process the Domestic Employee Compensation Obligations and coordinate the payment of the Employer Payroll Tax Obligations (as defined below).  On a bi-weekly basis, ADP calculates the aggregate Domestic Employee Obligations and the Employer Payroll Tax Obligations based upon information provided by the Debtors.  ADP's compensation is approximately $115,000 per payroll period for these services (the "Payroll Administration Obligations").  As of the

Commencement Date, the accrued and unpaid prepetition Payroll Administration Obligation is approximately $450,000.

23.     Approximately two to three days prior to the payment of the Employee Obligations, the Debtors submit a funding request to their prepetition secured lenders in an amount of such obligations. Approximately one day prior to the payment of the Domestic Employee Compensation Obligations, ADP debits the Debtors' payroll accounts and tenders payment to the Debtors' Domestic Employees.

**D.     Employer Payroll Tax Obligations**

24.     In connection with the salaries and wages paid to Employees, the Debtors are required to pay matching amounts from their own funds for, among other things, social security and Medicare taxes, as well as additional amounts for state and federal unemployment insurance, based on a percentage of gross payroll, employment training taxes, and state disability insurance contributions (the "Employer Payroll Tax Obligations"). As of the Commencement Date, the accrued and unpaid prepetition Employer Payroll Tax Obligations are approximately $260,000.

**II.     Employee Benefit Plan Obligations**

25.     In the ordinary course of business, the Debtors have established various benefit plans and policies for their Domestic Employees which can be divided into the following categories: (i) medical insurance, dental insurance, vision care, life and accidental death and dismemberment insurance, and long- and short-term disability insurance (collectively, the "Health and Welfare Plans"); (ii) paid time off plans, including vacation, comp time, personal days and holidays (collectively, the "PTO Plans"); (iii) a 401(k) plan (the "401(k) Plan"), (iv) a commuter benefit program (the "Commuter Benefit Program"), (v) a tax-advantaged education savings plan (the "College 529 Plan"), (vi) an employee assistance program (the "EAP"), and

(vii) a severance plan (the "Severance Plan," and together with the EAP, Health and Welfare Plans, PTO Plans, the 401(k) Plan, the Commuter Benefit Program, and the College 529 Plan, the "Employee Benefit Plans").  In certain instances, the Debtors deduct specified amounts from the Domestic Employees' wages in connection with certain of the Employee Benefits, such as, among others, medical insurance and 401(k) Plan contributions.  A schedule of the Employee Benefits Plans is attached as Exhibit A.

26.     The Debtors believe that their annual expenditures under the Employee Benefit Plans aggregate to approximately $9 million.   All obligations with respect to the Employee Benefits Plan (including insurance policies and coverage) are hereinafter referred to as the "Employee Benefit Obligations," which include the obligations arising under the various plans described below.  Because of the manner in which expenses are incurred and claims are processed under the Employee Benefit Plans, it is difficult for the Debtors to determine or estimate not only the accrued and unpaid prepetition Employee Benefit Obligations, but any such obligations regardless of when they were incurred.  As of the Commencement Date, the Debtors believe that the accrued and unpaid prepetition Employee Benefit Obligations, inclusive of all Employee contributions to such plans, aggregate to be approximately $1,470,000.  Below, the Debtors have broken down the amounts that comprise a substantial amount of the outstanding prepetition Employee Benefit Obligations.

### A.     Medical, Dental and Other Health Plans

27.     The Debtors offer various health benefits, including, among others, medical, vision and dental coverage (the "Health Plans").  An employee's eligibility to participate in the Health Plans is determined by their position within the Debtors' organizational structure, as well as time of employment.

### (i)     **BlueCross BlueShield Obligations**

28.     Salaried Employees, as well as DC Hourly Employees employed by the Debtors for more than 90 days, are eligible to receive medical, dental and vision insurance. The medical insurance provided to these Employees is provided by Empire BlueCross BlueShield (the "BlueCross BlueShield Plan").[4] The insurance premiums associated with each employee enrolled in the Blue Cross Blue Shield Plan are paid by the Debtors. The Debtors pay approximately $650,000 per month in respect of the Blue Cross Blue Shield Plan. Salaried Employees and qualified DC Hourly Employees are also eligible to receive coverage for their spouses and/or families under the Blue Cross Blue Shield Plan. Premiums on account of coverage provided to spouses and/or families are paid entirely by the employees. As of the Commencement Date, the accrued and unpaid prepetition amount on account of the Blue Cross Blue Shield Plan, including amounts withheld from Employees' wages to pay for insurance coverage for families and/or spouses, aggregates to approximately $1,300,000.

### (ii)     **Guardian Plan Obligations**

29.     The Debtors' also provide dental and vision programs for eligible Employees. Salaried Employees are immediately eligible to enroll for dental insurance, which is provided by The Guardian Life Insurance Company of America (the "Guardian Dental Plan"). Insurance premiums associated with each individual Employee enrolled in the Guardian Dental Plan are paid by the Debtors; premiums for coverage for families and/or spouses are paid entirely by the Employees. The Debtors pay approximately $54,800 per month in respect of the Guardian Dental Plan, and as of the Commencement Date, the accrued and unpaid prepetition

---

[4] In addition, a small number of Hourly Employees – those employed as either Asset Protection Agents ("APAs") or Asset Protection Agent Leaders ("APALs") – are eligible to enroll in the BlueCross BlueShield Plan.

amounts due, including amounts withheld from Employees' wages to pay for insurance coverage for families and/or spouses, aggregate to approximately $54,200.

30.    Lastly, Salaried Employees are immediately eligible for vision insurance provided by Vision Insurance Plan[5] (the "Vision Insurance Plan").  The Debtors pay all insurance premiums associated with coverage for individual employees; additional premiums on account of spouses and/or families are paid in their entirety by the covered employees.  The Debtors pay approximately $9,400 per month in respect of the Vision Insurance Plan, and as of the Commencement Date, the accrued and unpaid prepetition amounts owed to Vision Insurance Plan, including amounts withheld from Employees' wages to pay for insurance coverage for families and/or spouses, is approximately $9,600.

### (iii)    Aetna Plan Obligations

31.    Hourly Store Employees are, immediately upon the commencement of their employment, eligible to enroll in a medical insurance plan provided by Aetna Life Insurance Company (the "Aetna Plan").  In addition, Hourly Employees, subject to certain minimum work requirements, are eligible to enroll for dental insurance provided by Aetna (the "Aetna Dental Plan").  The insurance premiums associated with both the Aetna Plan and the Aetna Dental Plan are entirely funded by the employees who decide to enroll.  As such, as of the Commencement Date, the Debtors have no outstanding liability on account of the Aetna Plan or the Aetna Dental Plan.  However, as of the Commencement Date, the Debtors have withheld, but have not yet remitted to Aetna, certain amounts from the enrolled Employees' wages in the aggregate amount of $49,630.[6]

---

[5] The Vision Insurance Plan is provided through the Debtors' contract with Guardian.

[6] This amount also includes premiums withheld on account of the Aetna Life Insurance Plan (as described herein).

## B.    Life and AD&D Insurance

32.    The Debtors maintain basic life and accidental death and dismemberment coverage (the "Life and AD&D Insurance") for all Salaried Employees.  This coverage includes a company-paid life and AD&D insurance benefit up to $100,000 of coverage.  The insurance is provided through Guardian.  The Debtors pay approximately $144,000 per year to maintain this coverage.  As of the Commencement Date, the accrued and unpaid prepetition amounts owing on account of the Life and AD&D Insurance is $12,500.

33.    For Hourly Store Employees and APAs, the Debtors maintain a basic life insurance plan through Aetna (the "Aetna Life Insurance Plan").  The Aetna Life Insurance Plan offers a life insurance benefit of up to $20,000.  Premiums associated with the Aetna Life Insurance Plan are paid entirely by the covered employees.

## C.    Paid Time Off Benefits

34.    Under the PTO Plans, Employees are eligible, in certain circumstances, to receive their full wages for, among other things, vacation, personal days and holidays (the "PTO Obligations").  Eligible Employees either accrue or are awarded paid time off in the manner described below.

### (i)    Paid Time Off

35.    Generally, Hourly Employees are not eligible to receive paid time off ("PTO").  DC Hourly Employees, as well as APAs and APALs, however, are eligible for awards of PTO days.  DC Hourly Employees, following ninety (90) days of continuous employment with the Debtors, are awarded one (1) day of PTO.  For the nine (9) months following a DC Hourly Employee's first ninety (90) days of employment, DC Hourly Employees accrue one (1) PTO day per month for a total of ten (10) PTO days in their first year of employment.

Thereafter, DC Hourly Employees accrue 0.83 PTO days per month, which aggregates to ten (10) total PTO days awarded each year.

36.     Salaried Employees, APAs and APALs[7] are eligible for awards of paid time off.  Pursuant to the Debtors' policy, each year, on February 1 and August 1, eligible employees are awarded paid time off.  The awards are based on the Employee's tenure with the company, and are prorated based on the number of months worked prior to the award date (if the Employee did not work the full six month period).  Eligible Employees employed by the Debtors for up to two (2) years receive up to ten (10) PTO days, awarded five (5) on February 1 and five (5) on August 1.  Eligible Employees employed by the Debtors for more than two (2) years receive up to twelve (12) PTO days, awarded six (6) on February 1 and six (6) on August 1. Eligible Employees employed by the Debtors for more than five (5) years receive up to fifteen (15) PTO days, awarded seven (7) on February 1, and eight (8) on August 1.  Finally, eligible Employees employed by the Debtors for more than ten (10) years receive up to twenty (20) PTO days; awarded ten (10) on February 1, and ten (10) on August 1.[8]  In general, paid time off awarded to eligible Employees expires at the end of every fiscal year on January 31.  In certain states, where, by law, paid time off cannot expire, a cap is placed on the maximum number of days of paid time off an employee may carry at any one time.  The cap is equivalent to the maximum number of days an employee is eligible to be awarded in one year plus five (5) additional PTO days.

---

[7] APAs and APALs are paid on an hourly basis.

[8] Employees who begin work on or after the 15th of the month do not receive PTO awards for that month.

### (ii)    Personal Days

37.    Salaried Employees are eligible to receive awards of personal days after 30 days of employment.  On February 1 of every year, an award of up to five (5) personal days is made to eligible employees, depending on the month in which the employee began their employment with the Debtors.  Awarded but unused personal days expire at the end of every fiscal year on January 31.

### (iii)    Other Paid Time Off

38.    The Debtors also maintain paid time off programs for certain holidays. The Debtors are not aware of any accrued and unpaid obligations relating to this program.

39.    In addition, certain store managers are awarded comp days for working six days per week during holiday seasons.  In 2007, four (4) total comp days were awarded.  The comp days expire within six months.  The Debtors are not aware of any awarded but unused comp days still outstanding.

40.    Because the benefits provided pursuant to the PTO Plans are essential features of the Debtors' employment package provided to Employees, and failure to provide these benefits could harm Employee morale and encourage the premature departure of the Employees, the Debtors request authority to honor all PTO Obligations as and when they come due.

## D.    Disability Benefits

41.    The Debtors maintain both short- and long-term disability insurance plans. Under the Debtors' voluntary long-term disability plan, which is administered by Guardian and funded entirely by the Debtors, an Employee is eligible to receive benefits if the Employee has been disabled for more than 180 consecutive calendar days.  Under the long-term disability plan, eligible Employees receive 60% of their monthly compensation up to a maximum of $6,000 per

month if the Employee earns less than $100,000 per year or up to a maximum of $10,000 per month if the Employee earns more than $100,000 per year, from the 180th day following the start of their disability to the end of their disability. All Salaried Employees are immediately eligible for participation in the long-term disability plan. As of the Commencement Date, the Debtors believe that approximately $11,500 is owed to Guardian on account of the long-term disability plan.

42.     The Debtors also maintain a short-term disability insurance program, which is administered by Guardian. All Salaried Employees are immediately eligible to participate in the program. Hourly Employees employed in New York, New Jersey and California are also immediately eligible for short-term disability coverage. Under the short-term disability plan, eligible Employees receive disability benefits of up to 60% of their weekly earnings, up to a maximum of $750 per week if the Employee earns less than $100,000 per year or $1,000 per week if the Employee earns more than $100,000, for the first six (6) months of a qualified disability. As of the Commencement Date, the Debtors believe that approximately $13,500 is owed to Guardian on account of the short-term disability plan.

43.     Lastly, the Debtors maintain, as required pursuant to New York law, a short-term disability policy for all New York Employees (the "New York Disability Policy"). The New York Disability Policy is provided by National Benefit Life Insurance Company, and provides a disability benefit of up to 60% of an Employee's weekly earnings, up to a maximum of $170 per week, for up to six (6) months of a qualified disability. The Debtors pay approximately $2.00 per eligible Employee per quarter. As of the Commencement Date, the Debtors do not have any accrued and unpaid amounts due on account of the New York Disability Policy.

### E.    401(k) Plan

44.    The Debtors maintain a retirement and savings plan pursuant to section 401 of the Internal Revenue Code (the "401(k) Plan").  All Employees employed by the Debtors for at least one (1) year are eligible to participate in the 401(k) Plan.  Those Employees who are eligible and participate in the 401(k) Plan may contribute up to 20% of their annual compensation up to statutorily prescribed dollar amounts.  The Debtors do not match contributions made by eligible and participating Employees.

45.    The Debtors deposit Employee contributions with the trustee of the 401(k) Plan no more than three (3) business days after the Domestic Employee Obligations are satisfied (the "401(k) Plan Obligations").  As of the Commencement Date, the accrued and unpaid prepetition 401(k) Plan Obligations aggregate to approximately $13,200.  State Street Bank administers the 401(k) Plan, but is not compensated directly by the Debtors.  As such, the Debtors have no outstanding administrative obligations with respect to the 401(k) Plan.

### F.    College 529 Plan

46.    The Debtors also maintain the College 529 Plan – a tax advantaged education savings plan established pursuant to section 529 of the Internal Revenue Code.  Under the College 529 Plan, all employees are eligible to contribute to a savings plan with certain tax benefits up to certain statutorily prescribed contribution limits.  Post-tax deductions are deposited into an account and earnings accumulate on a tax free basis and can then be used towards a post-secondary education for any individual, including the Employee-contributor.  The College 529 Plan is administered by ADP.  ADP receives a monthly fee for administering the College 529 Plan.  Company wide, approximately only five (5) Employees participate in the College 529 Plan, and, as such, ADP's monthly fee is nominal.  As of the Commencement Date,

approximately $5,400 has been withheld from Employees' wages but remains unpaid to ADP on account of the College 529 Plan.

### G.     **Employee Assistance Program**

47.     The Debtors also maintain an Employee Assistance Program, which is administered by Behavioral Health, and provides a resource for employees seeking help during times of personal crisis, in addition to providing counseling on parenting, care giving, and other personal matters. The EAP is provided to the Debtors through the Debtors' contract with Guardian, and, as such, there are no outstanding administrative or other fees owed to Behavioral Health on account of the EAP.

### H.     **Commuter Benefit Program**

48.     Administered by ADP, the Commuter Benefit Program allows Employees to use pre-tax earnings to pay, on a monthly basis, parking or public transportation costs. A significant number of the Employees participate in the Commuter Benefit Program. Money is deducted from a participating Employee's first paycheck of each month and a transit check is sent to such Employee in exchange. Given that a substantial portion of the Debtors' stores are located in places where public transportation is frequently used, the Debtors regard this benefit as essential to curb, or even prevent, absenteeism. In 2007, Employee deductions on account of the Commuter Benefit Program totaled approximately $67,740. As of the Commencement Date, no amounts are outstanding on account of the Commuter Benefit Program.

49.     Importantly, the benefit to the Debtors' employees of the Commuter Benefit Program substantially outweighs the costs to the Debtors. Although the Debtors pay ADP a $230 administrative fee per month, this fee is entirely offset by matching tax savings to the Debtors, resulting in no net fee. Given the substantial economic benefits received by both the

Debtors and their Employees through the Commuter Benefit Plan, the Debtors request authority to continue the Commuter Benefit Program postpetition.

### I.   <u>Severance Plan</u>

50.   The Debtors maintain a Severance Plan for the benefit of Salaried Employees and DC Hourly Employees.  The Severance Plan provides severance benefits to eligible Employees whose employment with the Debtors is terminated in connection with a layoff and who satisfy certain other eligibility requirements.  The severance benefit paid to Salaried Employees in connection with the Severance Plan is equivalent to one (1) week of pay for every full year of service the eligible Employee has completed with the Debtors, with a minimum severance benefit of two (2) weeks of pay.  For DC Hourly Employees, the severance benefit is equivalent to one (1) week of pay for every full year of service the eligible DC Hourly Employee has completed with the Debtors, with a minimum severance benefit of one (1) week of pay.  To receive the severance benefit, each eligible Employee must execute and sign a separation agreement and general release provided by the Debtors.  While the Debtors currently have no outstanding obligations on account of the Severance Plan, the Debtors seek to continue the Severance Plan postpetition and to provide any eligible Employees thereunder with a severance benefit in the event such Employee's employment with the Debtors is terminated.

### III.   <u>Total Employee Obligations</u>

51.   Based upon the foregoing, the Debtors believe that the aggregate amount of all Employee Obligations, as of the Commencement Date, does not exceed $5,600,000.

<b>Cause Exists to Authorize the<br>Payment of the Debtors' Employee Obligations</b>

52.   Pursuant to sections 507(a)(4)(A) of the Bankruptcy Code, claims of Employees of the Debtors for "wages, salaries, or commissions, including vacation, severance,

and sick leave pay" earned within 180 days before the Commencement Date are afforded priority unsecured status to the extent of $10,950 per Employee.  Similarly, section 507(a)(5) of the Bankruptcy Code provides that Employees' claims for contributions to certain employee benefit plans also are afforded priority unsecured status to the extent of $10,950 per Employee covered by such plan, less any amount paid pursuant to section 507(a)(4).

53.     Furthermore, section 363(b)(1) of the Bankruptcy Code provides, in pertinent part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Section 105(a) of the Bankruptcy Code further provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.  No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

54.     The Debtors believe that most of the Employee Obligations relating to the period prior to the Commencement Date constitute priority claims under sections 507(a)(4) and (5) of the Bankruptcy Code.  As priority claims, the Employee Obligations must be paid in full before any general unsecured obligations of the Debtors may be satisfied.  Accordingly, the relief requested may affect only the timing of the payment of these priority obligations and will not prejudice the rights of general unsecured creditors or other parties in interest.  Indeed, as of the Commencement Date, the Debtors believe that no Employees are owed in excess of $10,950 on account of prepetition wages.

55.     Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this

title."  11 U.S.C. § 105(a).  Moreover, section 363(b)(1) of the Bankruptcy Code provides "[t]he

trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate."  11 U.S.C. § 363(b)(1).

56.     A bankruptcy court's use of its equitable powers to "authorize the

payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the

Debtors is not a novel concept."  In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr.

S.D.N.Y. 1989).  "Under Section 105, the court can permit pre-plan payment of a pre-petition

obligation when essential to the continued operation of the Debtors."  In re NVR L.P., 147 B.R.

126, 127 (Bankr. E.D. Va. 1992) (citing Ionosphere Clubs, 98 B.R. at 177).  See also In re Just

for Feet, Inc., 242 B.R. 821 (D. Del. 1999) (court is authorized under section 105(a) to allow

immediate payment of prepetition claims of vendors found to be critical to the Debtors'

reorganization, citing In re Penn Central Transp. Co., 486 F.2d 519 (3d Cir. 1973)); In re

Columbia Gas Sys. Inc., 171 B.R. 189 (Bankr. D. Del. 1994) (noting that, in the Third Circuit,

Debtors may pay prepetition claims that are essential to continued operation of their business).

57.     The "necessity of payment" doctrine "recognizes the existence of the

judicial power to authorize a Debtor in a reorganization case to pay prepetition claims where

such payment is essential to the continued operation of the Debtors."  In re Ionosphere Clubs,

Inc., 98 B.R. at 176 (Bankr. S.D.N.Y. 1989) (authorizing the payment of prepetition employee

wages and benefits); see also Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp.

(In re Chateaugay Corp.), 80 B.R. 279, 285-86 (S.D.N.Y. 1987), appeal dismissed 838 F.2d 59

(2d Cir. 1988) (approving lower court order authorizing payment of prepetition wages, salaries,

expenses, and benefits).  This doctrine is consistent with the paramount goal of chapter 11 of

"facilitating the continued operation and rehabilitation of the Debtors." <u>Ionosphere Clubs</u>, 98 B.R. at 176.

58.     In this case, any delay or failure to pay wages, salaries, benefits, and other similar items would irreparably impair the Employees' morale, dedication, confidence, and cooperation, and would adversely impact the Debtors' relationship with their Employees at a time when the Employees' support is critical to Debtors' chapter 11 cases. At this early stage, the Debtors simply cannot risk the substantial damage to their businesses that would inevitably attend a rapid decline in their Employees' morale.

59.     Absent a grant of the relief requested herein, the Employees will suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable the Employees to meet their own personal financial obligations. Without the requested relief, the stability of the Debtors will be undermined, perhaps irreparably, by the distinct possibility that otherwise loyal Employees will seek other employment alternatives. In addition, it would be inequitable to require the Debtors' Employees to bear personally the cost of any business expenses they incurred prepetition, for the benefit of the Debtors, with the understanding that they would be reimbursed.

60.     With respect to Employer Payroll Tax Obligations in particular, the payment of such taxes will not prejudice other creditors of the Debtors' estates, as the relevant Taxing Authorities generally would hold priority claims under section 507(a)(8) of the Bankruptcy Code in respect of such obligations. Moreover, the portion of the payroll taxes withheld from an Employee's wages on behalf of the applicable Taxing Authority is held in trust by the Debtors. As such, these Trust Fund Taxes are not property of the Debtors' estate under section 541 of the Bankruptcy Code. <u>See</u>, <u>e.g.</u>, <u>Begier v. IRS</u>, 496 U.S. 53 (1990) (withholding

taxes are property held by a Debtors in trust for another and, as such, are not property of the Debtors' estate).

61.     In addition, the Debtors believe it is necessary to continue payment of administrative fees to the various administrators that administer the Debtors' Employee Obligations and related Employee Benefit Plans.  Without the continued services of these administrators, including, but not limited to, ADP, Aetna, and BlueCross BlueShield, the Debtors will be unable to continue to honor their Employee Obligations and related Employee Benefit Plans in an efficient and cost-effective manner.

62.     The Debtors do not seek to alter their compensation, vacation, or other benefit policies at this time.  This Motion is intended only to permit the Debtors, in their discretion, to make payments consistent with the Debtors' existing policies to the extent that, without the benefit of an order approving this Motion, such payments may be inconsistent with the relevant provisions of the Bankruptcy Code, and to permit the Debtors, in their discretion, to continue to honor their practices, programs, and policies with respect to their Employees, as such practices, programs, and policies were in effect as of the Commencement Date.  Payment of all Employee Obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors' estates, their creditors, and all parties in interest and will enable the Debtors to continue to operate their business in an economic and efficient manner without disruption.  The Debtors' Employees are central to their operations and are vital to these chapter 11 cases.  A significant deterioration in employee morale at this critical time undoubtedly would have a devastating impact on the Debtors, their customers and vendors, and the value of the Debtors' assets and business.  The total amount sought to be paid herein is relatively modest

compared with the size of the Debtors' overall business and the importance of the Employees to the Debtors' chapter 11 cases.

63.     In other chapter 11 cases, courts in this district have approved payment of prepetition claims for compensation, benefits, and expense reimbursements similar to those described herein.[9] See, e.g., In re Lexington Precision Corp., Case No. 08-11153 (MG) (Bankr. S.D.N.Y. April 22, 2008) [Docket No. 27]; In re Fortunoff Fine Jewelry and Silverware, LLC, Case No. 08-10353 (JMP) (Bankr. S.D.N.Y. Feb. 29, 2008) [Docket No. 302]; (Bankr. S.D.N.Y. Feb. 5, 2008) [Docket No. 44]; In re PRC, LLC, Case No. 08-10239 (MG) (Bankr. S.D.N.Y. Jan. 24, 2008) [Docket No. 27]; Quebecor World (USA) Inc., Case No. 08-10152 (JMP) (Bankr. Jan. 23, S.D.N.Y. 2008) [Docket No. 41]; In re Silicon Graphics, Inc., Case No. 06-10977 (BRL) (Bankr. S.D.N.Y. May 31, 2006) [Docket No. 146], (Bankr. S.D.N.Y. May 10, 2006) [Docket No. 51]; In re Atkins Nutritionals, Inc., et al., Case No. 05-15913 (ALG) (Bankr. S.D.N.Y. Aug. 1, 2005) [Docket No. 31]; In re Footstar, Inc., et al., Case No. 04-22350 (ASH) (Bankr. S.D.N.Y. Mar. 3, 2004) [Docket No. 58].

64.     The Debtors' submit the facts cited herein illustrate that the relief requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates. Based on the foregoing, Bankruptcy Rule 6003 has been satisfied.

---

[9] Because of the voluminous nature of the unreported orders cited herein, they are not annexed to this Motion.  Copies of these orders are available upon request of Debtors' counsel, including at the hearing to consider the Motion.

65.     Furthermore, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the stay of the order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).[10]

### Applicable Banks Should be Authorized
### to Honor and Pay Checks Issued and Make
### Other Transfers to Pay the Employee Obligations

66.     As a result of the commencement of the Debtors' chapter 11 cases, and in the absence of an order of the Court providing otherwise, the Banks may reject or dishonor the Debtors' checks, wire transfers and direct deposit transfers with respect to prepetition Employee Obligations.  Therefore, the Debtors request that the Court authorize the Banks listed on <u>Exhibit B</u> hereto, and any other bank authorized by the Court to administer the Debtors' bank accounts under the Cash Management Motion[11] to receive, process, honor, and pay all prepetition and postpetition checks issued by the Debtors, and funds transfers requested by the Debtors, in each case, with respect to the Domestic Employee Obligations.  The Debtors also seek authority to issue new postpetition checks, or effect new funds transfers, on account of prepetition Domestic Employee Obligations to replace any prepetition checks or funds transfer requests that may be dishonored or rejected.

67.     The Debtors represent that each of these checks or transfers is or will be drawn on the Debtors' Disbursement Accounts and can be readily identified as relating directly

---

[10] Bankruptcy Rule 6004(h) is an interim bankruptcy rule adopted pursuant to standing General Order M-308 of the United States Bankruptcy Court for the Southern District of New York, signed on October 11, 2005 by Chief Judge Stuart M. Bernstein.

[11] Simultaneously herewith, the Debtors filed the Motion Pursuant to Sections 105(a), 345(b), 363(b), 363(c) and 364(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 for (A) Authorization to (i) Continue Using Existing Centralized Cash Management System, (ii) Honor Certain Prepetition Obligations Related to the Use of the Cash Management System; and (iii) Maintain Existing Bank Accounts and Business Forms, and (B) an Extension of Time to Comply with Section 345(b) of the Bankruptcy Code (the "<u>Cash Management Motion</u>").

to payment of the Employee Obligations.  The Debtors believe that prepetition checks and transfers, other than those for Domestic Employee Obligations, or those authorized by another order of the Court, will not be honored inadvertently.

68.     Authorization to pay all amounts on account of prepetition Employee Obligations shall not be deemed to constitute postpetition assumption or adoption of any contract, program, or policy pursuant to section 365 of the Bankruptcy Code.  The Debtors are in the process of reviewing these matters and reserve all of their rights under the Bankruptcy Code with respect thereto.  Moreover, authorization to pay all amounts in respect of prepetition Employee Obligations shall not affect the Debtors' right to contest the amount or validity of any Employee Obligation, including without limitation, the Payroll Taxes that may be due to any Taxing Authority.

## Memorandum of Law

69.     Pursuant to Local Bankruptcy Rule for the Southern District of New York 9013-1(b), because there are no novel issues of law presented herein, the Debtors respectfully request that the Court waive the requirement that the Debtors file a memorandum of law in support of this Motion.

## Notice

70.     No trustee, examiner, or creditors' committee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion on (i) the Office of the United States Trustee for the Southern District of New York, (ii) counsel to the agents for the Debtors' prepetition lenders, and (iii) those creditors holding the thirty largest unsecured claims against the Debtors' estates (on a consolidated basis).  The Debtors submit that no other or further notice need be provided.

71.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully requests that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: July 9, 2008
        New York, New York

/s/ Lori R. Fife
Harvey R. Miller
Lori R. Fife
Shai Y. Waisman
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

# EXHIBIT A

## Schedule of Benefit Plans

| Type of Coverage | Company | Policy Period | Policy # |
|---|---|---|---|
| Medical | Aetna Life Insurance Company | Dec 2007-Nov 2008 | 800911 |
| Medical | Empire BlueCross BlueShield | June 2008 - May 2009 | 376775 |
| Dental | The Guardian Insurance Company of America | August 2008 - July 2009 | G-00395630-FC |
| Dental | Aetna Life Insurance Company | Dec 2007-Nov 2008 | 800911 |
| Vision | Vision Insurance Plan | August 2008 - July 2009 | G-00395630-FC (under Guardian) |
| Long- and Short-Term Disability | The Guardian Insurance Company of America | August 2008 - July 2009 | G-00395630-FC |
| Life / AD&D Insurance | The Guardian Insurance Company of America | August 2008 - July 2009 | G-00395630-FC |
| Life Insurance | Aetna Life Insurance Company | Dec 2007-Nov 2008 | 800911 |
| 401(k) Plan | State Street Bank | n/a | 700075 |
| College 529 Plan | ADP | n/a | 850764 |
| Commuter Benefit Program | ADP | n/a | n/a |
| Employee Assistance Program | Behavioral Health | August 2008 - July 2009 | G-00395630-FC (under Guardian) |

# EXHIBIT B

## Banks

| BANK | ACCOUNT TYPE |
|---|---|
| Cathay Bank<br>800 W. 6th Street<br>Los Angeles, CA 90017<br>Attn: Louise Yeh | Master Operating Account, payroll accounts, transit check account, lockbox accounts, money market accounts |
| Bank of China, Shanghai Branch, Changing Sub branch<br>Room 709, No. 2201<br>Yanan Road (W)<br>Shanghai, China<br>Attn: Zhao Peiling | Operating account |
| PICIC Commercial Bank Ltd.<br>27-A Business Arcade<br>P.E.C.h.S., Block-6<br>Karachi, Pakistan<br>Attn: Syed Muhammed Azeem | Operating account |
| Jordan National Bank<br>Chamber of Industry Building<br>Branch, 2nd Circle<br>Amman – Jordan<br>Attn: Abdalhakem Alnsor<br>Fax: 962-6-4649564 | Operating account |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
:
In re                                    :          **Chapter 11 Case No.**
:
**STEVE & BARRY'S**                      :
**MANHATTAN LLC, <u>et</u> <u>al.</u>,** :          **___ - _____ (   )**
:
        **Debtors.**                     :          **(Jointly Administered)**
:
------------------------------------------------------------x

**ORDER PURSUANT TO SECTIONS 105(a) AND
363(b) OF THE BANKRUPTCY CODE AND BANKRUPTCY
RULES 6003 AND 6004 (i) AUTHORIZING, BUT NOT DIRECTING,
PAYMENT OF WAGES, COMPENSATION, AND EMPLOYEE BENEFITS,
AND (ii) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND
<u>PROCESS CHECKS AND TRANSFERS RELATED TO SUCH OBLIGATIONS</u>**

Upon the motion, dated July 9, 2008 (the "<u>Motion</u>"), of Steve & Barry's

Manhattan LLC and its debtor affiliates, as debtors and debtors in possession, (together, the

"<u>Debtors</u>"), the Debtors are seeking authorization, pursuant to sections 105(a) and 363(b) of

title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rule 6003 of the Federal Rules

of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), to pay wages, compensation, and all other

Employee Obligations[1] and authorizing financial institutions to honor and process checks and

transfers related to such obligations, all as more fully described in the Motion; and the Court

having jurisdiction to consider the Motion and the relief requested therein in accordance with 28

U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the

Southern District of New York Any and All Proceedings Under Title 11, dated July 10, 1984

(Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the
Motion.

core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been

provided to (i) the United States Trustee for the Southern District of New York (the "U.S.

Trustee"), (ii) counsel to the agents for the Debtors' prepetition lenders, and (iii) those creditors

holding the thirty largest unsecured claims against the Debtors' estates (on a consolidated basis),

and it appearing that no other or further notice need be provided; and a hearing having been held

to consider the relief requested in the Motion (the "Hearing"); and the appearances of all

interested parties having been noted in the record of the Hearing; and upon the Affidavit of Gary

Sugarman Pursuant to Rule 1007-2 of the Local Bankruptcy Rules of the Southern District of

New York in Support of the First-Day Motions and Applications, sworn to on July 9, 2008, the

record of the Hearing, and all of the proceedings had before the Court; and the Court having

found and determined that the relief sought in the Motion is in the best interests of the Debtors,

their estates and creditors, and all parties in interest and that the legal and factual bases set forth

in the Motion establish just cause for the relief granted herein; and after due deliberation and

sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that pursuant to sections 105(a) and 363(b) of the Bankruptcy Code,

the Debtors are authorized, but not directed, to continue to honor existing practices, programs,

and policies with respect to their Employees as such practices, programs, and policies were in

effect as of the date of the commencement of the Debtors' chapter 11 cases; and it is further

ORDERED that pursuant to sections 105(a) and 363(b) of the Bankruptcy Code,

the Debtors are authorized, but not required, to make all payments with respect to prepetition

Employee Obligations in the amounts described in the Motion with respect to such Employee

Obligations (including, but not limited to, the obligations arising from the plans listed on Exhibit A annexed hereto), and in accordance with the Debtors' prepetition practices and policies; and it is further

ORDERED that the banks set forth on Exhibit B annexed hereto and any other bank authorized to administer the Debtors bank accounts under the Cash Management Motion (the "Banks") shall be, and hereby are authorized, when the Debtors request in the Debtors' sole discretion, to receive, process, honor and pay any and all checks drawn on the Debtors' payroll or disbursement accounts and any other transfers that are related to the prepetition Employee Obligations and the costs and expenses incidental thereto, whether those checks were presented prior to or after the Commencement Date, provided that sufficient funds are available in the accounts to make such payments; and it is further

ORDERED that any Bank may rely on the representations of the Debtors with respect to whether any check or other transfer drawn or issued by the Debtors prior to the Commencement Date should be honored pursuant to this Order, and such Bank shall not have any liability to any party for relying on such representations by the Debtors as provided for herein; and it is further

ORDERED that the Debtors are authorized (consistent with this Order) to issue postpetition checks or to effect postpetition funds transfer requests in replacement of any checks or funds transfer requests related to Domestic Employee Obligations dishonored or rejected as a consequence of the commencement of the Debtors' chapter 11 cases; and it is further

ORDERED that nothing in the Motion shall be deemed a request by the Debtors for authority to assume, and nothing in this Order shall be deemed authorization or approval to

assume, any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code; and it is further

ORDERED that nothing in the Motion or this Order shall be construed as impairing the Debtors' right to contest the validity or amount of any Employee Obligation, including without limitation any taxes that may be due to any Taxing Authority; and it is further

ORDERED that Bankruptcy Rule 6003(b) has been satisfied; and it is further

ORDERED that notwithstanding any applicability of Bankruptcy Rules 6004(h),[2] 7062, or 9014, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rules 4001(d) and 6004(a) are waived; and it is further

ORDERED that within three (3) business days after entry of this Order, the Debtors shall serve a copy of this Order on (i) the U.S. Trustee, (ii) counsel to the agents for the Debtors' prepetition lenders, and (iii) those creditors holding the thirty (30) largest unsecured claims against the Debtors' estates(on a consolidated basis); and it is further

ORDERED that the requirement set forth in Local Bankruptcy Rule 9013-1(b) for the filing of a separate memorandum of law in support of the Motion is waived.

Dated:  July __, 2008
        New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

---

[2] Bankruptcy Rule 6004(h) is an interim bankruptcy rule adopted pursuant to standing General Order M-308 of the United States Bankruptcy Court for the Southern District of New York, signed on October 11, 2005 by Chief Judge Stuart M. Bernstein.

## EXHIBIT A

### Schedule of Benefit Programs

| Type of Coverage | Company | Policy Period | Policy # |
|---|---|---|---|
| Medical | Aetna Life Insurance Company | Dec 2007-Nov 2008 | 800911 |
| Medical | Empire BlueCross BlueShield | June 2008 - May 2009 | 376775 |
| Dental | The Guardian Insurance Company of America | August 2008 - July 2009 | G-00395630-FC |
| Dental | Aetna Life Insurance Company | Dec 2007-Nov 2008 | 800911 |
| Vision | Vision Insurance Plan (provided through Guardian) | August 2008 - July 2009 | G-00395630-FC (under Guardian) |
| Long- and Short-Term Disability | The Guardian Insurance Company of America | August 2008 - July 2009 | G-00395630-FC |
| Life / AD&D Insurance | The Guardian Insurance Company of America | August 2008 - July 2009 | G-00395630-FC |
| Life Insurance | Aetna Life Insurance Company | Dec 2007-Nov 2008 | 800911 |
| 401(k) Plan | State Street Bank | n/a | 700075 |
| College 529 Plan | ADP | n/a | 850764 |
| Commuter Benefit Program | ADP | n/a | n/a |
| Employee Assistance Program | Behavioral Health | August 2008 - July 2009 | G-00395630-FC (under Guardian) |

# EXHIBIT B

## Banks

| BANK | ACCOUNT TYPE |
|------|-------------|
| Cathay Bank<br>800 W. 6th Street<br>Los Angeles, CA 90017<br>Attn: Louise Yeh | Master Operating Account, payroll accounts, transit check account, lockbox accounts, money market accounts |
| Bank of China, Shanghai Branch, Changing Sub branch<br>Room 709, No. 2201<br>Yanan Road (W)<br>Shanghai, China<br>Attn: Zhao Peiling | Operating account |
| PICIC Commercial Bank Ltd.<br>27-A Business Arcade<br>P.E.C.h.S., Block-6<br>Karachi, Pakistan<br>Attn: Syed Muhammed Azeem | Operating account |
| Jordan National Bank<br>Chamber of Industry Building<br>Branch, 2nd Circle<br>Amman – Jordan<br>Attn: Abdalhakem Alnsor<br>Fax: 962-6-4649564 | Operating account |