WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Harvey R. Miller
Lori R. Fife
Shai Y. Waisman

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | : | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **STEVE & BARRY'S** | : | |
| **MANHATTAN LLC, et al.,** | : | **___ - _____ (  )** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

---------------------------------------------------------------x

**DEBTORS' MOTION PURSUANT TO SECTIONS 105(a), 345(b), 363(b), 363(c) AND
364(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6003 AND 6004 (A)
FOR AUTHORIZATION TO (i) CONTINUE USING EXISTING CENTRALIZED CASH
MANAGEMENT SYSTEM, AS MODIFIED, (ii) HONOR CERTAIN PREPETITION
OBLIGATIONS RELATED TO THE USE OF THE CASH MANAGEMENT SYSTEM,
AND (iii) MAINTAIN EXISTING BANK ACCOUNTS AND BUSINESS FORMS; (B)
FOR AN EXTENSION OF TIME TO COMPLY WITH SECTION 345(b) OF THE
BANKRUPTCY CODE, AND (C) TO SCHEDULE A FINAL HEARING**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Steve & Barry's Manhattan LLC and its debtor affiliates, as debtors and debtors

in possession (collectively, "Steve & Barry's" or the "Debtors"), respectfully represent:

**Background**

1.      On the date hereof (the "Commencement Date"), the Debtors each

commenced with this Court a voluntary case under chapter 11 of title 11 of the United States

Code (the "Bankruptcy Code").  The Debtors are authorized to operate their businesses and

manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.     Contemporaneously herewith, the Debtors filed a motion seeking joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

<b><u>Steve and Barry's Business</u></b>

3.     Steve & Barry's is a specialty retailer of apparel and accessories that provides consumers with quality low-priced apparel.  Founded in 1985, Steve & Barry's has grown exponentially from an original store in Philadelphia, Pennsylvania to 276 stores located throughout the United States.   Many Steve & Barry's retail locations serve economically challenged areas that other retailers have abandoned because of household income levels, population trends or crime rates.  During the course of its expansion, Steve & Barry's has diversified its business beyond its original line of university apparel, and its products currently fall broadly into three categories: (i) licensed university apparel and lifestyle brands, (ii) private-label casual clothing and accessories for men, women and children, and (iii) exclusive celebrity branded lines of apparel and accessories.

4.     Steve & Barry's offers quality apparel and accessories at dramatically lower prices than typically found for similar goods from other specialty retailers, and in a more upscale, customer-friendly store design.  Steve & Barry's achieves this by operating stores with low occupancy costs, and by relying mostly upon word of mouth and news stories, rather than paid print or other advertising, resulting in significant cost savings.  Steve & Barry's keeps its costs low by maintaining overseas offices and purchasing most merchandise directly from their sources without intermediaries.  The savings realized through each strategy are then passed on to

Steve & Barry's customers in the form of low prices. Almost all items in Steve & Barry's retail locations are priced at $9.98 or less.

5. As of May 31, 2008, Steve & Barry's (including nondebtor affiliates) consolidated assets totaled approximately $693.5 million and recorded consolidated liabilities totaled approximately $638 million. Consolidated revenues for the twelve months ended May 31, 2008, were approximately $656.6 million. Steve & Barry's currently employs, either directly or through its non-debtor affiliates, approximately 8,600 domestic employees and 1,100 international employees. Approximately 7,300 of the domestic employees are part-time hourly employees and 1,300 are full-time salaried employees.

## Jurisdiction and Venue

6. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

7. To efficiently and seamlessly manage their businesses, the Debtors utilize a centralized cash management system (the "Cash Management System") to collect and transfer the funds generated by sales at their retail locations and disburse those funds to satisfy the obligations required to operate their businesses. The Cash Management System facilitates the Debtors' cash monitoring, forecasting, and reporting, and enables the Debtors to maintain control over the administration of their bank accounts (the "Bank Accounts") located at the banks (the "Banks") listed on Exhibit A annexed hereto.

8. By this Motion, pursuant to sections 105(a), 345(b), 363(b), 363(c), and 364(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, the Debtors request (i)

authority to continue to operate the Cash Management System on a modified basis to effectuate their use of their prepetition lenders' cash collateral, (ii) an extension of time to comply with section 345(b) of the Bankruptcy Code, and pending such compliance or other agreement of the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), to maintain existing Bank Accounts, (iii) authority to honor certain prepetition obligations related to the use of the Cash Management System, (iv) authority to maintain existing business forms, and (v) to schedule a final hearing granting the relief requested herein on a final basis.

## I.

## The Cash Management System

9.　　The Debtors are party, among other things, to a Credit Agreement, dated as of February 1, 2008 (the "Prepetition Credit Facility") with General Electric Capital Corporation ("GECC"), as agent, letter of credit issuer and lender, and other lenders party thereto (collectively, the "Prepetition Secured Lenders"), pursuant to which the Prepetition Secured Lenders provided the Debtors with a revolving line of credit and a swing line of credit (the "Revolver") to fund their operations.

10.　　Prior to the Commencement Date, the Debtors' ability to borrow funds under the Revolver was subject to certain availability formulas based on the level of the Debtors' accounts receivable and inventories.  On a daily basis, the Debtors drew against the Revolver to pay their payables, cover wire transfers, and meet other day-to-day cash needs and, in turn, collections on the Debtors' sales and Tenant Allowances (as defined below) were used to pay down the Revolver.

11.　　In the ordinary course of business prior to the Commencement Date, the Debtors used the Cash Management System, which is similar to those utilized by other large

companies, to efficiently collect, transfer, and distribute funds generated by the Debtors' business operations. In the ordinary course of business, the Debtors accurately recorded such collections, transfers, and disbursements as they were made. The components of the Cash Management System are organized around three principal functions: cash collection, concentration, and disbursements. To provide a general overview of the movement of cash through the Cash Management System, attached, as <u>Exhibit B</u>, is a chart illustrating the flow of funds through the Cash Management System.

**A.** <u>**Cash Collection**</u>

12.     The Debtors generate and receive funds primarily from three sources: (i) cash or check sales of merchandise through their retail locations, (ii) collection of credit card receivables, and (iii) receipt of tenant allowances from landlords in connection with the opening of new retail locations. The Debtors operate 276 retail locations in 37 states. The Debtors accept payment by cash, check or credit card in each of their retail locations. On a daily basis, cash and checks that are collected in each retail location are picked up by armored cars (the "<u>Armored Carriers</u>") and temporarily deposited into deposit accounts (the "<u>Deposit Accounts</u>") at local branches of the Banks. Funds generated from collection of credit card receivables are automatically deposited in lockboxes (the "<u>Lockboxes</u>") located at the Banks. In connection with the Debtors' continued expansion across the United States, the Debtors often receive favorable up-front cash inducements from landlords for leasing retail space that is in need of renovation ("<u>Tenant Allowances</u>"). The Debtors temporarily deposit Tenant Allowances in a separate deposit account (together with the other Deposit Accounts and the Lockboxes, the "<u>Collection Accounts</u>").

**B.**     **Concentration**

13.    In accordance with the terms of blocked account agreements between the Prepetition Secured Lenders and the Banks, funds received into the Collection Accounts (collectively, "Collection Account Funds") are consolidated by each Bank and automatically swept, either on a daily basis or every one or two weeks, depending on the Bank Account, into a concentration account maintained at DeutscheBank Trust Company Americas in New York City in the name of GECC, as agent under the Prepetition Credit Facility (the "Concentration Account"). The Prepetition Secured Lenders then credit these funds against the Revolver, pursuant to the terms of the Prepetition Credit Facility. Only the Prepetition Secured Lenders are able to access the funds in the Concentration Account.

**C.**     **Disbursements**

14.    On a daily basis, the Debtors calculate the funds needed to pay their disbursements and notify the Prepetition Secured Lenders of such amount. Pursuant to the terms of the Revolver, the Prepetition Secured Lenders, subject to availability, wire the requested funds to a master operating account (the "Master Operating Account") at Cathay Bank. The Debtors then make disbursements either directly from the Master Operating Account or by transferring funds to separate accounts, from which disbursements are made.

15.    Domestically, the Debtors pay payroll and issue transit checks by utilizing funds in the Master Operating Account that are transferred to other accounts at Cathay Bank (the "Sub Operating Accounts"). Funds are wired to the payroll Sub Operating Accounts from the Master Operating Account as checks are presented, which usually is daily. Funds are wired to the transit check Sub Operating Account from the Master Operating Account as needed, which usually is once or twice per month.

16.     In their overseas operations, the Debtors make disbursements from bank accounts located in China, Pakistan and Jordan, where the Debtors operate foreign offices (collectively, the "Foreign Accounts").  The Debtors wire funds to the Foreign Accounts from the Master Operating Account on a weekly basis once requests from foreign offices are made based on the amounts needed by such foreign offices to cover operating expenses.

17.     The Debtors fund from the Master Operating Account the operations of their non-debtor affiliates, Unisource Worldwide Private Limited and Superior Universal Private Limited (collectively, "Non-Debtor Affiliates"), which provide support services to the Debtors from offices in India, Thailand, Bangladesh, and Kenya.  Funds to Non-Debtor Affiliates are wired on a weekly basis based on the amounts needed by the Non-Debtor Affiliates to cover operating expenses.

18.     All other disbursements, such as rent, utilities, insurance, capitalized lease payments, taxes, inventory purchases, and the funding of health and welfare benefits, are made directly from the Master Operating Account.

## II.

### Continuation of the Debtors' Centralized Cash Management System, As Modified, Is in the Best Interests of the Debtors, Their Estates, and All Parties in Interest

19.     The Debtors' Cash Management System constitutes an ordinary course, essential business practice providing significant benefits to the Debtors including, inter alia, the ability to (i) control corporate funds, (ii) ensure the availability of funds when necessary, and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information.  Any disruption of the Cash Management System could have a severe and adverse impact upon the Debtors' reorganization efforts.

20.     In connection with the Debtors' Cash Collateral Motion,[1] the Debtors seek authority to use the cash collateral of the Prepetition Secured Lenders.  In connection therewith, the Debtors request that the Court authorize and direct the Banks to commence the automatic transfer of all available funds from the Collection Accounts to the Master Operating Account on a daily basis (or as often as practicable).  Without such relief, because the Debtors do not have access to any of the Collection Accounts, they would not be able to access funds that exist in those accounts today or funds that are received into those accounts after the Commencement Date.

21.     The automatic transfer of cash collateral is necessary to implement the relief requested in the Cash Collateral Motion and will not prejudice the Prepetition Secured Lenders, who have consented to the Debtors' use of cash collateral subject to certain terms and conditions, all as described in said Motion and provided for in the proposed order attached thereto.  Section 362 of the Bankruptcy Code prohibits the Prepetition Secured Lenders from accessing the funds in the Collection Accounts and applying such funds to repay the Revolver. Moreover, pursuant to the Cash Collateral Motion, if granted, the Debtors will provide the Prepetition Secured Lenders with adequate protection for the Debtors' use of cash collateral. Finally, the Debtors will be subject to various restrictions on the use of cash collateral, as set forth in the budget agreed to by the Prepetition Secured Lenders.

22.     Further, the Debtors are requesting authority to honor prepetition intercompany obligations to the Non-Debtor Affiliates.  Most of the Debtors' business process operations, such as accounting, visual merchandising, information technology, and sourcing, are

---

[1] Contemporaneously herewith, the Debtors filed a Motion (A) to (i) Authorize Use of Cash Collateral, (ii) Grant Adequate Protection, and (iii) Modify the Automatic Stay, and (B) to Schedule a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "Cash Collateral Motion").

provided by their Non-Debtor Affiliates. The Non-Debtor Affiliates have no independent source of income and are fully reliant on the Debtors for funding their operations. Failure to honor prepetition obligations to the Non-Debtor Affiliates, which provide essential support and sales services to the Debtors, could have an immediate and significantly adverse effect on the Debtors. Not only could this diminish the value of the Debtors' estates through a reduction in the value of the Debtors' interest in such affiliates, but it could have an immediate and potentially irreparable impact on the operations of the Debtors themselves. For instance, if the Debtors' fail to honor prepetition intercompany obligations to the Non-Debtor Affiliates, such entities may refuse to provide support services to the Debtors and/or may seek protection under local laws. In addition, if such prepetition obligations are not honored, such Non-Debtor Affiliates would be required to institute new cash management structures which would be time consuming and costly, and would result in delayed receipt of customer payments.

23. The Debtors will continue to maintain all receipts and disbursements and records of all transfers within the Cash Management System utilized postpetition. In this way, all transfers and transactions will be properly documented, and accurate intercompany balances will be maintained. As a result, the Debtors will be able to accurately document and record the transactions occurring within the Cash Management System, including intercompany transfers, for the benefit of all parties in interest.

24. The Debtors will maintain their books and records relating to the Cash Management System to the same extent the books and records were maintained before the Commencement Date. Based on the foregoing, the Debtors believe that maintenance of the existing Cash Management System is in the best interests of their estates and all parties in

interest.  Therefore, the Debtors seek authority to maintain and use their Cash Management System during their chapter 11 cases.

25.     Section 363(c)(1) of the Bankruptcy Code authorizes the debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).  The purpose of section 363(c)(1) of the Bankruptcy Code is to provide a debtor in possession with the flexibility to engage in the ordinary course transactions required to operate its business without unneeded oversight by its creditors or the court.  Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne), 114 F.3d 379, 384 (2d Cir. 1997); In re Enron Corp., No. 01-16034 (ALG), 2003 WL 1562202, at *15 (Bankr. S.D.N.Y. Mar. 21, 2003); Chaney v. Official Comm. of Unsecured Creditors of Crystal Apparel, Inc. (In re Crystal Apparel, Inc.), 207 B.R. 406, 409 (S.D.N.Y. 1997).  Included within the purview of section 363(c) is a debtor's ability to continue the "routine transactions" necessitated by a debtor's cash management system.  Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.), 75 F.3d 1447, 1453 (10th Cir. 1996).  Accordingly, the Debtors seek authority under section 363(c)(1) of the Bankruptcy Code to continue the collection, concentration, and disbursement, including intercompany transfers, of cash pursuant to their Cash Management System described above.

26.     The Bankruptcy Code also provides a debtor in possession the freedom to obtain unsecured credit and incur unsecured debt in the ordinary course of business without notice and hearing.  11 U.S.C. § 364(a); see, e.g., In re Amdura Corp., 75 F.3d at 1453 (10th Cir. 1996); LNC Inv., Inc. v. First Fidelity Bank, 247 B.R. 38, 45 (S.D.N.Y. 2000); Mulligan v. Sobiech, 131 B.R. 917, 921 (S.D.N.Y. 1991).  The Debtors, therefore, seek authorization, to the extent necessary, to obtain unsecured credit and incur unsecured debt in the ordinary operation of their Cash Management System.

27.     The Court may exercise its equitable powers to grant the relief requested herein.  Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title."  11 U.S.C. § 105(a). Continuing the Cash Management System is vital to the efficient and economic administration of these chapter 11 cases, and the automatic transfers are necessary to allow meaningful use of the Cash Management System and to effectuate the relief requested in the Cash Collateral Motion. Therefore, it is within the Court's equitable power under section 105(a) to approve the continued use of the Cash Management System, as modified herein.

28.     These procedures are similar to those employed by comparable corporate enterprises.  Moreover, the relief requested herein is routinely granted in other chapter 11 cases.[2] See, e.g., Lexington Precision Corporation, et al., Case No. 08-11153 (MG) (Bankrs. S.D.N.Y. Apr. 2, 2008) [Doc. No. 25]; In re PRC, LLC, Case No. 08-10239 (MG) (Bankr. S.D.N.Y. Jan. 25, 2008) [Docket No. 36]; Silicon Graphics, Inc., et al., Case No. 06-10977 (BRL) (Bankr. S.D.N.Y. May 10, 2006) [Doc. No. 47], (Bankr. S.D.N.Y. July 19, 2006) [Doc. No. 375]; Atkins Nutritionals, Inc., et al., Case No. 05-15913 (ALG) (Bankr. S.D.N.Y. Aug. 1, 2005) [Doc. No. 36]; In re Footstar, Inc. et al., Case No. 04-22350 (ASH) (Bankr. S.D.N.Y. Mar. 3, 2004) [Doc. No. 43], (Bankr. S.D.N.Y. Mar. 31, 2004) [Doc. No. 250]; and In re Loral Space & Commc'ns LTD., et al. Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. July 16, 2003) [Doc. No. 26].  Similar authorization is appropriate in these chapter 11 cases.

---

[2] Because of the voluminous nature of the unreported orders cited herein, they are not annexed to this Motion.  Copies of these orders are available upon request of Debtors' counsel, including at the hearing to consider the Motion.

## III.

### Honoring Certain Prepetition Obligations of the Debtors
### Related to the Cash Management System Is in the Best Interests
### of the Debtors, Their Estates, and All Parties in Interest

29.     In connection with their use of the Cash Management System, the Debtors incur periodic service charges and other fees to the Banks for the maintenance of the Cash Management System (the "Service Charges").  The Debtors believe that there are no unpaid prepetition Service Charges as of the Commencement Date.  However, out of abundance of caution, the Debtors hereby request authority to pay the prepetition Service Charges, if any, that remain unpaid as of the Commencement Date.  Payment of the prepetition Services Charges is in the best interests of the Debtors, their estates and all parties in interest as it will prevent any disruption to the Cash Management System.  Because the Banks have setoff rights with respect to the Service Charges, payment of any prepetition Service Charges would not affect unsecured creditors and the issue of paying any prepetition Service Charges would just be a matter of timing.

30.     In addition, to avoid disruption to the Cash Management System, the Debtors request authority to pay the prepetition obligations owed to the Armored Carriers.  As discussed above, as part of the cash collection process, the Debtors use Armored Carriers to pick up cash from each of their retail locations and deliver it to the Debtors' Banks.  As such, it is crucial to the operation of the Cash Management System that the Debtors be able to use Armored Carriers.  The Debtors currently use eight Armored Carriers, a list of which is set forth on Exhibit C hereto.  As of July 9, 2008, the Debtors owe approximately $191,000.00 to these Armored Carriers for prepetition services.  The Debtors believe there is a high likelihood that the Armored Carriers will stop providing services to the Debtors if their prepetition bills are not paid.  Because there are a limited number of armored carriers that operate in each of the locales

where the Debtors have retail operations, the Debtors believe there is a significant risk that they would not be able to find substitute armored carriers to pick up cash from the Debtors' locations if the Armored Carriers to whom prepetition obligations are owed decide to stop providing services to the Debtors.  As a result, significant amounts of cash would build-up at the Debtors' retail locations, which are not equipped for storing large amounts of cash for an extended period of time, resulting in significant risk of theft.  Accordingly, the Debtors believe that payment of the prepetition obligations owed to the Armored Carriers is in the best interests of the Debtors, their estates and all parties in interest as it will prevent theft and any resulting disruption to the Cash Management System.

31.     Accordingly, by this Motion, the Debtors seek authority, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 to pay, at the Debtors' sole discretion, the prepetition Service Charges, if any, and the prepetition obligations owed to Armored Carriers.  The Debtors' submit the facts cited herein illustrate that the relief requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates.  Based on the foregoing, Bankruptcy Rule 6003 has been satisfied.

32.     Furthermore, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the stay of the order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).[3]

---

[3] Bankruptcy Rule 6004(h) is an interim bankruptcy rule adopted pursuant to standing General Order M-308 of the United States Bankruptcy Court for the Southern District of New York, signed on October 11, 2005 by Chief Judge Stuart M. Bernstein.

# IV.

## Section 345(b) of the Bankruptcy Code

33.     Section 345 of the Bankruptcy Code governs a debtor's cash deposits during a chapter 11 case and authorizes deposits of money as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."  11 U.S.C. § 345(a).  For deposits that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) requires the estate to obtain from the entity with which the money is deposited a bond in favor of the United States and secured by the undertaking of an adequate corporate surety, unless the Court for cause orders otherwise.  11 U.S.C. § 345(a)-(b).  In the alternative, the estate may require the entity to deposit governmental securities pursuant to 31 U.S.C. § 9303.  Section 9303 provides that when a person is required by law to give a surety bond, that person, in lieu of a surety bond, may provide a governmental obligation.  31 U.S.C. § 9303.

### A.     Debtors Are in Compliance With Section 345 of the Bankruptcy Code With Respect to Certain of its Bank Accounts

34.     Most of the Debtors' Bank Accounts are maintained at banks that have been approved by the U.S. Trustee as authorized bank depositories ("Authorized Bank Depositories").  Accordingly, the Debtors believe that any funds that are deposited in these accounts are secure and, thus, the Debtors are in compliance with section 345 of the Bankruptcy Code.

**B.** **To the Extent Necessary, the Debtors Seek a 30-Day Extension to Come Into Compliance with Section 345 of the Bankruptcy Code With Respect to Certain Other Bank Accounts**

35.     As a result of the automatic transfers of Collection Account Funds to the Master Operating Account, the Master Operating Account is likely to contain funds in excess of the amounts insured by the Federal Deposit Insurance Corporation (the "FDIC"). The Master Operating Account is at Cathay Bank, which is not currently an Authorized Bank Depository. In addition, certain of the Debtors' Collection Accounts and certain disbursement accounts are at Cathay Bank, IBC Bank and Bank of Hawaii, which also are not currently Authorized Bank Depositories. However, because cash in these Collection Accounts will be automatically swept to the Master Operating Account on a daily basis (or as often as practicable), the Debtors do not anticipate that on average there will be more than $100,000 in cash accumulating in each of these accounts.[4] In addition, the disbursement accounts at Cathay Bank, other than the Master Operating Account, do not and will not contain significant amount of cash accumulating in them.

36.     To the extent funds in the Bank Accounts at Cathay Bank, IBC Bank and Bank of Hawaii exceed the amounts insured by the FDIC, the Debtors believe that such amounts will be secure. Among other considerations, Cathay Bank, IBC Bank, and Bank of Hawaii are highly rated and secure federally chartered banks subject to supervision by federal banking regulators, and the Debtors retain the right to remove funds held at such banks.

37.     Nonetheless, the Debtors propose to engage in discussions with the U.S. Trustee to determine what modifications to the Bank Accounts, if any, would be appropriate

---

[4] Prior to the Commencement Date, the funds in IBC Bank and Bank of Hawaii were automatically swept into the Concentration Account once or twice a week, with the exception of the Christmas season, and less than $100,000.00 of cash accumulated in each of these accounts in between the sweeps. During the Christmas season, the Debtors increased the wiring frequency of the sweeps so that less than $100,000.00 of cash accumulated in each of the Bank Accounts in IBC and Bank of Hawaii.

under the circumstances.  Accordingly, the Debtors request a 30-day extension (or such

additional time to which the U.S. Trustee may agree) of the time period in which to either come

into compliance with section 345(b) of the Bankruptcy Code or to make other arrangements that

would be acceptable to the U.S. Trustee.  The Debtors believe that the benefits of the requested

extension far outweigh any harm to the estates.  See generally In re Serv. Merchandise Co., Inc.,

240 B.R. 894 (Bankr. M.D. Tenn. 1999) (noting that some of the factors to consider in

determining whether cause exists "for relief from the strictures of § 345(b)" is whether benefits

to the debtor outweigh the harm, if any, to the estate).

### C.    The Debtors Seek Authority to Modify the Cash Management System to the Extent Necessary

38.    If pursuant to the foregoing discussions with the U.S. Trustee or the

implementation of the Investment Guidelines (as defined in the Investment Guidelines Motion)[5]

it shall become necessary to modify the Cash Management System, the Debtors request authority

to make such modifications to the Cash Management System.  The Debtors anticipate that the

modifications to the Cash Management System may include, without limitation, the opening of

new bank or investment accounts.

39.    The Debtors request that the Court authorize and direct financial

institutions to honor the Debtors' requests to open or close, as the case may be, the Bank

Accounts or additional bank or investment accounts as may be necessary in connection with the

foregoing.

---

[5] Contemporaneously herewith, the Debtors filed a Motion Pursuant to Sections 105(a), 345(b), and 363(c) of the Bankruptcy Code for an Order Authorizing the Implementation of Investment Guidelines (the "Investment Guidelines Motion").

# V.

## Maintenance of the Debtors' Existing Bank
## Accounts and Business Forms Is Warranted

40.      As part of the Cash Management System, the Debtors maintain

approximately 100 Bank Accounts (including sub-accounts) with the financial institutions

identified on Exhibit A annexed hereto.  The Debtors routinely deposit and withdraw funds from

the Bank Accounts by checks, wire transfers, and automated clearinghouse transfers.

41.      Rigid adherence to the U.S. Trustee's "Operating Guidelines and

Reporting Requirements For Debtors in Possession and Trustees" (the "Guidelines") would

require, as of the Commencement Date, the closure of the Debtors' prepetition bank accounts,

the opening of new accounts, and the immediate printing of new checks with a "Debtor in

Possession" designation on them.  The Debtors believe, however, that their transition to chapter

11 will be smoother, less costly, and more orderly, and disruption and harm to their Cash

Management System will be minimized, if the Bank Accounts are continued following the

commencement of these cases with the same account numbers; provided, however, that checks

issued or dated prior to the Commencement Date will not be honored absent a prior order of the

Court.

42.      Unless otherwise ordered by this Court, no Bank shall honor or pay any

check issued on account of a prepetition claim.  The Banks may honor any checks issued on

account of prepetition claims only where this Court has specifically authorized such checks to be

honored.  Furthermore, notwithstanding anything to the contrary in any other "first day" order or

other order of this Court, the Debtors request the Banks be authorized to accept and honor all

representations from the Debtors as to which checks should be honored or dishonored consistent

with any order(s) of this Court, whether or not the checks are dated prior to, on, or subsequent to

the Commencement Date. The Banks shall not be liable to any party for following the Debtors' instructions or representations regarding which checks should be honored or for implementing the automatic transfer of funds from the Collection Accounts to the Master Operating Account.

43.     By preserving business continuity and avoiding disruption and delay to the Debtors' disbursement obligations, including payroll, that would necessarily result from closing the Bank Accounts and opening new accounts, all parties in interest, including employees, vendors, and customers, will be best-served. The confusion that would otherwise result, absent the relief requested herein, would ill-serve the Debtors' rehabilitative efforts.

44.     Accordingly, the Debtors respectfully request authority to maintain the Bank Accounts in the ordinary course of business, to continue utilizing the Cash Management System to manage cash in a manner consistent with prepetition practices, and to pay any ordinary course bank fees that may be incurred in connection with the Bank Accounts or any other new bank account that may be opened pursuant to an order of this Court following the Commencement Date.

45.     In addition, to minimize expenses, the Debtors further request they be authorized to continue to use their correspondence and business forms, including, but not limited to, purchase orders, multi-copy checks, letterhead, envelopes, promotional materials, and other business forms (collectively, the "Business Forms"), substantially in the forms existing immediately before the Commencement Date, without reference to their status as debtors in possession, provided, however, that the Debtors shall commence marking "Debtor in Possession" and the chapter 11 case number under which these cases are being jointly administered on their existing check stock, business stock, and wire transfer instructions instead of having new stock printed with such marking. If and when the Debtors requires new stock, they shall print "Debtor

in Possession" and the chapter 11 case number under which these cases are being jointly administered on the stock.

46.     If the Debtors are not permitted to maintain and utilize their current Bank Accounts and their existing Business Forms, the resultant prejudice will include significant (i) disruption to the Debtors' ordinary financial affairs and business operations, (ii) delay in the administration of the Debtors' estates, and (iii) cost to the estates to set up new systems, open new accounts, print new business forms, and print new checks.

47.     In other chapter 11 cases, bankruptcy courts have recognized that strict enforcement of the requirement that a debtor in possession close its bank accounts does not serve the rehabilitative process of chapter 11.  Accordingly, these courts have waived such requirements and replaced them with alternative procedures similar to those proposed here.[6]  See e.g., Lexington Precision Corporation, et al., Case No. 08-11153 (MG) (Bankr. S.D.N.Y. Apr. 2, 2008) [Docket No. 25]; In re PRC, LLC, Case No. 08-10239 (MG) (Bankr. S.D.N.Y. Jan. 25, 2008) [Docket No. 36]; Silicon Graphics, Inc., et al., Case No. 06-10977 (BRL) (Bankr. S.D.N.Y. May 10, 2006) [Doc. No. 47], (Bankr. S.D.N.Y. July 19, 2006) [Doc. No. 375]; Atkins Nutritionals, Inc., et al., Case No. 05-15913 (ALG) (Bankr. S.D.N.Y. Aug. 1, 2005) [Doc. No. 36]; In re Footstar, Inc. et al., Case No. 04-22350 (ASH) (Bankr. S.D.N.Y. Mar. 3, 2004) [Doc. No. 43], (Bankr. S.D.N.Y. Mar. 31, 2004) [Doc. No. 250]; and In re Loral Space & Commc'ns LTD., et al. Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. July 16, 2003) [Doc. No. 26].  Similar authorization is appropriate in these chapter 11 cases.

---

[6] Because of the voluminous nature of the unreported orders cited herein, they are not annexed to this Motion.  Copies of these orders are available upon request of Debtors' counsel, including at the hearing to consider the Motion.

## **Waiver of Memorandum of Law**

48.     Pursuant to Local Bankruptcy Rule for the Southern District of New York 9013-1(b), because there are no novel issues of law presented herein, the Debtors respectfully request that the Court waive the requirement that the Debtors file a memorandum of law in support of this Motion.

## **Notice**

49.     No trustee, examiner, or statutory creditors' committee has been appointed in these chapter 11 cases.  Notice of this Motion has been provided to (i) the U.S. Trustee, (ii) counsel to the agents for the Debtors' prepetition lenders, and (iii) those creditors holding the thirty largest unsecured claims against the Debtors' estates (on a consolidated basis).  The Debtors submit that no other or further notice need be provided.

50.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: July 9, 2008
       New York, New York

                                        /s/ Lori R. Fife
                                        Harvey R. Miller
                                        Lori R. Fife
                                        Shai Y. Waisman
                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York 10153-0119
                                        Telephone:  (212) 310-8000
                                        Facsimile:  (212) 310-8007

                                        Attorneys for Debtors and
                                        Debtors in Possession

# EXHIBIT A

## BANK ACCOUNTS

# COLLECTION ACCOUNTS

| BANK | ACCOUNT TYPE |
|---|---|
| Bank of America<br>100 Federal Street, 9th Floor<br>Boston, MA 02110<br>Attn: Elsie Baptiste<br>Fax: (617) 235-2501 | Various deposit accounts |
| Bank of Hawaii<br>Waikele Branch<br>94-817 Lumiaina St.<br>Waipahu, HI 96797<br>Attn: Lance Taketa<br>Fax: (808) 676-0080 | Deposit account |
| HSBC<br>P.O. Box 1393<br>Buffalo, NY 14240<br>Attn: Kathy Smythe<br>Fax: (315) 764-9703 | Deposit account |
| IBC Bank<br>2305 Del Rio Blvd<br>Eagle Pass, TX 78852<br>Attn: Rosalba Duran<br>Fax: (830) 773-4942 | Deposit account |
| JP Morgan Chase<br>210 W. State Street<br>West Lafayette, IN 47906<br>Attn: Marie Garms<br>Fax: (888) 280-6387 | Various deposit accounts |
| National City<br>1900 East Ninth Street, LOC 01-3415<br>Cleveland, OH 44114-3484<br>Attn: Paul Catalano<br>Fax: (866) 772-5393 | Deposit account |
| PNC<br>249 Fifth Avenue<br>Pittsburgh, PA 15222<br>Attn: Joanne Kushenerick<br>Fax: (732) 220-3020 | Deposit account |
| Regions Bank<br>P.O. Box 680<br>Huntsville, AL 35804<br>Attn: David Gillies<br>Fax: (256) 895-3280 | Various deposit account |

| Wells Fargo<br>1241 John Q Hammons Dr., Ste. 501<br>Madison, WI 53717<br>Attn: Angela Bitner<br>Fax: (414) 224-7410 | Various deposit accounts |
| --- | --- |

## DISBURSEMENT ACCOUNTS

| BANK | ACCOUNT TYPE |
| --- | --- |
| Cathay Bank<br>800 W. 6th Street<br>Los Angeles, CA 90017<br>Attn: Louise Yeh<br>Fax: (213) 972-4242 | Master Operating Account, payroll accounts, transit check account, lockbox accounts, money market accounts |
| Bank of China, Shanghai Branch,<br>Changing Sub branch<br>3rd Floor, No. 2201<br>Yanan Road (W)<br>Shanghai, China<br>Attn: Zhao Peiling, Maggie Cheng<br>Fax: 021-62705615 | Operating account |
| PICIC Commercial Bank Ltd.<br>27-A Business Arcade<br>P.E.C.h.S., Block-6<br>Karachi, Pakistan<br>Attn: Maimoona Aijaz, Mr. Haris<br>Fax: 9221-4524710 | Operating account |
| Jordan National Bank<br>Chamber of Industry Building<br>Branch, 2nd Circle<br>Amman – Jordan<br>Attn: Abdalhakem Alnsor<br>Fax: 962-6-4649564 | Operating account |

# EXHIBIT B

## CASH MANAGEMENT SYSTEM

# CASH MANAGEMENT SYSTEM



**COLLECTION**  **CONCENTRATION**  **SOURCE OF DISBURSEMENTS**  **TYPES OF DISBURSEMENTS**

**FUNDINGS**  **3RD PARTY**

CASH AND CHECKS FROM STORE SALES

(Various deposit accounts at PNC, JP Morgan, BoA, Wells Fargo, Regions Bank, IBC Bank, Bank of Hawaii, HSBC, Nat'l City)

CREDIT CARD RECEIVABLES

TENANT ALLOWANCE RECEIPTS
(Cathay Bank A/C No. 23508745)

CONCENTRATION ACCOUNT

(Deutsche Bank)

MASTER OPERATING ACCOUNT

(Cathay Bank A/C No. 23506409)

MONEY MARKET ACCOUNTS
(Cathay Bank)

GECC REVOLVER

PAYROLL ACCOUNTS

TRANSIT CHECKS ACCOUNT

HEALTH & WELFARE BENEFITS

CORPORATE PAYABLES TO FOREIGN OFFICES

RENT

CAPITALIZED LEASE

UTILITIES

INSURANCE

TAXES

INVENTORY

401(K)

COLLEGE 529 PLAN

OTHER

# EXHIBIT C

## ARMORED CARRIERS

| NAME | # of Retail Locations Serviced Directly or Through Subsidiary |
|---|---|
| Garda CL Atlantic, Inc. | 201 |
| Brink's, Incorporated | 37 |
| Dunbar Armored, Inc. | 12 |
| Elyte Pacific Services | 1 |
| Gem City Armored Security, Inc. | 1 |
| GJ's Security, Inc. | 2 |
| Granite City Armored Security, Inc. | 1 |
| Loomis | 23 |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
:
In re                            :           **Chapter 11 Case No.**
:
**STEVE & BARRY'S**          :
**MANHATTAN LLC, <u>et</u> <u>al.</u>,**     :    ___ - _____ (  )
:
**Debtors.**           :        **(Jointly Administered)**
:
-----------------------------------------------------------------x

### INTERIM ORDER PURSUANT TO SECTIONS 105(a), 345(b), 363(b), 363(c) AND 364(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6003 AND 6004 (A) AUTHORIZING DEBTORS TO (i) CONTINUE TO USE EXISTING CENTRALIZED CASH MANAGEMENT SYSTEM, AS MODIFIED, (ii) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED TO THE USE OF THE CASH MANAGEMENT SYSTEM, AND (iii) MAINTAIN EXISTING BANK ACCOUNTS AND BUSINESS FORMS; (B) EXTENDING THE DEBTORS' TIME TO COMPLY WITH SECTION 345(b) OF THE BANKRUPTCY CODE; AND (C) SCHEDULING A FINAL HEARING

Upon the motion, dated July 9, 2008 (the "<u>Motion</u>"), of Steve & Barry's

Manhattan LLC and its debtor affiliates, as debtors and debtors in possession (collectively, the

"<u>Debtors</u>"), pursuant to sections 105(a), 345(b), 363(b), 363(c) and 364(a) of chapter 11 of title

11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rules 6003 and 6004 of the Federal

Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), (A) for authorization to (i) continue to

use the Debtors' centralized cash management system, as modified (the "<u>Cash Management</u>

<u>System</u>"); (ii) honor certain prepetition obligations related to the Cash Management System; (iii)

maintain and utilize existing bank accounts (the "<u>Bank Accounts</u>") and business forms (the

"<u>Business Forms</u>"); and (iv) modify the Cash Management System, including the closing of any

existing Bank Account(s) and the opening of any new bank accounts, as may be necessary in

connection with section 345 of the Bankruptcy Code; (B) for authorization and directing

financial institutions to honor the Debtors' requests to open or close, as the case may be, the

Bank Accounts or additional bank or investment accounts; (C) an extension of the time to comply with section 345(b) of the Bankruptcy Code, and (D) to schedule a final hearing (the "Final Hearing") granting the relief requested in the Motion on a final basis, all as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to (i) the United States Trustee for the Southern District of New York (the "U.S. Trustee"), (ii) counsel to the agents for the Debtors' prepetition lenders, and (iii) those creditors holding the thirty largest unsecured claims against the Debtors' estates (on a consolidated basis), and it appearing that no other or further notice need be provided; and a hearing having been held to consider the relief requested in the Motion (the "Hearing"); and the appearances of all interested parties having been noted in the record of the Hearing; and upon the Affidavit of Gary Sugarman Pursuant to Local Bankruptcy Rule 1007-2 in Support of First-Day Motions and Applications, sworn to on July 9, 2008, the record of the Hearing, and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted on an interim basis; and it is further

ORDERED that the Debtors are authorized and empowered, pursuant to sections 105(a) and 363(c) of the Bankruptcy Code, to continue to manage their cash pursuant to the Cash Management System maintained by the Debtors prior to the commencement of their chapter 11 cases (the "Commencement Date"), as modified by this Order, and to collect, concentrate, and disburse cash in accordance with the Cash Management System, including intercompany transfers of funds; and it is further

ORDERED that pursuant to section 105(a) of the Bankruptcy Code, each of the banks listed on Exhibit A hereto (the "Banks") are authorized and directed to commence immediately automatic transfers (the "Automatic Transfers") on a daily basis, or as often as practicable, of all available funds currently in or received into its accounts, including deposit and lockbox accounts, maintained in the Debtors' names (collectively, the "Collection Accounts"), to the Debtors' master operating account at Cathay Bank ("Cathay"), account number 23506409, and any successor account designated by the Debtors (the "Master Operating Account"), without the need to comply with any lockbox or blocked account agreement or any preexisting transfer arrangement concerning said accounts; and it is further

ORDERED that the Debtors shall maintain accurate records of all transfers within the Cash Management System so that all postpetition transfers and transactions shall be adequately and promptly documented in, and readily ascertainable from, their books and records, to the same extent maintained by the Debtors prior to the Commencement Date; and it is further

ORDERED that the Debtors are authorized to: (i) designate, maintain and continue to use any or all of their existing Bank Accounts listed on Exhibit A, annexed hereto, in the names and with the account numbers existing immediately prior to the Commencement Date, (ii) deposit funds in and withdraw funds from such accounts by all usual means including,

without limitation, checks, wire transfers, automated clearinghouse transfers and other debits, (iii) pay any bank fees or charges associated with the Bank Accounts, and (iv) treat their prepetition Bank Accounts for all purposes as debtors in possession accounts; and it is further

ORDERED that except as otherwise provided in this Order, all financial institutions in which the Debtors maintain the Bank Accounts as of the commencement of their chapter 11 cases are authorized and directed to continue to maintain, service, and administer such Bank Accounts without interruption and in the usual and ordinary course, and to receive, process, honor and pay any and all checks, drafts, wires, or other transfers by the holders or makers thereof, as the case may be; provided, however, that nothing contained herein shall authorize any such financial institution to honor any check, draft, wire, or other transfer issued or dated prior to the Commencement Date, except as otherwise provided by further order of this Court; provided, however, that any such financial institution may rely on the representations of the Debtors with respect to whether any check, draft, wire, or other transfer drawn or issued by the Debtors prior to the Commencement Date should be honored pursuant to an order of this Court, and such bank shall not have any liability to any party for relying on such representation by the Debtors as provided for herein; and it is further

ORDERED that the Debtors are in compliance with section 345(b) of the Bankruptcy Code with respect to those Bank Accounts located in Banks that have been approved by the U.S. Trustee as authorized bank depositories ("Authorized Bank Depositories"); and it is further

ORDERED that with respect to those Bank Accounts which are not located in Banks that are Authorized Bank Depositories, the Debtors shall have 30 days (or such additional time as the U.S. Trustee may agreed to) from the entry of this Order (the "Extension Period") to

either come into compliance with section 345(b) of the Bankruptcy Code or to make such other arrangements as agreed with the U.S. Trustee; and it is further

ORDERED, that nothing contained herein shall prevent the Debtors from opening any additional bank accounts, or closing any existing Bank Account(s) as they may deem necessary and appropriate, and the Banks are authorized to honor the Debtors' requests to open or close, as the case may be, such Bank Accounts or additional bank accounts; provided, however, that any new account shall be with a bank that is insured with the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation and that is organized under the laws of the United States or any State therein; and it is further

ORDERED that the Debtors shall mark "Debtor in Possession" and the chapter 11 case number under which these cases are being jointly administered on their check stock, business form stock, and wire transfer instructions and shall not be required to order new stock with such marking until they exhaust their current stock; and it is further

ORDERED that, pursuant to section 364(a) of the Bankruptcy Code, the Debtors are authorized in connection with the ordinary course of their Cash Management System to obtain unsecured credit and incur unsecured debt in the ordinary course of business without notice and a hearing; and it is further

ORDERED that the Debtors are authorized, but not directed, to pay prepetition amounts outstanding as of the Commencement Date, if any, owed to the Banks as service charges for the maintenance of the Cash Management System; and it is further

ORDERED that the Debtors are authorized, but not directed, to pay prepetition amounts outstanding as of the Commencement Date, if any, owed to the armored car service providers listed on Exhibit B hereto; and it is further

ORDERED that Bankruptcy Rule 6003(b) has been satisfied; and it is further

ORDERED that notwithstanding any applicability of Bankruptcy Rules 6004(h),[1] 7062, or 9014, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rules 6004(a) are waived; and it is further

ORDERED that the Final Hearing to consider entry of an order granting the relief requested in the Motion on a final basis shall be held on _____, 2008 at __:00 a.m. (Eastern Time); and any objections to entry of such order shall be in writing, filed with the Court in accordance with General Order M-242, and served upon (i) counsel to the Debtors; (ii) the U.S. Trustee; (iii) counsel to the agents for the Debtors' prepetition lenders, and (iv) counsel for any statutory committee appointed in these cases, in each case so as to be received no later than 4:00 p.m. (Eastern Time) on _____, 2008; and it is further

ORDERED that the Debtors shall serve this Order within three business days of its entry on (i) the U.S. Trustee, (ii) counsel to the agents for the Debtors' prepetition lenders, and (iii) creditors holding the thirty largest unsecured claims against the Debtors (on a consolidated basis); and it is further

---

[1] Bankruptcy Rule 6004(h) is an interim bankruptcy rule adopted pursuant to standing General Order M-308 of the United States Bankruptcy Court for the Southern District of New York, signed on October 11, 2005 by Chief Judge Stuart M. Bernstein.

ORDERED that the requirement set forth in Local Bankruptcy Rule 9013-1(b) for

the filing of a separate memorandum of law in support of the Motion is waived.

Dated: July ___, 2008
       New York, New York


_____
    UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

# BANK ACCOUNTS

# COLLECTION ACCOUNTS

| BANK | ACCOUNT TYPE |
|---|---|
| Bank of America<br>100 Federal Street, 9th Floor<br>Boston, MA 02110<br>Attn: Elsie Baptiste<br>Fax: (617) 235-2501 | Various deposit accounts |
| Bank of Hawaii<br>Waikele Branch<br>94-817 Lumiaina St.<br>Waipahu, HI 96797<br>Attn: Lance Taketa<br>Fax: (808) 676-0080 | Deposit account |
| HSBC<br>P.O. Box 1393<br>Buffalo, NY 14240<br>Attn: Kathy Smythe<br>Fax: (315) 764-9703 | Deposit account |
| IBC Bank<br>2305 Del Rio Blvd<br>Eagle Pass, TX 78852<br>Attn: Rosalba Duran<br>Fax: (830) 773-4942 | Deposit account |
| JP Morgan Chase<br>210 W. State Street<br>West Lafayette, IN 47906<br>Attn: Marie Garms<br>Fax: (888) 280-6387 | Various deposit accounts |
| National City<br>1900 East Ninth Street, LOC 01-3415<br>Cleveland, OH 44114-3484<br>Attn: Paul Catalano<br>Fax: (866) 772-5393 | Deposit account |
| PNC<br>249 Fifth Avenue<br>Pittsburgh, PA 15222<br>Attn: Joanne Kushenerick<br>Fax: (732) 220-3020 | Deposit account |
| Regions Bank<br>P.O. Box 680<br>Huntsville, AL 35804<br>Attn: David Gillies<br>Fax: (256) 895-3280 | Various deposit account |

| | |
|---|---|
| Wells Fargo<br>1241 John Q Hammons Dr., Ste. 501<br>Madison, WI 53717<br>Attn: Angela Bitner<br>Fax: (414) 224-7410 | Various deposit accounts |

## DISBURSEMENT ACCOUNTS

| BANK | ACCOUNT TYPE |
|---|---|
| Cathay Bank<br>800 W. 6th Street<br>Los Angeles, CA 90017<br>Attn: Louise Yeh<br>Fax: (213) 972-4242 | Master Operating Account, payroll accounts, transit check account, lockbox accounts, money market accounts |
| Bank of China, Shanghai Branch,<br>Changing Sub branch<br>3rd Floor, No. 2201<br>Yanan Road (W)<br>Shanghai, China<br>Attn: Zhao Peiling, Maggie Cheng<br>Fax: 021-62705615 | Operating account |
| PICIC Commercial Bank Ltd.<br>27-A Business Arcade<br>P.E.C.h.S., Block-6<br>Karachi, Pakistan<br>Attn: Maimoona Aijaz, Mr. Haris<br>Fax: 9221-4524710 | Operating account |
| Jordan National Bank<br>Chamber of Industry Building<br>Branch, 2nd Circle<br>Amman – Jordan<br>Attn: Abdalhakem Alnsor<br>Fax: 962-6-4649564 | Operating account |

# EXHIBIT B

## ARMORED CARRIERS

| NAME | # of Retail Locations Serviced Directly or Through Subsidiary |
|---|:---:|
| Garda CL Atlantic, Inc. | 201 |
| Brink's, Incorporated | 37 |
| Dunbar Armored, Inc. | 12 |
| Elyte Pacific Services | 1 |
| Gem City Armored Security, Inc. | 1 |
| GJ's Security, Inc. | 2 |
| Granite City Armored Security, Inc. | 1 |
| Loomis | 23 |