WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Harvey R. Miller
Lori R. Fife
Shai Y. Waisman

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
|  | : |  |
| --- | --- | --- |
| **In re** | : | **Chapter 11 Case No.** |
|  | : |  |
| **STEVE & BARRY'S** | : |  |
| **MANHATTAN LLC, et al.,** | : | **___ - _____ (  )** |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)** |
|  | : |  |

---------------------------------------------------------------x

**APPLICATION PURSUANT TO SECTIONS 327(a) AND 328(a) OF THE**
**BANKRUPTCY CODE FOR AUTHORIZATION TO RETAIN AND EMPLOY**
**CONWAY, DEL GENIO, GRIES & CO., LLC AS FINANCIAL ADVISORS FOR**
**THE DEBTORS *NUNC PRO TUNC* TO THE COMMENCEMENT DATE**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Steve & Barry's Manhattan LLC and its debtor affiliates, as debtors and

debtors in possession (collectively, "Steve & Barry's" or the "Debtors"), respectfully

represent:

**Background**

1.     On the date hereof (the "Commencement Date"), the Debtors each

commenced with this Court a voluntary case under chapter 11 of title 11 of the United

States Code (the "<u>Bankruptcy Code</u>").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      Contemporaneously herewith, the Debtors filed a motion seeking joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

<b><u>Steve & Barry's Business</u></b>

3.      Steve & Barry's is a specialty retailer of apparel and accessories that provides consumers with quality low-priced apparel.  Founded in 1985, Steve & Barry's has grown exponentially from an original store in Philadelphia, Pennsylvania to 276 stores located throughout the United States.   Many Steve & Barry's retail locations serve economically challenged areas that other retailers have abandoned because of household income levels, population trends or crime rates.  During the course of its expansion, Steve & Barry's has diversified its business beyond its original line of university apparel, and its products currently fall broadly into three categories: (i) licensed university apparel and lifestyle brands, (ii) private-label casual clothing and accessories for men, women and children, and (iii) exclusive celebrity branded lines of apparel and accessories.

4.      Steve & Barry's offers quality apparel and accessories at dramatically lower prices than typically found for similar goods from other specialty retailers, and in a more upscale, customer-friendly store design.  Steve & Barry's achieves this by operating stores with low occupancy costs, and by relying mostly upon word of mouth and news stories, rather than paid print or other advertising, resulting in

significant cost savings. Steve & Barry's keeps its costs low by maintaining overseas offices and purchasing most merchandise directly from their sources without intermediaries. The savings realized through each strategy are then passed on to Steve & Barry's customers in the form of low prices. Almost all items in Steve & Barry's retail locations are priced at $9.98 or less.

5.     As of May 31, 2008, Steve & Barry's (including nondebtor affiliates) consolidated assets totaled approximately $693.5 million and recorded consolidated liabilities totaled approximately $638 million. Consolidated revenues for the twelve months ended May 31, 2008, were approximately $656.6 million. Steve & Barry's currently employs, either directly or through its non-debtor affiliates, approximately 8,600 domestic employees and 1,100 international employees. Approximately 7,300 of the domestic employees are part-time hourly employees and 1,300 are full-time salaried employees.

## Jurisdiction

6.     This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Retention of Conway, Del Genio, Gries & Co., LLC

7.     By this Application, the Debtors seek to employ and retain, *nunc pro tunc* to the Commencement Date, Conway, Del Genio, Gries & Co., LLC ("CDG") to provide necessary financial advisory services to the Debtors in these chapter 11 cases pursuant to sections 327(a) and 328(a) of the Bankruptcy Code and the terms of the CDG

agreement dated June 10, 2008 (the "CDG Agreement") attached hereto as Exhibit A. The services of CDG are necessary in order to enable the Debtors to execute their duties as debtors in possession. CDG's familiarity with the Debtors' financial affairs, and the business and financial circumstances surrounding the commencement of these chapter 11 cases, will minimize charges to the Debtors' estates for the services contemplated herein.

8. CDG is well-qualified to serve as the Debtors' bankruptcy consultants and special financial advisors. CDG was founded in 1998 by three former partners from the corporate finance and restructuring and reorganization practices of Ernst & Young LLP. Each of CDG's founders has more than 25 years of experience advising corporate clients. CDG was created as a financial advisory firm to provide services focusing on, among other things, the management and restructuring of under-performing companies, mergers and acquisitions and valuations. CDG employs approximately 30 professionals from restructuring boutiques, corporations and international accounting firms. CDG specializes in, among other things, corporate restructuring, crisis management and mergers and acquisitions in chapter 11 cases.

9. CDG has a longstanding reputation in assisting companies through complex financial restructurings, including chapter 11 cases. Since 1998, when CDG was founded, it has advised on over 90 restructuring and interim management transactions with a total deal value in excess of $40 billion. CDG's past and current clients include The Sharper Image, Adelphia Communications Corporation, Mariner Health Group, Inc., Mariner Post-Acute Network, Inc., Montgomery Ward, LLC, Wheeling Pittsburg Steel Group, The Penn Traffic Company, OCA, Inc., Corvest Promotional Products, Inc., Haven Eldercare LLC and USInternetworking, Inc.

10.    Since December 2007 CDG has rendered discrete services to the Debtors.  On or about June 10, 2008, the Debtors re-engaged CDG to: (i) advise and assist management in reviewing and developing the Debtors' cash-flow forecast, (ii) advise and assist management in developing the Debtors' business plan, and (iii) provide such other services as  requested by the Debtors.  CDG provided such services from the date of its engagement up to immediately prior to the Commencement Date.

11.    The Debtors have employed CDG as financial advisors in connection with, among other things, the commencement and prosecution of these chapter 11 cases and the formulation of their business plan and plan of reorganization. The Debtors anticipate during the chapter 11 cases that CDG will render financial advisory services to the Debtors as described below.  Such services are not duplicative in any manner with the services to be performed by the other professionals retained by the Debtors in these chapter 11 cases.  The Debtors and CDG will undertake every reasonable effort to avoid any duplication of services.

12.    All of the services that CDG will provide to the Debtors will be: (i) appropriately directed by the Debtors so as to avoid duplicative efforts among the professionals retained in the case, and (ii) performed in accordance with applicable standards of the profession.  As more fully described in the CDG Agreement, the services to be provided by CDG in these chapter 11 cases are presently anticipated to include the following (capitalized terms not otherwise defined herein are defined in the CDG Agreement):

a.    Review the Debtors' current liquidity forecast and assist management in modifying and updating such forecast base

upon current information, CDG's observations and other information as it becomes available;

b. Gather and analyze data (including the Debtors' existing indebtedness), interview appropriate management and evaluate the Debtors' existing financial forecasts and budgets to determine the extent of the Debtors' financial challenges;

c. Assist the Debtors in developing and evaluating various restructuring scenarios;

d. Assist the Debtors in the preparation, design, and execution of the Restructuring plan;

e. Assist the Debtors in the development of a business plan;

f. As part of the development and review of the Business Plan, evaluate and analyze various parts of the Debtors' business; and

g. Assess inventory position and management strategies and other key working capital drivers.

13. CDG's decision to accept this engagement to advise and assist the Debtors is contingent upon its ability to be retained in accordance with its customary terms and conditions of employment and compensated for its services and reimbursed for the out-of-pocket expenses it incurs in accordance with its customary billing practices which are outlined in the appended Affidavit of Robert P. Conway (the "Conway Affidavit") filed in support of this Application.

14. CDG will seek compensation for its services and reimbursement of its expenses, as specified in the CDG Agreement, with the payment of such fees and expenses to be approved in accordance with the guidelines of this Court. As more fully

described in the CDG Agreement, in consideration of the services provided, the Debtors have agreed to pay CDG:

a.  A monthly fee of $250,000, which will be due and paid by the Debtors, beginning on the date of the CDG Agreement and thereafter in advance on the 10th of each month during the term of the CDG Agreement.  The Debtors will also pay CDG on the date of the CDG Agreement a retainer in the amount of $250,000 which shall be applied against their final invoice and, to the extent unused, will be returned to the Debtors;

b.  In addition to the foregoing, CDG will bill monthly in arrears for the reimbursement of all of its reasonable out-of-pocket expenses (including but not limited to travel costs, lodging, meals, research, telephone and facsimile, courier , overnight mail and copy expenses), incurred in connection with CDG's obligations under the CDG Agreement, the fees and disbursements of CDG's attorneys, plus any sales, use or similar taxes (including additions to such taxes, if any) arising in connection with any matter referred to in the CDG Agreement.  CDG will submit to the Debtors monthly invoices for all services rendered and expenses incurred under the CDG Agreement.  The Debtors will reimburse CDG for such expenses whether or not any transaction contemplated by the CDG Agreement shall be proposed or consummated;

c.  In the event CDG is requested or authorized by the Debtors or is required by government regulation, subpoena, or other legal process to produce CDG's documents or CDG's members, employees, agents or representatives as witnesses with respect to CDG's services for the Debtors, the Debtors will reimburse CDG for its professional time and expenses, as well as the fees and expenses of CDG's counsel, incurred in responding to such requests; and

d.  To the extent the Debtors request that CDG perform additional services not contemplated by the CDG Agreement, fees for and the scope of such service will be mutually agreed upon by CDG and the Debtors.

15.     Pursuant to the CDG Agreement, subject to the approval of this Court, the Debtors have agreed to indemnify CDG, its affiliates, consultants, independent contractors and each of their respective members, officers, directors, employees, agents controlling parties, and representatives (collectively, the "Indemnified Parties") from and against any Losses (as such term is defined in the CDG Agreement) brought by any party in connection with CDG's engagement by the Debtors, other than claims resulting from the gross negligence or willful misconduct of the Indemnified Parties.  The Debtors submit that such indemnification is standard in the specialized financial advisory industry and that the provision of such indemnification by the Debtors is fair and reasonable considering CDG's qualifications and the expectations of other special financial advisors in connection with engagements of this scope and size.  Accordingly, as part of this Application, the Debtors request that the Court approve CDG's terms of engagement as set forth in the CDG Agreement.

16.     CDG will seek interim and final allowance of compensation and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code, applicable Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), local rules and orders of the Court, and in accordance with the terms of the CDG Agreement and any procedures as may be fixed by order of the Court.

17.     To the best of the Debtors' knowledge, information and belief, CDG has no connection with, and holds no interest adverse to, the Debtors, its estates, its creditors, or any other party in interest, or its respective attorneys or accountants in the matters for which CDG is proposed to be retained, except as disclosed in the Conway Affidavit.

18.     CDG is a "disinterested person," as such term is defined in section 101(14) of the Bankruptcy Code and as required under section 327(a) of the Bankruptcy Code. The Conway Affidavit, executed on behalf of CDG in accordance with section 327 of the Bankruptcy Code and Bankruptcy Rule 2014, is filed contemporaneously herewith and incorporated herein by reference. The Debtors' knowledge, information, and belief regarding the matters set forth in this Application are based, and made in reliance, upon the Conway Affidavit.

19.     The Debtors submit that the appointment of CDG on the terms and conditions set forth herein and the CDG Agreement is in the best interest of the Debtors, its creditors, and all parties in interest.

## Notice

20.     No trustee, examiner, or creditors' committee has been appointed in these chapter 11 cases. The Debtors have served notice of this Application on (i) the office of the United States Trustee for the Southern District of New York, (ii) counsel to the agents for the Debtors' prepetition lenders, and (iii) those creditors holding the thirty largest unsecured claims against the Debtors' estates (on a consolidated basis). The Debtors submit that no other or further notice need be provided.

21.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated:  July 9, 2008
      New York, New York

Steve & Barry's Manhattan LLC
(for itself and on behalf of its affiliated
Debtors and Debtors in Possession)


By:  /s/ Barry Prevor
     Barry Prevor
     Chairman and Secretary

# Affidavit of Robert P. Conway

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------x
:
In re : **Chapter 11 Case No.**
:
**STEVE & BARRY'S** :
**MANHATTAN LLC, et al.,** : ___ - _____ ( )
:
Debtors. : **(Jointly Administered)**
:
--------------------------------------------------------------x


**AFFIDAVIT OF ROBERT P. CONWAY IN SUPPORT OF THE DEBTORS'**
**APPLICATION PURSUANT TO SECTIONS 327(A) AND 328 (A) OF THE**
**BANKRUPTCY CODE FOR AUTHORIZATION TO RETAIN AND EMPLOY**
**CONWAY, DEL GENIO, GRIES & CO., LLC AS FINANCIAL ADVISORS FOR**
**THE DEBTORS *NUNC PRO TUNC* TO THE COMMENCEMENT DATE**

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )


Rober P. Conway, being duly sworn, deposes and says:

1.      I make this affidavit in support of the application dated July 9,

2008 (the "Application") of Steve & Barry's Manhattan LLC and its debtor affiliates, as

debtors and debtors in possession (collectively, the "Debtors"), pursuant to sections

327(a) and 328(a) of chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code") for authorization to employ and retain Conway, Del Genio, Gries & Co., LLC

("CDG") as financial advisors for the Debtors *nunc pro tunc* to the date of

commencement of these chapter 11 cases (the "Commencement Date").

2.      I am a founder and principal of CDG.  The name, address,

telephone number, and facsimile number of CDG is:

Conway, Del Genio, Gries & Co., LLC
Olympic Tower
645 Fifth Avenue
New York, New York 10022
Tel: (212) 813-1300
Fax: (212) 813-0580

### CDG's Qualifications

3.       CDG was founded in 1998 by three former partners from the corporate finance and restructuring and reorganization practices of Ernst & Young LLP. Each of CDG's founders has more than 25 years of experience advising corporate clients. CDG was created as a financial advisory firm to provide services focusing on, among other things, the management and restructuring of under-performing companies, mergers and acquisitions and valuations.  CDG employs approximately 30 professionals from restructuring boutiques, corporations and international accounting firms.  CDG specializes in, among other things, corporate restructuring, crisis management and mergers and acquisitions in chapter 11 cases.

4.       CDG has a longstanding reputation in assisting companies through complex financial restructurings, including chapter 11 cases.  Since 1998, when CDG was founded, it has advised on over 90 restructuring and interim management transactions with a total deal value in excess of $40 billion. CDG's past and current clients include The Sharper Image, Adelphia Communications Corporation, Mariner Health Group, Inc., Mariner Post-Acute Network, Inc., Montgomery Ward, LLC, Wheeling Pittsburg Steel Group, The Penn Traffic Company, OCA, Inc., Corvest Promotional Products, Inc., Haven Eldercare LLC and USInternetworking, Inc.

5.      Since December 2007 CDG has rendered discrete financial advisory services to the Debtors in connection with their restructuring efforts (the "2007 Engagement"). CDG has become familiar with the Debtors' operations and is well qualified to represent the Debtors as financial advisors in connection with such matters in a cost-effective and efficient manner.

### Disinterestedness of Professionals

6.      Based on the results of the conflict search conducted to date and described more fully below, to the best of my knowledge, neither I, CDG, nor any member or employee thereof, insofar as I have been able to ascertain, has any connection with the Debtors, their creditors, other parties-in-interest (as reasonably known to us), their respective attorneys, or the U.S. Trustee or any person employed in the Office of the U.S. Trustee, except as disclosed or otherwise described herein.

7.      To the best of my knowledge, CDG is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, in that, its members and employees:

   a.   are not creditors, equity security holders or insiders of the Debtors;

   b.   were not, within two years before the date of filing of the Debtors' chapter 11 petitions, a director, officer, or employee of the Debtors; and

   c.   do not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors or for any other reason.

8.     As part of its diverse practice, CDG appears in numerous cases, proceedings and transactions involving attorneys, accountants, investment bankers and financial consultants, some of which may represent claimants and parties-in-interest in these chapter 11 cases. Further, CDG has in the past, and may in the future, be represented by several attorneys and law firms in the legal community, some of whom may be involved in these proceedings. In addition, CDG has in the past and will likely in the future be working with or against other professionals involved in these cases in matters unrelated to these cases. Based on our current knowledge of the professionals involved, and to the best of my knowledge, none of these business relations constitute interests materially adverse to the Debtors herein in matters upon which CDG is to be employed.

9.     CDG may have in the past represented, may currently represent, and likely in the future will represent, parties-in-interest of the Debtors in connection with matters unrelated to the Debtors and these chapter 11 cases (except as described below). CDG has run the following parties related to the Debtors through its conflicts system: (a) non-Debtor affiliate(s), (b) current and former directors (for up to three years), (c) affiliations of directors, (d) current and former officers (for up to three years), (e) significant stockholders (those holding greater than 5%), (f) secured creditors, (g) top 30 unsecured creditors, (h) underwriting investment bankers for the Debtorss securities (for all securities issued or outstanding on the date of the filing of the petition within the prior three years), (i) insurers, (j) professionals, (k) significant lessors, and (l) employees of the United States Trustee for the Southern District of New York.

10.     To the best of my knowledge, CDG has been retained by, or is currently retained by and will likely in the future be retained by the entities described below (or their affiliates), in matters unrelated to the Debtor.

| Name of Entity | Relation to Debtor | Role of Client |
|---|---|---|
| Weil, Gotshal & Manges LLP | Professional | Counsel to GECC in matters unrelated to the Debtors |
| National City Bank | Secured Creditor | Lender |
| GECC/General Electric | Secured Creditor | Agent and Lender |

11.     CDG has received fees in excess of 1% of CDG's annual gross revenues from retention by Weil, Gotshal & Manges LLP in other matters unrelated to the Debtors' chapter 11 cases.

12.     CDG personnel and their family members may have business associations with certain creditors of the Debtor unrelated to Debtor's chapter 11 cases. In addition, in the ordinary course of its business, CDG may engage counsel or other professionals in unrelated matters who now represent, or who may in the future represent, creditors, or other interested parties in these cases.

13.     Debtor has numerous shareholders, lenders, creditors and other parties with whom they maintain business relationships. CDG may have advisory or other commercial or professional relationships with such entities or persons completely unrelated to Debtor or its business affairs. No such relationships are in any way related to these chapter 11 cases.

14.     Additionally, CDG has represented, and may currently represent, entities which hold or may in the future hold certain of the Debtor's debt in beneficial accounts on behalf of unidentified parties.

15.     Because distressed debt is actively traded in the commercial markets, CDG may be unaware of the actual holder of such debt at any given moment. CDG has been engaged by numerous entities in unrelated matters that may buy and/or sell distressed debt of chapter 11 debtors.

16.     To the best of my knowledge, CDG has not been retained to assist any entity or person other than the Debtors on matters relating to, or in connection with, these chapter 11 cases. If this Court approves the proposed employment of CDG by the Debtors, CDG will not accept any engagement or perform any services for any entity or person other than the Debtors in these chapter 11 cases. CDG will, however, continue to provide professional services to entities or persons that may be creditors of the Debtors or parties in interest in these chapter 11 cases; provided, however, that such services do not relate to, or have any direct connection with, these chapter 11 cases.

17.     Because Debtor is a large enterprise with numerous creditors and other relationships, CDG is unable to state with certainty that every client relationship or other connection has been disclosed. In this regard, if CDG discovers additional information that requires disclosure, CDG will file a supplemental disclosure with the Court.

18.     I am not related or connected to, and, to the best of my knowledge, no other employee of CDG is related nor connected to any United States Bankruptcy

Judge or District Judge for the Southern District of New York or the United States

Trustee for the Southern District of New York or to any employee in the offices thereof.

**Professional Services Compensation**

19.     CDG and the Debtors have entered into an agreement dated June

10, 2008 that will govern the relationship between them, a copy of which is attached as

Exhibit A to the Application (the "CDG Agreement").  CDG will provide such financial

advisory services as CDG and the Debtors shall deem appropriate and feasible in order to

advise the Debtors in the course of these chapter 11 cases, including, but not limited to,

the following (capitalized terms not otherwise defined herein are defined in the CDG

Agreement):

   a.     Review the Debtors' current liquidity forecast and assist
          management in modifying and updating such forecast base
          upon current information, CDG's observations and other
          information as it becomes available;

   b.     Gather and analyze data (including the Debtors' existing
          indebtedness), interview appropriate management and
          evaluate the Debtors' existing financial forecasts and
          budgets to determine the extent of the Debtors' financial
          challenges;

   c.     Assist the Debtors in developing and evaluating various
          restructuring scenarios;

   d.     Assist the Debtors in the preparation, design, and
          execution of the Restructuring plan;

   e.     Assist the Debtors in the development of a business
          plan;

   f.     As part of the development and review of the Business
          Plan, evaluate and analyze various parts of the Debtors'
          business; and

g. Assess inventory position and management strategies and other key working capital drivers.

20. Prior to the Commencement Date, CDG performed certain professional services for the Debtors beginning June 10, 2008 and has invoiced for $500,000 in fees and as part of their retainer through the period ending July 9, 2008, and approximately $2,185 in expenses incurred and processed to date. Prior to the Commencement Date, CDG has received payments totaling $500,000 for fees invoiced and approximately a $2,185 expense advance to be first applied against pre-petition expenses (incurred and processed and incurred but not yet processed). Additionally, CDG received $25,000 for fees related to the 2007 engagement.

21. The services set forth in the CDG Agreement and summarized above do not encompass other services or transactions that may be undertaken by CDG at the request of the Debtors not set forth in the CDG Agreement. The terms and conditions of any such services, including compensation arrangements, would be set forth in a separate written agreement between the Debtors and CDG and would be subject to any necessary Court approval.

22. The services that CDG will provide to the Debtors are necessary to enable the Debtors to maximize the value of their estate and to reorganize successfully. The Debtors believe that the services will not duplicate the services that, subject to this Court entering or having entered appropriate orders, other financial advisors, if any, would provide to the Debtors in these cases. CDG will carry out unique functions and will use reasonable efforts to coordinate with the Debtors' other retained professionals to avoid the unnecessary duplication of services.

23.     CDG has agreed to represent the Debtors for compensation at the amounts agreed upon between the parties pursuant to the CDG Agreement. As more fully described in the CDG Agreement, in consideration of the services provided by CDG, the Debtors have agreed to pay CDG:

a.     A monthly fee of $250,000, which will be due and paid by the Debtors, beginning on the date of the CDG Agreement and thereafter in advance on the 10th of each month during the term of the CDG Agreement. The Debtors will also pay CDG on the date of the CDG Agreement a retainer in the amount of $250,000 which shall be applied against their final invoice and, to the extent unused, will be returned to the Debtors;

b.     In addition to the foregoing, CDG will bill monthly in arrears for the reimbursement of all of its reasonable out-of-pocket expenses (including but not limited to travel costs, lodging, meals, research, telephone and facsimile, courier , overnight mail and copy expenses), incurred in connection with CDG's obligations under the CDG Agreement, the fees and disbursements of CDG's attorneys, plus any sales, use or similar taxes (including additions to such taxes, if any) arising in connection with any matter referred to in the CDG Agreement. CDG will submit to the Debtors monthly invoices for all services rendered and expenses incurred under the CDG Agreement. The Debtors will reimburse CDG for such expenses whether or not any transaction contemplated by the CDG Agreement shall be proposed or consummated;

c.     In the event CDG is requested or authorized by the Debtors or is required by government regulation, subpoena, or other legal process to produce CDG's documents or CDG's members, employees, agents or representatives as witnesses with respect to CDG's services for the Debtors, the Debtors will reimburse CDG for its professional time and expenses, as well as the fees and expenses of CDG's counsel, incurred in responding to such requests; and

d.     To the extent the Debtors request that CDG perform additional services not contemplated by the CDG

Agreement, fees for and the scope of such service will be mutually agreed upon by CDG and the Debtors.

24.     CDG will maintain detailed records of any actual and necessary costs and expenses incurred in connection with the aforementioned services, including receipts for any individual expenditure.

25.     CDG will seek compensation and reimbursement of expenses, as specified in the CDG Agreement, with the payment of such fees and expenses to be approved in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules and any orders of this Court, for all services performed and expenses incurred after the Commencement Date.

26.     CDG has not shared or agreed to share any of its compensation from the Debtors with any other person, other than the principals and employees of CDG, as permitted by section 504 of the Bankruptcy Code.

27.     Based on its experience and independent analysis, CDG believes that the Fee Structure is fair and reasonable. CDG believes that the Fee Structure appropriately reflects the nature and scope of the services to be provided by CDG, CDG's substantial experience with respect to financial advisory services, and the fee structures typically utilized by CDG and other leading financial advisors which do not bill their clients on an hourly basis.

Executed on this 9th day of July, 2008.

_____
Robert P. Conway
Principal

Subscribed and Sworn to before me
this 9th day of July, 2008

_____
Notary Public, State of New York
No.
Qualified in New York County
My Commission expires:

MEGAN MCGUIRE
NOTARY PUBLIC-STATE OF NEW YORK
No. 01MC6169095
Qualified in Nassau County
My Commission Expires June 18, 2011

**Exhibit A**

**CDG Agreement**



**Conway
Del Genio
Gries & Co., LLC**

June 10, 2008

Andy Todd
Steve & Barry's
12 Harbor Park Drive
Port Washington, NY 11050

Dear Andy:

This letter agreement confirms the engagement of Conway, Del Genio, Gries & Co., LLC ("CDG") by Steve & Barry's (the "Company"), as its financial advisor with respect to a possible Restructuring (as defined below) and with respect to other financial matters as to which the Company and CDG may agree in writing during the Term (as determined pursuant to Section C below) of this engagement ("Agreement"). All references in this letter to this Agreement shall include Schedule I hereto and Attachment A thereto.

A.     Scope of Services

CDG will:

I.    Review the Company's current liquidity forecast and assist management in modifying and updating such forecast based upon current information, CDG's observations and other information as it becomes available, including:

  a.    Evaluate immediate liquidity needs and assist the Company in the management of cash flow including review of daily cash disbursements;

  b.    Identify opportunities to improve liquidity;

  c.    Develop and expand 13-week cash flow forecast as requested by management and required by lenders;

  d.    Provide recommended improvements to the forecast process;

  e.    Monitor tenant allowances and collections.

II. Gather and analyze data (including the Company's existing indebtedness), interview appropriate management and evaluate the Company's existing financial forecasts and budgets to determine the extent of the Company's financial challenges

III. Assist the Company in developing and evaluating various restructuring scenarios, including:

    a. Develop various restructuring strategies/alternatives including the sale of assets;

    b. Assist the Company in the preparation of Chapter 11 filing;

    c. Develop a DIP cash flow forecast;

    d. Identify risks/benefits of both in-and out-of-court restructuring strategies;

    e. Present findings and recommendations to senior management and the Board of Directors.

IV. If requested by the Company or required by the lenders, assist the Company in the preparation, design, and execution of the Restructuring plan including:

    a. Assist the Company in developing and preparing evaluation materials for potential capital sources;

    b. Lead negotiations with potential capital sources;

    c. Participate in the Company's board meetings as appropriate, and provide periodic status reports and advice with respect to the restructuring plan;

    d. Perform such other services and analyses relating to the restructuring effort as are or become consistent with the foregoing items, or as the parties hereto mutually agree.

V. Assist the Company in the development of a 2009 business plan (including detailed financial projections), which plan would be shared with creditors, partners, and investors in discussions concerning a potential Restructuring (as defined below) of some or all of the Company's current indebtedness, obligations or liabilities)

VI. As part of the development and review of the Business Plan,

    a. Evaluate product lines and store profitability;

    b. Analyze detailed 4-wall profitability including carrying cost of inventory;

      c. Identify stores for closure and assess impact on the business;

      d. Evaluate lease terms and opportunities;

      e. Identify and quantify tenant allowances;

      f. Evaluate capital expenditure plans and ROI;

      g. Prepare a detailed bottoms-up financial model;

      h. Evaluate expense structure and overhead and assist management in identifying opportunities to reduce expenses;

VII. Assess inventory position and management strategies and other key working capital drivers, including:

      a. Review of inventory on hand, goods landed in Columbus and merchandise in transit;

      b. Work with the Company to develop processes to monitor inventory levels;

      c. Evaluate foreign and domestic purchasing strategies;

      d. Assist in identifying opportunities to reduce inventory levels, eliminate slow turning inventory, etc.;

      e. Prepare SKU analysis evaluating turns and profitability;

      f. Assist in the implementation of inventory management strategies;

      g. Evaluate other working capital management strategies.

CDG will not perform, directly or indirectly, solicitation services in connection with any transaction providing for the exchange of any security between the Company and its existing security holders.

For purposes of this Agreement, the term "Restructuring" shall mean any of the following: (x) recapitalization or restructuring with respect to the Company's obligations (including, without limitation, through any exchange, conversion, cancellation, forgiveness, retirement and/or a material modification or amendment to the terms, conditions or covenants of any of the Company's Obligations (including, without limitation, joint ventures or partnership interests, capital or operating lease obligations, trade credits, pension and other employee benefit obligations and other contract obligations)), including pursuant to an exchange transaction, a solicitation of consents, waivers, acceptances or authorizations, a bankruptcy proceeding or reorganization, a refinancing or repurchase, or (y) a Sale (as defined below).

For purposes of this Agreement, the term "Sale" shall mean the disposition to one or more third parties in one or a series of related transactions (whether or not pursuant to Section 363 of the U.S. Bankruptcy Code (the "Code")) of (x) a significant portion of the equity securities of the Company by the security holders of the Company or (y) a significant portion of the assets (including the assignment of any executory contracts) or businesses of the Company or its subsidiaries, in either case, including through a sale or exchange of capital stock, options or assets, a lease of assets with or without a purchase option, a merger, consolidation or other business combination, an exchange or tender offer, a recapitalization, the formation of a joint venture, partnership or similar entity, or any similar transaction.

In rendering its services to the Company hereunder, CDG is not assuming any responsibility for the Company's underlying business decision to pursue (or not to pursue) any business strategy or to effect (or not to effect) any Restructuring, Financing, Sale or other transaction. The Company agrees that CDG shall not have any obligation or responsibility to provide accounting, or audit for the Company or to otherwise advise with respect to the tax consequences of any proposed transaction directly or indirectly related to our services hereunder. The Company agrees that CDG shall not have any obligation or responsibility to provide any fairness opinions or any advice or opinions with respect to solvency in connection with any transaction. The Company and CDG confirm that each will rely on its own counsel, accountants and other similar expert advisors for legal, accounting, tax and other similar advice.

In order to coordinate effectively the Company's and CDG's activities to effect a Restructuring, Financing, Sale or other transaction, the Company will promptly inform CDG of any discussions, negotiations or inquiries regarding a possible Restructuring, Financing, Sale or other transaction (including any such discussions, negotiations or inquiries that have occurred in the six month period prior to the date of this Agreement).

Notwithstanding anything contained in this Agreement to the contrary, CDG makes no representations or warranties about the Company's ability to (i) successfully complete a Restructuring, Financing, Sale or other transaction or (ii) satisfy its obligations in full or (iii) maintain sufficient liquidity to operate its business.

B.     Fees & Expenses

For CDG's financial advisory services provided pursuant to this Agreement, it is agreed that the Company shall pay the following cash fees:

I.     Monthly Fee:  A monthly fee of $250,000.00 (the "Monthly Fee"), which shall be due and paid by the Company, beginning on the date hereof and hereafter in advance on the 10th of each month during the Term (as determined pursuant to Section C hereof) of this Agreement. The Company shall also pay to CDG on the date hereof a retainer in the amount of $250,000.00 which shall be applied against our final invoice and, to the extent unused, will be returned to the Company.

II. In addition to the foregoing, CDG will bill monthly in arrears for the reimbursement of all of its reasonable out-of-pocket expenses (including but not limited to travel costs, lodging, meals, research, telephone and facsimile, courier, overnight mail and copy expenses), incurred in connection with CDG's obligations under this Agreement, the fees and disbursements of CDG's attorneys, plus any sales, use or similar taxes (including additions to such taxes, if any) arising in connection with any matter referred to in this Agreement. CDG will submit to the Company monthly invoices for all services rendered and expenses incurred hereunder. The Company shall reimburse CDG for such expenses whether or not any transaction contemplated by this Agreement shall be proposed or consummated.

The Company shall pay CDG's fees and expenses in accordance with the terms hereof, except to the extent modified by the Bankruptcy Court.

In the event CDG is requested or authorized by the Company or is required by government regulation, subpoena, or other legal process to produce CDG's documents or CDG's members, employees, agents or representatives as witnesses with respect to CDG's services for the Company, the Company will reimburse CDG for its professional time and expenses, as well as the fees and expenses of CDG's counsel, incurred in responding to such requests.

Based upon mutual discussion between the Company and CDG of the various issues which may arise in connection with CDG's engagement hereunder, CDG's commitment to the variable level of time and effort necessary to address such issues, the level of staffing requested by the Company and the market price for CDG's engagements of this nature, the Company agrees that the fee arrangement hereunder fairly compensates CDG. The Company and CDG acknowledge and agree that the hours worked, the results achieved and the ultimate benefit to the Company of the work performed, in each case, in connection with this engagement, may vary, and that the Company and CDG have taken this into account in setting the fees hereunder.

To the extent that the Company requests that CDG perform additional services not contemplated by this Agreement, fees for and the scope of such services shall be mutually agreed upon by CDG and the Company, in writing, in advance.

C.     Term

The term of CDG's engagement as financial advisor to the Company (the "Term") shall commence on the date hereof and continue until terminated by either party in accordance with the provisions of Section E hereof.

D.     Staffing

CDG's services will be led by Robert Conway. In addition to Mr. Conway, CDG's performance of this Agreement will be staffed by other personnel possessing the requisite skills and

experience necessary to achieve the objectives set forth above in an expeditious and effective manner.

E.     Termination

Either party may terminate this Agreement on thirty (30) days' written notice; provided, however, that (a) termination in accordance with this Section E or through expiration of the Term shall not affect the Company's continuing obligation to indemnify and to otherwise limit the liability of the Indemnified Parties (as defined herein) as provided for in this Agreement; and (b) CDG shall be entitled to (i) the fees earned and expenses incurred, as calculated in accordance with Section B, through the date of termination or expiration of the Term and (ii) be paid the Restructuring Fee, Financing Transaction Fee or Sale Transaction Fee, as the case may be, if a Restructuring, Financing or Sale, is consummated on or before the date that is 12 months after the date of termination hereof or the date of expiration of the Term, as the case may be.

F.     Certain Tax Disclosures

Notwithstanding anything herein to the contrary and except as reasonably necessary to comply with any applicable federal and state securities laws, the Company (and each employee, representative, or other agent of the Company) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of any transaction directly or indirectly related to our services hereunder and all materials of any kind (including opinions or other tax analyses) that are provided to any party relating to such tax treatment and tax structure. For this purpose, "tax structure" is any fact that may be relevant to understanding the tax treatment of any transaction directly or indirectly related to our services hereunder.

G.     Miscellaneous

The Company recognizes and confirms that CDG in acting pursuant to this engagement will be using information in reports and other information provided by others, including, without limitation, information provided by or on behalf of the Company and any potential acquirors, and that CDG does not assume responsibility for and may rely, without independent verification, on the accuracy and completeness of any such reports and information. The Company represents that the disclosure materials will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances in which they were made, not false or misleading. In addition, the Company represents and warrants that any information relating to the Company that is furnished to CDG by or on behalf of the Company or other relevant parties will be true, complete and correct in all material respects. The foregoing shall remain operative and in full force and effect regardless of any investigation made by or on behalf of any Indemnified Party (as defined elsewhere in this Agreement).

The Company agrees that any information or advice (written or oral) rendered by CDG, its affiliates or any of its representatives in connection with this engagement is for the confidential use of the Company only in its evaluation of a Restructuring, Financing, Sale or other transaction

and the Company will not and will not permit any third party to disclose or otherwise refer to such advice or information in any manner without CDG's prior written consent.

The Company agrees to provide indemnification to and to limit liability of CDG and certain other persons in connection with CDG's engagement hereunder in accordance with Schedule I, which is attached hereto and made a part hereof.

Any controversy or claim arising out of or relating to this Agreement or the services provided by CDG pursuant hereto (including any such matter involving any parent, subsidiary, affiliate, successor in interest, or agent of the Company or of CDG) shall be submitted first to voluntary mediation, and if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in Schedule I to this Agreement; provided, however, the provisions of this paragraph set forth above shall not apply at any time that the Company is a debtor under any applicable provision of the Code; in such event the appropriate court having jurisdiction over the Company as a debtor shall resolve all controversies or claims arising out of this Agreement.

Should the Company become a debtor under any applicable provision of the Code, then the Company agrees to use its best efforts to obtain the approval of the court having jurisdiction over such case for the approval of this Agreement and CDG's retention by the Company under the terms of this Agreement. CDG shall have no obligation to provide any services under this Agreement in the event that the Company should become a debtor under any applicable reorganization law unless CDG's retention under the terms of this Agreement is approved on terms and conditions satisfactory to CDG by a final order of the appropriate court no longer subject to appeal, rehearing, reconsideration or petition for certiorari.

IN THE EVENT MEDIATION AND/OR ARBITRATION ARE UNAVAILABLE TO RESOLVE A DISPUTE BETWEEN THE PARTIES HERETO, THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY ACTION OR PROCEEDING ARISING IN CONNECTION WITH OR AS A RESULT OF THE ENGAGEMENT PROVIDED FOR IN THIS AGREEMENT.

The Company expressly acknowledges that CDG has been retained solely as an advisor to the Company, and not as an advisor to or an agent of any other person, and that the Company's engagement of CDG is not intended to confer rights upon any persons not a party hereto (including shareholders, employees or creditors of the Company) as against CDG, CDG's affiliates or their respective directors, officers, agents and employees. It is further understood and agreed that CDG will act under this Agreement as an independent contractor with duties solely to the Company as and to the extent set forth herein and nothing in this Agreement or the nature of CDG's services shall be deemed to create a fiduciary or agency relationship between CDG and the Company or its shareholders, employees or creditors. The obligations of CDG are solely entity obligations, and no officer, director, employee, agent, member, or controlling person shall be subjected to any personal liability whatsoever, nor will any such claim be asserted by or on behalf of any other party to this Agreement.

If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction to be void, invalid, or otherwise unenforceable, in whole or part, the remaining terms, provisions, covenants and restrictions contained in this Agreement shall remain in effect.

This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without reference to principles of conflicts of law other than Section 5-1401 of the New York General Obligations Law.

This Agreement shall constitute the entire understanding among the parties hereto with respect to the subject matter hereof, and supersedes and cancels all prior agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter.

Upon termination of this Agreement, CDG may publicly disclose its role as financial advisor pursuant to this Agreement; provided that if CDG's engagement becomes public prior to termination of this Agreement by any reason other than disclosure by CDG, CDG may publicly disclose its role as financial advisor at such earlier time.

This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

This Agreement is important to us and we appreciate the opportunity to serve you. If you are in agreement with the terms set forth herein, please confirm that the foregoing is in accordance with your understanding of our agreement by signing and returning this letter along with a check for the retainer and the first Monthly Fee in the total amount of $500,000.00.

Very truly yours,
Conway, Del Genio, Gries & Co., LLC

By _Robert P. Conway_

Consented and Agreed to:

Steve & Barry's

By _Adam Mandelbaum_
Adam Mandelbaum, General Counsel

SCHEDULE I

# INDEMNIFICATION, CONTRIBUTION, LIMITATION OF LIABILITY AND MEDIATION

This Schedule I and Attachment A hereto are a part of and incorporated into that certain letter agreement (together, the "Agreement"), dated June 10, 2008 between CDG and Steve and Barry's. All capitalized terms used but not defined herein shall have the same meaning as set forth in the Agreement.

The Company agrees to indemnify and hold harmless each of CDG and its affiliates, consultants, and independent contractors and each of their respective members, officers, directors, employees, agents, controlling parties and representatives (each, an "Indemnified Party" and collectively, the "Indemnified Parties") against any and all Losses caused by, relating to, based upon or arising out of (directly or indirectly):

  i.     this Agreement;

  ii.    the Indemnified Parties' acceptance of or the performance or non-performance of the services that are the subject of this Agreement and related activities prior to the date of this Agreement;

  iii.   any document or information, whether oral or written, provided to CDG by the Company or any of its representatives;

  iv.    the breach of any representations, warranties or covenants by the Company given pursuant hereto or in connection herewith;

  v.     CDG's involvement in the Restructuring;

  vi.    any filings made by or on behalf of any party with any governmental agency in connection with the Restructuring; or

  vii.   the Restructuring  (items (i) through (vii) are collectively referred to herein as the "Indemnified Events").

As used herein, the term "Losses" shall mean any and all losses, claims, damages, liabilities, penalties, obligations and expenses, including, but not limited to, reasonable attorney's fees, disbursements and court costs, and costs of investigation and preparation as and when incurred in investigating, preparing, pursuing or defending any action or claim (whether or not in connection with (x) pending or threatened litigation in which any Indemnified Party is a party, or may reasonably be expected to be made a party, or (y) enforcing this Agreement) and whether or not joint or several.

The Company agrees that it will not, without the prior written consent of an Indemnified Party, settle, compromise, discharge or consent to the entry of any judgment in any pending or

threatened claim, action, suit or proceeding based upon or in any way related to or arising out of any Indemnified Event and to which an Indemnified Party is or may reasonably be expected to be made a party unless (i) the Company has obtained a written agreement, approved by the relevant Indemnified Party (which approval shall not be unreasonably withheld or delayed) and executed by each party to such proposed settlement, compromise or discharge, or (ii) such settlement includes a provision unconditionally releasing such Indemnified Party and holding such Indemnified Party harmless against all liability in respect of claims by any releasing party relating to or arising out of the Indemnified Event. The Company will be liable for any settlement entered into by an Indemnified Party of any claim against such Indemnified Party made with the Company's prior written consent, which consent shall not be unreasonably withheld or delayed.

If any action, proceeding or investigation is commenced to which any Indemnified Party proposes to demand indemnification hereunder, such Indemnified Party will notify the Company with reasonable promptness; provided, however, that any failure by such Indemnified Party to notify the Company will not relieve the Company from its obligations hereunder, except to the extent that such failure shall have actually prejudiced the defense of such action. The Company will on demand, advance or pay promptly, on behalf of each Indemnified Party, all Losses that are asserted by the Indemnified Party to be subject to indemnification hereunder. Each Indemnified Party hereby undertakes, and the Company hereby accepts its undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such Indemnified Party is not entitled to be indemnified therefor. If any such action, proceeding or investigation in which an Indemnified Party is a party or is threatened to be made a party is also against the Company, the Company may, in lieu of advancing the expenses of separate counsel for any such Indemnified Party provide such Indemnified Party with legal representation by the same counsel who represents the Company, provided such counsel is reasonably satisfactory to such Indemnified Party, at no cost to such Indemnified Party; provided, however, that if such counsel or counsel to the Indemnified Party shall determine that due to the existence of actual or potential conflicts of interest between such Indemnified Party and the Company such counsel is unable to represent both the Indemnified Party and the Company, then the Indemnified Party shall be entitled to use separate counsel of its own choice and the Company shall promptly advance its reasonable expenses of such separate counsel upon submission of invoices therefor. Nothing herein shall prevent an Indemnified Party from using separate counsel of its own choice at its own expense, and the Company agrees to cause its counsel to cooperate with such counsel to the Indemnified Party.

In the event the foregoing indemnity is unavailable to an Indemnified Party for any reason, the Company agrees to contribute to any Losses related to or arising out of any Indemnified Event. Each of the Company, on the one hand, and the Indemnified Parties, on the other, shall contribute in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) from the actual or proposed transaction giving rise to this Agreement; provided, however, in no event regardless of the legal theory advanced or the allegations made in connection therewith shall the Indemnified Parties' aggregate contribution to the amount paid or payable to all parties exceed the aggregate fees actually received by such Indemnified Party

under this Agreement. For any other Losses, or for Losses referred to in the preceding sentence if the allocation provided for therein is unavailable for any reason, the Company and CDG shall contribute in such proportion as is appropriate to reflect not only such relative benefits but also the relative fault of each of the Company and the Indemnified Parties in connection with the statements, omissions or other conduct which resulted in such Losses, as well as any other relevant equitable considerations. Benefits received (or anticipated to be received) by the Company shall be deemed to be equal to the aggregate cash consideration and value of securities or any other property payable, exchangeable or transferable in such transaction or proposed transaction, and benefits received by the Indemnified Parties shall be deemed to be equal to the compensation payable by the Company to the Indemnified Parties in connection with such engagement. Relative fault shall be determined by reference to, among other things, whether any alleged untrue statement or omission or any other alleged conduct relates to information provided by the Company or other conduct by the Company (or its employees or other agents) on the one hand or by the Indemnified Parties on the other hand. The Company and CDG agree that it would not be just and equitable if contribution were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable considerations referred to above.

The Company will not be liable under the foregoing indemnification provision to any Indemnified Party to the extent that any Loss is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) on the merits to have resulted primarily and directly from such Indemnified Party's gross negligence or willful misconduct.

The Company agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or its owners, parents, creditors or security holders for or in connection with the engagement of CDG, except to the extent of any such liability for Losses that are found in a final judgment by a court of competent jurisdiction (not subject to further appeal) on the merits to have resulted primarily and directly from such Indemnified Party's gross negligence or willful misconduct. Notwithstanding anything contained herein to the contrary, in no event regardless of the legal theory advanced or the allegations made in connection therewith shall payments made by an Indemnified Party exceed the aggregate fees actually received by such Indemnified Party under this Agreement.

The rights provided herein shall not be deemed exclusive of any other rights to which the Indemnified Parties may be entitled under the certificate of incorporation or by-laws of the Company, any other agreements, any vote of stockholders or directors of the Company, any applicable law or otherwise.

## *Attachment A*

### *Dispute Resolution Procedures*

The following procedures shall be used to resolve any controversy or claim ("dispute") as provided in our letter agreement dated June 10, 2008 (the "Agreement").

### Mediation

A dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot otherwise agree on a mediator, one will be appointed by the American Arbitration Association ("AAA"). However, any mediator appointed by the AAA must be acceptable to all parties.

The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

The mediation shall take place in the Borough of Manhattan, New York, New York.

### Arbitration

If a dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. The arbitration will be conducted in accordance with the procedures in this document and the Commercial Arbitration Rules of the AAA. In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as follows: CDG and the Company will each select one arbitrator and the third arbitrator will be chosen by the two previously selected arbitrators. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability,

interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

Unless provided otherwise in the Agreement, the arbitrators shall have no power to award (i) damages inconsistent with the Agreement or (ii) punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or in any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a federal court deciding the matter in the same jurisdiction.

No discovery will be permitted in connection with the arbitration unless it is expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery. All aspects of the arbitration shall be treated as confidential. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.

The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

The arbitration shall take place in the Borough of Manhattan, New York, New York.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
                  :
**In re**                      :          **Chapter 11 Case No.**
                  :
**STEVE & BARRY'S**      :
**MANHATTAN LLC, et al.,**  :      ___ - _____ (  )
                  :
          **Debtors.**      :          **(Jointly Administered)**
                  :
------------------------------------------------------------x

**ORDER PURSUANT TO SECTIONS 327(a) AND 328(a) OF THE
BANKRUPTCY CODE AUTHORIZING RETENTION AND EMPLOYMENT OF
CONWAY, DEL GENIO, GRIES & CO., LLC AS FINANCIAL ADVISORS FOR
THE DEBTORS *NUNC PRO TUNC* TO THE COMMENCEMENT DATE**

        Upon the application dated July 9, 2008 (the "Application") of Steve &

Barry's Manhattan LLC and its debtor affiliates, as debtors and debtors in possession

(collectively, the "Debtors"), pursuant to sections 327(a) and 328(a) of chapter 11 of title

11 of the United States Code (the "Bankruptcy Code"), for authorization to retain and

employ Conway, Del Genio, Gries & Co., LLC ("CDG") as the financial advisors for the

Debtors *nunc pro tunc* to the date of commencement of these chapter 11 cases, all as

more fully set forth in the Application and the CDG letter agreement dated June 10, 2008

(the "CDG Agreement"); and upon consideration of the Affidavit of Robert P. Conway, a

Principal of CDG, in support of the Application, sworn to on the 9th day of July, 2008

(the "Conway Affidavit"); and the Court having jurisdiction to consider the Application

and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing

Order M-61 Referring to Bankruptcy Court for the Southern District of New York Any

and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and

consideration of the Application and the relief requested therein being a core proceeding

pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28

U.S.C. §§ 1408 and 1409; and due and proper notice of the Application having been

provided to (i) the United States Trustee for the Southern District of New York,

(ii) counsel to the agents for the Debtors' prepetition lenders, and (iii) those creditors

holding the thirty largest unsecured claims against the Debtors' estates (on a consolidated

basis), and it appearing that no other or further notice need be provided; and a hearing

having been held to consider the relief requested in the Application (the "Hearing"); and

the appearances of all interested parties having been noted in the record of the Hearing;

and upon the Affidavit of Gary Sugarman Pursuant to Rule 1007-2 of the Local

Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions

and Applications, sworn to on July 9, 2008, the record of the Hearing, all of the

proceedings had before the Court; the Court being satisfied, based on the representations

made in the Application and the Conway Affidavit, that CDG does not represent or hold

any interest adverse to the Debtors or to their estates as to the matters upon which it is to

be engaged and is a "disinterested person" under section 101(14) of the Bankruptcy

Code, as modified by section 1107(b) of the Bankruptcy Code, and that the employment

of CDG is in the best interests of the Debtors and their estates; and the Court having

determined that the legal and factual bases set forth in the Application and at the Hearing

establish just cause for the relief granted herein; and the relief requested in the

Application being in the best interests of the Debtors, their estates and creditors; and after

due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Debtors are authorized to employ and pay CDG the fees as set forth in the Application and in accordance with the CDG Agreement, subject, however, to final allowance in accordance with sections 328(a), 330, and 331 of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the Southern District of New York and orders of this Court; and it is further

ORDERED that the United States Trustee retains all rights to object to CDG's interim and final fee applications (including expense reimbursement) on all grounds including but not limited to the reasonableness standard provided for in section 330 of the Bankruptcy Code; and it is further

ORDERED that all requests of CDG for payment of indemnity pursuant to the CDG Agreement shall be made by means of an application (interim or final as the case may be) and shall be subject to review by the Court to ensure that payment of such indemnity conforms to the terms of the CDG Agreement and is reasonable based upon the circumstances of the litigation or settlement in respect of which indemnity is sought, provided, however, that in no event shall CDG be indemnified in the case of its own gross negligence or willful misconduct; and it is further

ORDERED that in no event shall CDG be indemnified if the Debtors or a representative of the estate, assets a claim for, and a court determines by final order that such claims arose out of, CDG's own gross negligence or willful misconduct; and it is further

ORDERED that in the event that CDG seeks reimbursement for attorneys' fees from the Debtors pursuant to the CDG Agreement, the invoices and supporting time records from such attorneys shall be included in CDG's own applications (both interim

and final) and such invoices and time records shall be subject to the United States Trustee's guidelines for compensation and reimbursement of expenses and the approval of the Court under the standards of §§ 330 and 331 of the Bankruptcy Code without regard to whether such attorney has been retained under § 327 of the Bankruptcy Code and without regard to whether such attorneys' services satisfy section 330(a)(3)(C) of the Bankruptcy Code; and it is further

ORDERED that this Court will retain jurisdiction to construe and enforce the terms of the Application, the CDG Agreement, and this Order.

Dated: August ___, 2008
        New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE