AMENDED AND RESTATED

ASSET PURCHASE AGREEMENT

AMONG

S&B INDUSTRIES INC.,

BH S&B HOLDINGS LLC

HILCO MERCHANT RESOURCES LLC

AND

GORDON BROTHERS RETAIL PARTNERS LLC

Dated as of August 21, 2008

# TABLE OF CONTENTS

## ARTICLE I

### DEFINITIONS

Section 1.1    Certain Definitions.............................................................................2
Section 1.2    Terms Defined Elsewhere in this Agreement .....................................11
Section 1.3    Other Definitional and Interpretive Matters. .....................................13

## ARTICLE II

### PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

Section 2.1    Purchase and Sale of Assets................................................................14
Section 2.2    Excluded Assets..................................................................................16
Section 2.3    Assumption of Liabilities....................................................................16
Section 2.4    Excluded Liabilities ............................................................................17
Section 2.5    Lease and Contract Designation; Cure Amounts.................................19
Section 2.6    Further Conveyances and Assumptions...............................................21
Section 2.7    Force Majeure .....................................................................................22
Section 2.8    Bulk Sales Laws..................................................................................22

## ARTICLE III

### CONSIDERATION

Section 3.1    Consideration ......................................................................................22
Section 3.2    Inventory Purchase Price Adjustment.................................................23
Section 3.3    Cash....................................................................................................23

## ARTICLE IV

### CLOSING AND TERMINATION

Section 4.1    Closing Date........................................................................................24
Section 4.2    Deliveries by Seller.............................................................................24
Section 4.3    Deliveries by Purchaser ......................................................................25
Section 4.4    Termination of Agreement..................................................................25
Section 4.5    Procedure Upon Termination...............................................................26
Section 4.6    Effect of Termination..........................................................................26

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF PARENT AND SELLERS

Section 5.1    Organization and Good Standing.................................................................28
Section 5.2    Authorization of Agreement ......................................................................28
Section 5.3    Conflicts; Consents of Third Parties. ........................................................28
Section 5.4    Financial Advisors ....................................................................................29
Section 5.5    Title to Assets ...........................................................................................29
Section 5.6    Legal Compliance .....................................................................................29
Section 5.7    Property.....................................................................................................29
Section 5.8    Intellectual Property..................................................................................30
Section 5.9    Insurance ...................................................................................................30
Section 5.10   Pricing......................................................................................................30
Section 5.11   Tax Matters ...............................................................................................31
Section 5.12   Cure Amounts ...........................................................................................31
Section 5.13   No Other Representations or Warranties; Schedules..................................31

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Section 6.1    Organization and Good Standing.................................................................31
Section 6.2    Authorization of Agreement ......................................................................31
Section 6.3    Conflicts; Consents of Third Parties. ........................................................32
Section 6.4    Litigation...................................................................................................32
Section 6.5    Financial Advisors ....................................................................................32
Section 6.6    Financial Capability ..................................................................................32

## ARTICLE VII

## BANKRUPTCY COURT MATTERS

Section 7.1    Competing Transaction..............................................................................33
Section 7.2    Bankruptcy Court Filings...........................................................................33

## ARTICLE VIII

## COVENANTS

Section 8.1    Access to Information ................................................................................34
Section 8.2    Conduct of the Business Pending the Closing ..........................................34
Section 8.3    Consents....................................................................................................36
Section 8.4    Regulatory Approvals. ..............................................................................36
Section 8.5    Further Assurances....................................................................................38
Section 8.6    Confidentiality ..........................................................................................38

Section 8.7    Preservation of Records ...........................................................................38
Section 8.8    Publicity .................................................................................................38
Section 8.9    Supplementation and Amendment of Schedules ...............................................39
Section 8.10   Court Order.............................................................................................39
Section 8.11   Adequate Assurance of Future Performance ...................................................39
Section 8.12   Purchaser Covenants after Closing; Access.....................................................40
Section 8.13   Authorization of Parent as Seller Representative. ..............................................40

ARTICLE IX

EMPLOYEES AND EMPLOYEE BENEFITS

Section 9.1    Employment.............................................................................................41
Section 9.2    Employee Benefits. ...................................................................................41

ARTICLE X

CONDITIONS TO CLOSING

Section 10.1   Conditions Precedent to Obligations of Purchaser ...............................................43
Section 10.2   Conditions Precedent to Obligations of Parent....................................................47
Section 10.3   Conditions Precedent to Obligations of Purchaser and Parent ...............................47
Section 10.4   Frustration of Closing Conditions....................................................................48

ARTICLE XI

NO SURVIVAL

Section 11.1   No Survival of Representations and Warranties....................................................48
Section 11.2   No Consequential Damages..........................................................................48

ARTICLE XII

TAXES

Section 12.1   Transfer Taxes .........................................................................................48
Section 12.2   Prorations...............................................................................................49
Section 12.3   Purchase Price Allocation ............................................................................49
Section 12.4   Cooperation.............................................................................................49

ARTICLE XIII

MISCELLANEOUS

Section 13.1   Expenses ................................................................................................50
Section 13.2   Injunctive Relief.......................................................................................50

Section 13.3    Submission to Jurisdiction; Consent to Service of Process. .................................50
Section 13.4    Waiver of Right to Trial by Jury .......................................................................51
Section 13.5    Entire Agreement; Amendments and Waivers ...................................................51
Section 13.6    Governing Law .................................................................................................51
Section 13.7    Notices .............................................................................................................51
Section 13.8    Severability ......................................................................................................52
Section 13.9    Binding Effect; Assignment ..............................................................................52
Section 13.10   Non-Recourse ...................................................................................................53
Section 13.11   Counterparts .....................................................................................................53

Schedules

| | |
|---|---|
| 1.1(d) | Confidentiality Agreements |
| 1.1(e) | Excluded Contracts |
| 1.1(f) | Excluded Leases |
| 1.1(g) | Knowledge of Seller |
| 1.1(h) | Purchased Contracts |
| 1.1(i) | Real Estate Occupancy Expenses |
| 1.1(j) | Real Property Leases |
| 2.5(a) | Purchased Leases |
| 3.2(a) | Inventory Adjustment Amount |
| 3.2(b) | Inventory Taking Procedures |
| 5.3(a) | No Conflicts |
| 5.3(b) | Consents |
| 5.4 | Financial Advisors |
| 5.7(a) | Real Property Leases |
| 5.7(b) | Grant of Rights |
| 5.7(c) | Entitlements |
| 5.7(d) | Conveyances |
| 5.7(f) | Furniture and Equipment |
| 5.8 | Intellectual Property |
| 5.9 | Insurance |
| 5.10 | Pricing |
| 5.12 | Cure Amounts |
| 6.3 | Conflicts |
| 8.2 | Conduct of the Business |
| 8.2(ix) | Store Retail Price |
| 8.2(xii) | Transferred Merchandise Mix |
| 10.1(g)(i) | Certain Intellectual Property |
| 10.1(g)(ii) | Intellectual Property to be Transferred |

Exhibits

| | |
|---|---|
| A | List of Affiliates of Parent that are Sellers |
| B | Bill of Sale |
| C | Assignment and Assumption Agreement |
| D | Agency Agreement |
| E | Trademark Assignment Agreement |
| F | Copyright Assignment Agreement |
| G | Standby Agency Agreement |
| H | Escrow Agreement |
| I | Bidding Procedures Order |

## AMENDED & RESTATED ASSET PURCHASE AGREEMENT

AMENDED & RESTATED ASSET PURCHASE AGREEMENT, dated as of August 21, 2008 (this "Agreement"), among S&B Industries Inc., a Delaware corporation ("Parent"), Affiliates of Parent set forth on Exhibit A hereto (the "Selling Affiliates"), Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners LLC on behalf of the Sub-Agent (as defined herein), and BH S&B Holdings LLC, a Delaware limited liability company ("Purchaser").

## W I T N E S S E T H:

WHEREAS, Parent and its Selling Affiliates (together with Parent, the "Sellers", and each, a "Seller") are debtors-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on July 9, 2008, in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case No. (08-12579(ALG)) (the "Bankruptcy Case");

WHEREAS, the Sellers presently conduct the Business;

WHEREAS, Purchaser desires to purchase substantially all the assets and assume certain lease and other obligations of the Sellers with the present intention of operating the Business as a going concern;

WHEREAS, Parent desires to, and desires to cause each Selling Affiliate to, sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from each Seller, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, all of the Purchased Assets and Assumed Liabilities, all as more specifically provided herein

WHEREAS, Parent, Selling Affiliates and Purchaser entered into an Asset Purchase Agreement dated August 4, 2008 in respect of the above (the "Original Agreement");

WHEREAS, Parent, Selling Affiliates and Purchaser desire to amend and restate the Asset Purchase Agreement as set forth herein; and

WHEREAS, certain terms used in this Agreement are defined in Section 1.1;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

ARTICLE I

DEFINITIONS

Section 1.1    <u>Certain Definitions</u>.

For purposes of this Agreement, the following terms shall have the meanings specified in this <u>Section 1.1</u>:

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"<u>Agent</u>" means Purchaser or Sub-Agent, as provided in the Agency Agreement, as may be amended by the parties thereto from time to time.

"<u>Applicable Lease Marketing Period Termination Date</u>" means, with respect to each Real Property Lease, the earliest to occur of (a) the Designation Deadline, (b) the tenth (10th) day following the date upon which Purchaser delivers to Parent a Property Dropout Notice with respect to such Real Property Lease; and (c) the fifteenth (15th) day following the date upon which Purchaser delivers to Sellers a Lease Assumption Notice with respect to a Real Property Lease.

"<u>Assumed Cure Amount</u>" means, with respect to each Purchased Lease, Purchased Contract, Designee Lease or Designee Contract, amounts payable in order to cure any defaults existing as of the date of assumption in respect of such Purchased Lease, Purchased Contract, Designee Lease or Designee Contracts, as approved by the Bankruptcy Court; <u>provided</u>, <u>however</u>, that Purchaser shall have no obligation to cure defaults or pay actual or pecuniary losses relating to such defaults in respect of the Celebrity Licenses to the extent such defaults or losses exceed Six Hundred Fifty Thousand Dollars ($650,000) in the aggregate (the "<u>Celebrity License Payment Cap</u>").

"<u>Auction</u>" means the Auction as contemplated by the Bidding Procedures Order.

"<u>Bidding Procedures Order</u>" means an order of the Bankruptcy Court in the form attached hereto as <u>Exhibit I</u>, as may be amended in form and substance satisfactory to Purchaser.

"<u>Blooper Merchandise</u>" means all saleable inventory of any kind or nature, wherever located, that is identified as "blooper" or "995" (or similarly named) merchandise on Sellers' records (including without limitation as identified on Sellers' Interlinks due diligence data as "blooper" merchandise, by means of store, Distribution Center, or transfer bar coding, by means of segregation in the Distribution Center "blooper rooms," by means of segregation in the Sellers' stores, or otherwise).  For purposes of <u>Section 3.2</u>, the Cost Value of the Blooper Merchandise shall be deemed to be Four Million Dollars ($4,000,000).

"Business" means the business of the Sellers.

"Business Day" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"Celebrity Licenses" means those Contracts set forth on Schedule 5.8 and identified as Celebrity Licenses.

"Collegiate and Miscellaneous Licenses" means those Contracts set forth on Schedule 5.8 and identified as Collegiate and Miscellaneous Licenses.

"Confidentiality Agreement" means those agreements in respect of obligations of confidentiality owed to a third party that are listed on Schedule 1.1(d).

"Contract" means any contract, commitment, indenture, note, bond, lease, license or other agreement, written or oral, relating to the assets of any Seller or the operation of the Business to which any Seller is a party or by which any of such Seller's assets are bound.

"Cost Value" means the lower of (i) the weighted average cost as reflected on Parent's inventory item master cost file identified as Parent's Interlinks Due Diligence document (date 7/16/08) "Inventory_Master_File2008-07-01-00-00-00.xlsx, using the definitions set forth in Parent's Interlinks Due Diligence document (date 7/15/08) "02E – Inventory Master File Cost Definition.doc" (the "Cost File"); or (ii) the Store Retail Price or DC Retail Price, as applicable, of such item of Merchandise.

"Creditors Committee" means the official committee of unsecured creditors of appointed in the Bankruptcy Case.

"Defective Merchandise" means any item of Merchandise other than Blooper Merchandise, that is defective or otherwise not saleable in the ordinary course because it is worn, scratched, broken, faded, torn, mismatched, tailored or affected by other similar defenses rendering it not first quality. Display Merchandise shall not per se be deemed to be Defective Merchandise.

"Deposit" means Sixteen Million Three Hundred Thousand Dollars ($16,300,000).

"Designation Deadline" means 5:00 p.m., New York time, on January 31, 2009, or such later date as the Parent and Purchaser may agree and as the Bankruptcy Court may authorize.

"Designee Contract" means a Contract to which any Seller is a party that is assumed and assigned by Sellers to a Person other than the Purchaser pursuant to Section 2.5(a).

"Designee Lease" means a Real Property Lease that is assumed and assigned by Sellers to a Person other than the Purchaser pursuant to Section 2.5(a).

"<u>Display Merchandise</u>" means those items of inventory (other than Blooper Merchandise) used in the ordinary course of business as displays or floor models, including inventory that has been removed from its original packaging for the purpose of putting such item on display but not customarily sold or saleable by Sellers, which goods are not otherwise damaged or defective.

"<u>Disposition Rights</u>" means the right to direct the disposition of the GOB Assets.

"<u>Distribution Center Merchandise</u>" means those items of inventory identified by UPC/SKU on <u>Schedule 3.2(b)(1)</u> annexed hereto, that were located in Sellers' Distribution Center and were transferred to the Store Closing Location prior to the start of the GOB Sales for purposes of inclusion in the GOB Sales. Notwithstanding the foregoing, in no event shall any Blooper Merchandise be deemed to be Distribution Center Merchandise (regardless of if/when such goods are delivered to the Store Closing Locations), and Sellers hereby represents that it has not, and will not transfer any Blooper Merchandise into the Store Closing Locations for inclusion in the GOB Sales.

"<u>Documents</u>" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related to the Business and the Purchased Assets in each case whether or not in electronic form.

"<u>Domestic Merchandise</u>" means those items of inventory that have been purchased by Sellers and are being delivered by a manufacturer/vendor located within the United States.

"<u>Employee Benefit Plan</u>" means each "employee benefit plan" (as defined in Section 3(3) of ERISA, including multiemployer plans within the meaning of Section 3(37) of ERISA), and each other stock purchase, stock option, severance, employment, change-in-control, fringe benefit, collective bargaining, bonus, incentive, deferred compensation, employee loan and all other employee benefit plans, agreements, programs, policies or other arrangements, whether or not subject to ERISA, sponsored, maintained, contributed or entered into by any of the Sellers under which any current or former Employee has any present or future right to benefits.

"<u>Employees</u>" means all individuals, as of the date hereof, whether or not actively at work as of the date hereof, who are employed by each Seller having significant responsibility related to the Business, together with individuals who are hired in respect of the Business after the date hereof and prior to the Closing as permitted by the provisions hereof, <u>provided</u>, <u>however</u>, for the avoidance of doubt, in each case excluding any employee on long-term disability.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" means a commercial bank reasonably acceptable to Parent and Purchaser.

"Escrow Agreement" means an agreement executed by Purchaser, Sellers and the Escrow Agent, in the form attached hereto as Exhibit H.

"Excluded Contract" means those Contracts set forth on Schedule 1.1(e) (as the same may be updated by Purchaser from time to time pursuant to Section 2.5(a).

"Excluded Defective Merchandise" means (i) those items of Defective Merchandise that are not saleable in the ordinary course because they are so damaged or defective that such inventory cannot reasonably be used for their intended purpose and (ii) inventory of any kind or nature, wherever located, that was, is, becomes, or reasonably could become subject to a claim of trademark (or other intellectual property) infringement by any third party.

"Excluded Leases" means those Real Property Leases set forth on Schedule 1.1(f) as the same may be updated by Purchaser from time to time pursuant to Section 2.5(a).

"Expense Reimbursement" means all reasonable out-of-pocket costs and expenses of third parties incurred by Purchaser (including the reasonable expenses of counsel and other outside consultants related to negotiation of this Agreement and investigating the Sellers or the Purchased Assets and attempting to satisfy the conditions herein), which, subject to Bankruptcy Court approval, shall constitute a super priority administrative expense under Section 503(b)(1) of the Bankruptcy Code and shall be paid as set forth in Section 4.6; provided, however, that the Expense Reimbursement shall in no event exceed Two Million Dollars ($2,000,000); and provided, further, that in the event this Agreement is terminated pursuant to Section 4.4(j), the Expense Reimbursement shall be limited to One Million Dollars ($1,000,000).

"Furniture and Equipment" means all furniture, fixtures, furnishings, equipment, vehicles, leasehold improvements, and other tangible personal property owned or used by the Sellers in the conduct of the Business, including all such artwork, desks, chairs, tables, Hardware, copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies.

"GECC" means General Electric Capital Corporation.

"GOB Assets" means all owned Merchandise and Furniture and Equipment located at Store Closing Locations.

"GOB Sales" means those "store closing" or other similarly themed sales conducted by Agent pursuant to the Agency Agreement and the Sale Order at the Store Closing Locations.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Hardware" means any and all computer and computer-related hardware, including, but not limited to, computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Intellectual Property" means (i) patents and patentable inventions, discoveries, innovations, improvements, invention disclosures and applications therefor, including divisions, continuations, continuations-in-part and renewal applications, and including renewals, extensions and reissues (collectively, "Patents"), (ii) registered and unregistered trademarks, service marks, brand names, domain names, certification marks, collective marks, logos, symbols, trade dress, trade names, assumed names, fictitious names, d/b/a's , and all other indicia of origin or quality, together with the goodwill associated therewith, and all applications, registrations and renewals thereof (collectively, "Trademarks"), (iii) published and unpublished works of authorship, whether copyrightable or not, including without limitation databases and any other compilations of information and applications and registrations thereof, and all derivative works, renewals, extensions, restorations and reversions thereof (collectively, "Copyrights"), (iv) computer programs, software, firmware, middleware, user interface, source code, object code, databases and compilations, including any and all data and collections of data whether machine readable or otherwise, algorithms, development tools, servers, and the like, flow charts, models and methodologies and other work product used to design, plan, organize and develop any of the foregoing, and user manuals and other training documentation related to any of the foregoing (collectively, "Software"), and (v) trade secrets, confidential information, show-how and know-how, including without limitation processes, ideas, concepts, schematics, business methods and programs, formulae, drawings, prototypes, prototypes, models, designs, customer information, and lists, such as customer, manufacturer and supplier lists (collectively, "Trade Secrets"), and all intellectual property rights arising from or in respect of each of the foregoing.

"Intellectual Property Licenses" means, collectively, Celebrity Licenses and Collegiate and Miscellaneous Licenses, and Intellectual Property licenses.

"Inventory" means all supplies, finished goods, saleable or other items of inventory owned by any Seller or used in connection with the Business, including all Merchandise, wherever located.

"Knowledge of Seller" means the knowledge, after reasonable inquiry, of those officers and directors of Seller and its Subsidiaries identified on Schedule 1.1(g).

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation.

"Leased Premises" means the real property demised by the Real Property Leases including, without limitation, and along with, any buildings or other improvements located

thereon or forming a part thereof (notwithstanding whether Seller or its Subsidiaries lease or own such buildings or other improvements), all fixtures, systems, equipment and items of personal property of the Sellers attached or appurtenant thereto, and all easements, licenses, rights and appurtenances relating to the foregoing.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

"Lenders" means GECC, and the Sellers' other secured lenders.

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"Lien" means any mortgage, lien, security interest, charge, hypothecation, deed of trust, pledge, right of use, first offer or refusal, easement, servitude, restrictive covenant, lease, sublease, covenant, right of way, option, claim, restriction, encroachment or encumbrance of any kind.

"Mahogany Hangers" means all functioning mahogany or other wooden hangers located in the Store Closing Locations, the other stores in respect of the Leased Premises and the Distribution Center (including those mahogany or other wooden hangers in the Store Closing Locations and the other stores in respect of the Leased Premises that have Merchandise hanging on them).

"Material Adverse Effect" means (i) a material adverse effect on the business, assets, properties, results of operations or financial condition of the Sellers (taken as a whole), or (ii) a material adverse effect on the ability of the Sellers (taken as a whole) to consummate the transactions contemplated by this Agreement or perform their obligations under this Agreement, other than an effect resulting solely from an Excluded Matter. "Excluded Matter" means any one or more of the following: (i) the effect of any change in the United States or foreign economies or securities or financial markets in general; (ii) the effect of any change that generally affects any industry in which any Seller operates except to the extent such change has a disproportionate effect on the Sellers; (iii) the effect of any change arising in connection with earthquakes, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway as of the date hereof; (iv) the effect of any action taken by Purchaser or its Affiliates with respect to the transactions contemplated hereby or with respect to any Seller, including such Seller's employees; (v) the effect of any changes in applicable Laws or accounting rules; or (vi) any effect resulting from the public announcement of this Agreement, compliance with terms of this Agreement or the consummation of the transactions contemplated by this Agreement; or (vii) any effect resulting from the filing of the Bankruptcy Case and reasonably anticipated effects thereof.

"Merchandise" means all finished goods saleable inventory (including Domestic Merchandise and Overseas Merchandise) owned by Sellers, held for sale in the Ordinary Course of Business and located at the Leased Premises as of the Closing Date, including (A) Defective

Merchandise; (B) Distribution Center Merchandise; (C) Display Merchandise, (D) Unprinted Merchandise; (E) Blooper Merchandise; (F) Merchandise subject to Gross Rings; and (G) On-Order Merchandise.  Notwithstanding the foregoing, "Merchandise" shall not include: (1) goods which belong to sublessees, licensees, department lessees, or concessionaires of Seller; (2) goods held by Seller on memo, on consignment, or as bailee; (3) Furniture and Equipment and hangers, other than Mahogany Hangers; (4) goods returned by the consumer after the Closing Date; and (5) Excluded Defective Merchandise.

"On-Order Merchandise" means those items of inventory identified by UPC/SKU on Schedule 3.2(b)(2) annexed hereto, that were ordered by Sellers in the ordinary course of business and are purchased by Sellers, but received at the Store Closing Locations, the Distribution Center or the other stores in respect of the Leased Premises after the Closing.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business through the date of the Original Agreement consistent with past practice, including as to frequency and amount.

"Overseas Merchandise" means items of inventory that are purchased by Sellers from a manufacturer/vendor located outside the United States and imported into the United States.

"Permits" means any approvals, authorizations, consents, licenses, permits or certificates of a Governmental Body.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Petition Date" means July 9, 2008.

"Proceeds" means the aggregate of (a) the total amount (in dollars) received on all sales of Merchandise and Furniture and Equipment owned by Sellers made under the Agency Agreement, exclusive of sales Taxes; and (b) all proceeds of Sellers' insurance for loss or damage to Merchandise or Furniture and Equipment owned by Sellers or loss of cash arising from events occurring prior to the Applicable Lease Marketing Period Termination Date. Proceeds shall also include any and all proceeds received by Purchaser or Agent from the disposition, in a commercially reasonable manner, of unsold Merchandise and Furniture and Equipment owned by Sellers prior to the Applicable Lease Marketing Period Termination Date, whether through salvage, bulk sale or otherwise.

"Products" means any and all products developed, manufactured, marketed or sold by the Sellers, whether work in progress or in final form.

"Purchased Contracts" means those Contracts set forth on Schedule 1.1(h) as the same may be updated by Purchaser from time to time pursuant to Section 2.5(a) and which are assumed and assigned to Purchaser on or prior to the Designation Deadline.

"Purchased Intellectual Property" means all worldwide Intellectual Property and Intellectual Property Licenses owned and/or used by Sellers in connection with, arising from or in respect of the Business.

"Purchased Leases" means those Real Property Leases designated as such on Schedule 2.5(a) as the same may be updated by Purchaser from time to time and which are assumed and assigned to Purchaser pursuant to the Sale Order together with all rights and interests of the Sellers relating thereto, whether held directly by the Sellers or indirectly through an agent or nominee (including but not limited to all security deposits, purchase options, renewal options, rights of first refusal, reconveyance rights and expansion rights, if any, and to the extent the following are assignable, fixtures, systems, equipment and items of personal property of the Sellers attached or appurtenant thereto, all buildings and improvements thereon or forming a part thereof and all easements, licenses, rights and appurtenances thereto and associated with such Purchased Leases).

"Qualified Bid" means a Qualified Bid as defined in the Sale Motion. This Agreement shall be deemed to be a Qualified Bid.

"Real Estate Occupancy Expenses" means only those per diem expenses to the extent actually incurred of operating each location subject to a Real Property Lease in the amounts shown on Schedule 1.1(i) attached hereto.

"Real Property Leases" means the leases and other instruments and agreements for the Leased Premises which are set forth on Schedule 1.1(j), together with (and as amended, modified, supplemented or restated by) all amendments, modifications, supplements, including consents and evidence of commencement dates (to the extent such information is in the possession of the Sellers), and restatements thereto or thereof (if any), and all rights and interests of the Sellers relating thereto, whether held directly by the Sellers or indirectly through an agent or nominee (including but not limited to all security deposits, purchase options, renewal options, rights of first refusal, reconveyance rights and expansion rights, if any).

"Sale Hearing" means the hearing(s) conducted by the Bankruptcy Court pursuant to which the Sale Order is entered.

"Sale Motion" means the Debtors' Amended Motion pursuant to Section 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006 for (i) approval of procedures in connection with the sale of all or substantially all of the Debtors' assets, (ii) authorization to enter into stalking horse agreements in connection therewith, (iii) approval of the payment of stalking horse protections, and (v) the setting of related auction and hearing dates dated July 16, 2008, as the same may be amended in form and substance satisfactory to Purchaser.

"Sale Order" shall be an order or orders of the Bankruptcy Court in form and substance acceptable to Purchaser and Parent approving this Agreement and all of the terms and

conditions hereof, and approving and authorizing the Sellers to consummate the transactions contemplated hereby.

"Standby Agency Agreement" means the agency agreement in the form attached hereto as Exhibit G.

"Subsidiary" means any Person of which a majority of the outstanding voting securities or other voting equity interests are owned, directly or indirectly, by Seller.

"Sub-Agent" means a joint venture comprised of Hilco Merchant Resources, LLC, with a principal place of business at 5 Revere Drive, Suite 206, Northbrook, IL 60062 and Gordon Brothers Retail Partners, LLC, with a principal place of business at 101 Huntington Avenue, 10th Floor, Boston, MA 02199.

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including, without limitation, all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i).

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes, and any amendments thereof.

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the design, development, reproduction, maintenance or modification of, any of the Products.

"Termination Fee" means an amount equal to two percent (2.0%) of the Purchase Price, which shall, subject to Bankruptcy Court approval, constitute a super priority administrative expense under Section 503(b)(1) of the Bankruptcy Code and shall be paid as set forth in Section 4.6 provided, however, that in the event this Agreement is terminated pursuant to Section 4.4(j), and Parent and Agent shall have entered into the Standby Agency Agreement and such agreement is subsequently terminated as a result of the Bankruptcy Court approving a Qualified Bid, or Parent or Sellers withdraw or seek authority to withdraw their motion seeking approval of the transactions contemplated by the Standby Agency Agreement, or announce any stand alone plan of reorganization or liquidation (or supports any such plan filed by any other party), the amount of the Termination Fee shall be equal to one-half of one percent (0.5%) of the Purchase Price.

"Unprinted Merchandise" means those items of inventory wherever located (including without limitation at the Stores, the Distribution Centers, Sellers' third-party screen

printer vendors, or otherwise) that are awaiting screen printing (or further screen printing) necessary to make such goods finished goods saleable inventory but are delivered to the Store Closing Locations, without having been printed; provided, however, that that such items are not otherwise Excluded Defective Merchandise. For purposes of clarification, those items of inventory located in the Store Closing Locations or the Distribution Centers that are intended to be sold as blanks (unprinted) shall not be deemed "Unprinted Merchandise."

Section 1.2    Terms Defined Elsewhere in this Agreement. For purposes of this Agreement, the following terms have meanings set forth in the sections indicated:

| Term | Section |
| --- | --- |
| Agency Agreement | Section 10.1(c) |
| Agreement | Introduction |
| Alternate Procedure | Section 9.1(c) |
| Antitrust Division | Section 8.4(a) |
| Antitrust Laws | Section 8.4(b) |
| Asset Acquisition Statement | Section 12.3 |
| Assumed Liabilities | Section 2.3 |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bidding Procedures Approval Date | Section 7.1(a) |
| Business Employee List | Section 9.1(a) |
| Closing | Section 4.1 |
| Closing Date | Section 4.1 |
| Competing Bid | Section 7.1(a) |
| Confidential Information | Section 8.6 |
| Confidentiality Agreement | Section 1.1 |
| Copyrights | Section 1.1 |
| Designated Amendment Real Property Leases | Section 8.2(xiv) |
| Escrow Amount | Section 3.1(b)(ii) |
| Excluded Assets | Section 2.2 |
| Excluded Liabilities | Section 2.4 |
| Excluded Matter | Section 1.1 |
| FTC | Section 8.4(a) |
| Global Inventory Adjustment | Schedule 3.2(b) |
| GOB Assets | Section 2.5(c) |
| HSR Act | Section 1.1 |
| Indian Assets | Section 2.1(d) |
| Inventory Adjustment Amount | Section 3.2(a) |
| Inventory Taking | Schedule 3.2(b) |
| Inventory Target | Section 3.2(a) |
| Lease Assumption Notice | Section 2.5(e)(iii) |
| Original Agreement | Recitals |
| Parent | Introduction |
| Patents | Section 1.1 |
| Property Dropout Notice | Section 2.5(e)(i) |

| Term | Section |
|------|---------|
| Purchase Price | Section 3.1 |
| Purchased Assets | Section 2.1 |
| Purchased Cash | Section 3.3 |
| Purchased Claims | **Error! Reference source not found.** |
| Purchaser | Introduction |
| Purchaser Documents | Section 6.2 |
| Purchaser Plans | Section 9.2(b) |
| Remaining Purchase Price | Section 3.1(c) |
| Required Consents | Section 10.1(e) |
| Revised Statements | Section 12.3 |
| Sale Order Approval Date | Section 7.1(a) |
| Section | Section 1.3(a) |
| Seller | Recitals |
| Seller Documents | Section 5.2 |
| Sellers | Recitals |
| Selling Affiliates | Introduction |
| Software | Section 1.1 |
| Standard Procedure | Section 9.1(c) |
| Standby Agency Agreement | Section 1.1 |
| Store Closing Locations | Section 2.5(c) |
| Termination Date | Section 4.4(a) |
| Trade Secrets | Section 1.1 |
| Trademarks | Section 1.1 |
| Transfer Taxes | Section 12.1 |
| Transferred Employees | Section 9.1(b) |
| Weekly Sale Reconciliation | Schedule 3.2(b) |

Section 1.3    Other Definitional and Interpretive Matters.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars.  Any reference in this Agreement to $ shall mean U.S. dollars.

Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any matter or item disclosed on one schedule shall be deemed to have been disclosed on each other schedule to the extent it is reasonably apparent on the face of such disclosure (and not by reference to the underlying documents) that such disclosed matter is relevant to each other schedule.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number shall include the plural and vice versa.

Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein.  The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including.  The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

Section References.  All section references contained herein, unless otherwise specified, shall refer to sections of this Agreement.

(b)    The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

# ARTICLE II

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

Section 2.1    <u>Purchase and Sale of Assets</u>.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall purchase, acquire and accept from the Sellers, and Sellers shall (and shall cause the Selling Affiliates to) sell, transfer, assign, convey and deliver to Purchaser all of the Sellers' right, title and interest in, to and under the Purchased Assets free and clear of any and all liabilities, obligations and Liens, other than the Assumed Liabilities.  "<u>Purchased Assets</u>" shall mean the following assets of the Sellers (but excluding Excluded Assets) as of the Closing to the extent related to, used by or used in the Business or specifically identified below:

(a)    all accounts receivable of the Sellers other than any accounts receivable arising solely out of or in connection with any Excluded Contract;

(b)    all Inventory, other than the Inventory constituting part of the GOB Assets;

(c)    rights to acquire goods in transit or at port, and/or previously produced, in each case  to the extent the same were, prior to the Petition Date, scheduled to be delivered to any of the Sellers, and having an aggregate minimum value of not less than Twenty Five Million Dollars ($25,000,000);

(d)    all of the assets of S&B Retail India LLC, UniSource Worldwide Private Ltd., and Superior Universal Private Ltd. (collectively, the "Indian Assets");

(e)    all deposits (including customer deposits and security deposits for rent, electricity, telephone or otherwise) and prepaid charges and expenses of the Sellers, other than any deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Assets;

(f)    all rights of the Sellers under each Purchased Lease and Designee Lease, together with all improvements, fixtures and other appurtenances thereto and rights in respect thereof;

(g)    the Disposition Rights;

(h)    the Purchased Cash;

(i)    the Furniture and Equipment at any Leased Premises in respect of any Purchased Lease;

(j)    the Purchased Intellectual Property;

(k)    the Purchased Contracts, including all insurance policies relating to the Purchased Assets and any rights to proceeds in respect of such insurance policies where the related incident or event of loss occurred after the Closing Date;

(l) all Documents that are used in, held for use in or intended to be used in, or that arise primarily out of, the Business, including Documents relating to Products, services, marketing, advertising, promotional materials, Purchased Intellectual Property, personnel files for Transferred Employees and all files, customer files and documents (including credit information), supplier lists, records, literature and correspondence, whether or not physically located on any of the premises referred to in clause (d) above, but excluding (i) personnel files for Employees of the Sellers who are not Transferred Employees, (ii) such files as may be required under applicable Law regarding employee privacy, (iii) Documents in respect of the Excluded Assets which each Seller is not permitted to transfer pursuant to any Confidentiality Agreement, and (iv) any Documents primarily related to or are required to realize the benefits of any Excluded Assets (provided that Purchaser shall be provided with copies of such Documents); provided, however, that the Sellers shall have continued access to such documents as are necessary to administer the Bankruptcy Case;

(m) all Permits used in, held for use in or intended to be used in the Business to the extent assignable;

(n) all supplies owned by the Sellers and used in, held for use in or intended to be used in connection with the Business;

(o) all rights of each Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of such Seller or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof), to the extent assignable, and including all rights, benefits and claims under any agreements regarding confidentiality and restrictions on the conduct of third parties with respect to competition with the Business and solicitation of employees of the Business entered into in connection with the Bankruptcy Case;

(p) all rights of the Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to Products sold, or services provided, to the Sellers or to the extent affecting or relating to any Purchased Assets, to the extent assignable other than any warranties, representations and guarantees pertaining to any Excluded Assets;

(q) any rights, claims or causes of action, including causes of action under chapter 5 of the Bankruptcy Code, of any Seller relating to or arising against suppliers, vendors, merchants, manufacturers, counterparties to leases, counterparties to licenses, and counterparties to other contracts in respect of the assets, properties, conduct of business or operations of such Seller arising out of events occurring on or prior to the Closing Date (the "Purchased Claims"); provided, however, that Purchaser shall not pursue any such causes of action under chapter 5 of the Bankruptcy Code; and provided, further, for the avoidance of doubt the Purchased Claims do not include any claims or causes of action of any Seller relating to or arising against insiders (as defined in the Bankruptcy Code) of the Sellers, or BDO Seidman LLP and any and all of its affiliates; and

(r)     all goodwill and other intangible assets associated with the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property.

Section 2.2     Excluded Assets.  Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and the Sellers shall retain all right, title and interest to, in and under the Excluded Assets.  "Excluded Assets" shall mean all interests and rights of the Sellers in and to solely the following assets:

(a)     all cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries, other than Purchased Cash;

(b)     all of the Sellers' deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Assets;

(c)     the Excluded Leases;

(d)     the Excluded Contracts, including any accounts receivable arising out of or in connection with any Excluded Contract;

(e)     the GOB Assets at the Store Closing Locations as of the Closing Date;

(f)     any rights, claims or causes of action, including causes of action under chapter 5 of the Bankruptcy Code, of any Seller arising out of events occurring on or prior to the Closing Date, other than the Purchased Claims;

(g)     (i) books and records that the Sellers are required by Law to retain including, without limitation, Tax Returns, financial statements, and corporate or other entity filings; provided, however, that Purchaser shall have the right to make copies of any portions of such retained books and records that relate to the Business or any of the Purchased Assets; (ii) minute books, stock ledgers and stock certificates of Subsidiaries; and (iii) documents relating to proposals to acquire the Business by Persons other than Purchaser.

(h)     any claim, right or interest of any Seller in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) ending on or before the Closing Date;

(i)     all rights to proceeds under insurance policies relating to the assets, properties, business or operations of the Sellers where the related incident or event of loss occurred prior to the Closing Date; and

(j)     all ownership interests in the Selling Affiliates.

Section 2.3     Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing Purchaser shall assume, effective as of the Closing Date, and shall timely perform and discharge in accordance with their respective terms, the following Liabilities (collectively, the "Assumed Liabilities"); provided, however, that in no event shall the Assumed Liabilities include any of the Excluded Liabilities:

(a)     all Liabilities of the Sellers arising after the Closing Date under the Purchased Contracts and the Purchased Leases, including the operating expenses associated with the Distribution Center and U.S. and overseas corporate headquarters, to the extent the same constitute part of the Purchased Assets;

(b)     all costs associated with delivery of goods in transit and/or previously produced inventory which is purchased by Purchaser, including related freight forwarding and storage costs;

(c)     if Purchaser determines in its sole discretion to purchase the customer lists related to the Business, all costs of a privacy ombudsman to the extent that the Bankruptcy Court requires a privacy ombudsman to be appointed; provided, however, that Seller shall use all reasonable best efforts to ensure that a privacy ombudsman is not required;

(d)     Liabilities arising from the post-Closing sale of Products in the Ordinary Course of Business pursuant to product warranties, product returns and rebates;

(e)     all Transfer Taxes applicable to the transfer of the Purchased Assets pursuant to this Agreement, up to the amount of One Hundred Fifty Thousand Dollars ($150,000.00) (the "Transfer Tax Cap"); and

(f)     all Liabilities relating to amounts required to be paid by Purchaser hereunder, including the Assumed Cure Amount.

Section 2.4     Excluded Liabilities.  Other than the Assumed Liabilities, Purchaser will not assume, be liable for, have any responsibility for or otherwise become obligated in respect of any actual, unliquidated or contingent liabilities or any other obligations of any Seller or arising out of, relating to or otherwise in respect of the Business (the "Excluded Liabilities"), including the following Liabilities:

(a)     all Liabilities arising out of or related to the Excluded Assets, including Contracts that are not Purchased Contracts;

(b)     all Liabilities under or with respect to (i) any Employee Benefit Plan, (ii) Sections 412, 4971 and 4980B of the Internal Revenue Code, 26 U.S.C. § 1 et seq. (the "Code"), or Title IV or Section 302 of ERISA with respect to any employee benefit plan that is or has been maintained or contributed to by any of the Sellers or any entity with which any of the Sellers is considered a single employer under Section 414 of the Code, or (iii) any current or former Business employees and their compensation and benefits, including any severance, retention or similar payments due or that become payable in connection with actions taken under this Agreement;

(c)     all Liabilities for income, franchise and transfer Taxes of the Sellers for any Tax period, and, except as otherwise provided in Section 2.3(e), Section 12.1 and Section 12.2, all Liabilities for Taxes of the Sellers relating to the Purchased Assets for any Tax periods (or portions thereof) ending on or before the Closing Date, including for the avoidance of doubt any Transfer Taxes in excess of the Transfer Tax Cap; and

(d) any post-petition debt or administrative expense debt other than the Assumed Cure Amount;

(e) any Liabilities relating to the Indian Assets;

(f) any indebtedness for borrowed money or other interest bearing obligations;

(g) any amounts payable to any Affiliates of the Sellers;

(h) any cash overdraft Liability;

(i) any Liability accruing prior to the Closing Date to the extent that Seller or any Seller Affiliate is actually reimbursed therefor under its insurance policies;

(j) any damages or Liabilities arising out of or in connection with any litigation or other claims pending against Seller or any Selling Affiliate on or prior to the Closing Date;

(k) except to the extent specifically provided in Article IX, all Liabilities arising on or prior to the Closing Date out of, relating to or with respect to any Transferred Employees including in relation to (i) the employment by or performance of services for Sellers, or termination of employment or services, or (ii) workers' compensation claims relating to occurrences on or prior to the Closing Date;

(l) any Liability arising out of or in connection with a violation of any law on or prior to the Closing Date, including any violations of law relating to occupational safety and health or discrimination on the basis of age, race, creed, color or disability, or any conduct prohibited by the Foreign Corrupt Practices Act of 1977;

(m) any environmental Liabilities arising on or prior to the Closing Date under federal, state or local law (including but not limited to administrative or civil fines or penalties for violations of environmental laws, or remediation or response costs for contamination);

(n) any employment agreements, retirement or pension plans of Sellers and post-retirement benefits of any type or nature, whether funded or unfunded;

(o) any Liability under the Worker Adjustment and Retraining Notification Act (or any similar state or local law) arising on or prior to the Closing Date or out of the transactions contemplated hereby;

(p) any Liability (including, without limitation, all environmental Liabilities) arising in connection with or relating to the use, operation or location of the Real Property Leases on or prior to the Closing Date other than Purchased Leases and Designee Leases; and

(q) all Liabilities relating to amounts required to be paid by each Seller hereunder.

Section 2.5    Lease and Contract Designation; Cure Amounts.

(a)    Designation.  On or prior to the Designation Deadline and pursuant to the terms of this Section 2.5, Purchaser shall designate each Real Property Lease a Purchased Lease, a Designee Lease or an Excluded Lease and shall designate each Contract a Purchased Contract, a Designee Contract or an Excluded Contract.  Notwithstanding the foregoing, if a Contract or Real Property Lease is not designated on or before the Designation Deadline, and such Contract or Real Property Lease has not been rejected by the Sellers pursuant to Section 365 of the Bankruptcy Code, Sellers shall, upon request of Purchaser, assume and assign such Contract or Real Property Lease to Purchaser or its designee for no additional consideration.

(b)    Assignment and Assumption.  At such time as is specified in the Sale Order, this Agreement and any other orders of the Bankruptcy Court, Sellers shall assign to Purchaser and Purchaser shall assume from Sellers, the Purchased Contracts and the Purchased Leases and Sellers shall assign to Purchaser's designees and Purchaser shall cause such designees to assume from Sellers, the Designee Leases and the Designee Contracts pursuant to Section 365 of the Bankruptcy Code.

(c)    Assets to be Liquidated; Proceeds.  Subject to entry by the Bankruptcy Court of the Sale Order, Agent shall act as the exclusive agent of the Sellers for the purpose of liquidating the GOB Assets in those Leased Premises designated by the Purchaser from time-to-time from the date hereof through the Designation Deadline (such locations, the "Store Closing Locations") through the conduct of Store Closing Sales.  Notwithstanding the designation of a Leased Premises as a Store Closing Location, Purchaser may deliver notice to Agent to defer commencement of a GOB Sale and irrespective of such designation, Purchaser shall have the other rights contemplated by this Section 2.5 with respect to the related Real Property Leases.  The terms, conditions and procedures applicable to the conduct of the Store Closing Sales in the Store Closing Locations and the sale or other disposition of the GOB Assets from the Store Closing Locations are set forth in the Agency Agreement.  Notwithstanding the foregoing, following the Closing, Purchaser shall have the right to direct the transfer of GOB Assets to be transferred from Store Closing Locations to such other facilities as Purchaser and Agent shall agree at the expense of the Purchaser or the Agent under the Agency Agreement.  For purposes of securing the rights of Purchaser and Agent with respect to the Disposition Rights at the Store Closing Locations, Sellers hereby grant to Purchaser and Agent pursuant to Bankruptcy Code § 364(d) a first priority security interest in and lien upon the Merchandise and Furniture and Equipment owned by Sellers located at the Store Closing Locations, and the Proceeds thereof to secure all obligations of Seller to Purchaser and Agent hereunder, provided, however, until the payment of the Purchase Price in full, the security interest granted to Agent hereunder shall remain junior and subordinate in all respects to the security interest of Lenders to the extent of the unpaid portion of the Purchase Price.  Pursuant to the Sale Order, the security interest granted to Purchaser and Agent hereunder shall be deemed properly perfected without the need for further filings or documentation.

(d)    Lease Designation Rights.  From and after the Closing Date, Purchaser or its designated agent shall have the exclusive right to act as the exclusive agent of the Sellers for the limited purposes of marketing and disposing of the Real Property Leases that have not yet been designated as Purchased Leases, Designee Leases or Excluded Leases through the

Applicable Lease Marketing Period, and thereafter to designate the ultimate assignee of all of the Sellers' right, title and interest in and to such Real Property Leases.

      (e)     <u>Marketing Period</u>.

      (i)     During the period from the Closing Date through the Applicable Lease Marketing Period Termination Date (as to each Leased Premises, the "<u>Applicable Lease Marketing Period</u>"), Sellers agree to cooperate reasonably with Purchaser to arrange for the sale of the Sellers' leasehold interests in those Real Property Leases determined by Purchaser.  Without limiting the generality of the foregoing, Sellers agree:  (x) to provide Purchaser with all due diligence materials and information as Purchaser shall reasonably request in connection with its efforts to market and attempt to sell the applicable Real Property Leases (including complete copies of the subject leases and any abstracts prepared with respect thereto, and all communications with the tenants thereunder, all property surveys, all environmental reports and tax and utility records) and (y) to cooperate with Purchaser, its agents and any potential purchasers of any of the Real Property Leases and to provide reasonable access to such locations.

      (ii)     At any time prior to the expiration of the Applicable Lease Marketing Period, Purchaser shall have the right, which right may be exercised at any time and from time to time in Purchaser's sole and absolute discretion, to provide written notice to Parent (each such notice, a "<u>Property Dropout Notice</u>") of Purchaser's (or its designee's) election to discontinue its efforts to market and attempt to sell any Real Property Lease. Upon Purchaser's delivery of a Property Dropout Notice, the affected Real Property Lease shall be deemed an Excluded Lease, and Sellers may dispose of such property in such manner as Sellers may elect, and all proceeds realized upon a disposition of same shall be the exclusive property of Sellers.

      (iii)     At any time prior to the expiration of the Applicable Lease Marketing Period for each Real Property Lease, Purchaser shall have the right, which right may be exercised at any time and from time to time in Purchaser's sole and absolute discretion, to provide written notice to Parent (each such notice, a "<u>Lease Assumption Notice</u>") of Purchaser's election to deem the Real Property Lease identified in the subject Lease Assumption Notice(s) a Designee Lease or a Purchased Lease and require Parent to use commercially reasonable efforts to assume and/or assign or to cause to be assumed and/or assigned such Real Property Lease(s) to Purchaser or Purchaser's designee.  Within fifteen (15) days following the date Purchaser delivers a Lease Assumption Notice to Parent, Sellers shall take all requisite actions (including actions required under Section 363 and/or Section 365 of the Bankruptcy Code, as applicable) to assume and/or assign such Real Property Lease(s) to Purchaser or the designee identified by Purchaser in such Lease Assumption Notice(s).  Purchaser shall reimburse Seller for the cost of any such actions (including any payment of the Assumed Cure Amount in respect of the Purchased Leases) and any cash sale proceeds (net of selling expenses) that are received from the assignment of a Real Property Lease to a third party shall be shared equally between Purchaser and Parent.

(f)     Purchaser shall pay the Assumed Cure Amount, as and when finally determined by the Bankruptcy Court pursuant to the procedures set forth in the Sale Order or any other applicable order of the Bankruptcy Court; provided, however, that after determination by the Bankruptcy Court of the Assumed Cure Amount in respect of any Purchased Contract or Purchased Lease, Purchaser may, in it sole discretion, redesignate such Purchased Contract or Purchased Lease as an Excluded Contract or Excluded Lease.

(g)     Purchaser or its designee under any Lease Assumption Notice shall be required to provide adequate assurance of future performance with respect to such Purchased Lease or Designee Lease and, notwithstanding anything to the contrary, neither Parent nor any Seller shall have any liability for Purchaser's failure to satisfy such requirements of the Bankruptcy Code.

(h)     Sellers hereby appoint Purchaser as agent-in-fact for the sole purpose of allowing Purchaser to continue to operate under the Real Property Leases and other Contracts until such time as Purchaser either designates such Contract as a Purchased Lease, Purchased Contract, Designee Lease or Designee Contract, or designates that it does not want to have such contract assumed and assigned to it or its designee; provided, however, during such period, Purchaser shall be responsible for all obligations arising from or in connection with such Real Property Lease(s) or Contract(s), including, with respect to such Real Property Leases, the Real Estate Occupancy Expenses and the prorated amount of rent in respect of the period from the date on which the Real Property Lease is so designated through the end of the applicable month, other than in respect of Store Closing Locations (the "Pro-rated Rent").  To the extent the Pro-rated Rent has been paid by Sellers prior to the Closing, Purchaser shall reimburse Sellers at Closing on a dollar-for-dollar basis therefor.

(i)     Prior to the Designation Deadline, Parent or Sellers shall not reject, amend or modify any Real Property Lease or Contract that has not been designated by Purchaser an Excluded Lease or Excluded Contract, as applicable.

Section 2.6     Further Conveyances and Assumptions.

(a)     From time to time following the Closing, Parent shall, or shall cause the Selling Affiliates to, make available to Purchaser such data in personnel records of Transferred Employees as is reasonably necessary for Purchaser to transition such employees into Purchaser's records.

(b)     From time to time following the Closing, Parent and Purchaser shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Seller Documents and to assure fully to Seller and its Affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement and the Seller Documents, and to otherwise make effective the transactions contemplated hereby and thereby.

Section 2.7    Force Majeure.  If any casualty, act of terrorism, or act of God prevents or substantially inhibits the conduct of business in the ordinary course at any Leased Premises, such Leased Premises and the Merchandise located at such Leased Premises shall, in Purchaser's discretion, be eliminated from the transactions contemplated hereby and considered to be deleted from this Agreement as of the date of such event, and Parent, Sellers and Purchaser shall have no further rights or obligations hereunder with respect thereto; provided, however, that (i) subject to the terms of Section 2.5(c) above, the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Purchase Price shall be reduced to account for any Merchandise eliminated from the transactions contemplated hereby which is not the subject of insurance proceeds, and Sellers shall reimburse Purchaser for the amount the Purchase Price is so reduced.

Section 2.8    Bulk Sales Laws.  Purchaser hereby waives compliance by any Seller with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

# ARTICLE III

# CONSIDERATION

Section 3.1    Consideration.  The aggregate consideration to be paid by the Purchaser and Agent for the Purchased Assets and for the right of Agent to conduct the GOB Sales pursuant to the terms of the Agency Agreement shall be an amount in cash equal to One Hundred Sixty Three Million Dollars ($163,000,000) (the "Purchase Price"), subject to adjustment pursuant to Section 3.2 and (b) the assumption of the Assumed Liabilities.  The Purchase Price shall be payable as follows:

(a)    Promptly following the date of the Original Agreement, Purchaser deposited the Deposit, which is to be held pursuant to the terms and conditions of this Agreement.

(b)    On the Closing Date, Purchaser and Agent shall:

(i)    pay an amount to Parent, by wire transfer of immediately available funds into an account designated by Parent, equal to eighty five percent (85%) of the Purchase Price less the Deposit and less interest accrued on the Deposit; and

(ii)    deposit into an account with the Escrow Agent, subject to the terms of the Escrow Agreement an amount equal to fifteen percent (15%) of the Purchase Price (such amount, the "Escrow Amount").

(c)    No later than two (2) Business Days after the final reconciliation of the Inventory Taking, an amount equal to (such amount, the "Remaining Purchase Price") (a) the Escrow Amount, plus or minus (b) the Inventory Adjustment Amount, shall be released to Parent; provided, however, as follows:

(i)     if the Remaining Purchase Price is greater than the Escrow Amount, then (A) the Escrow Agent shall release the Escrow Amount to an account designated by Parent, and (B) Purchaser shall pay by wire transfer of immediately available funds to an account designated by Parent, the amount by which the Remaining Purchase Price exceeds the Escrow Amount;

(ii)     if the Remaining Purchase Price is less than the Escrow Amount, then (A) the excess of the Escrow Amount over the Remaining Purchase Price shall be released to Purchaser, and (B) the Escrow Agent shall release the remainder of the Escrow Amount to an account designated by Parent; and

(iii)     if the Remaining Purchase Price is a negative amount, then (A) the Escrow Agent shall release the Escrow Amount to an account designated by Purchaser, and (B) Sellers shall pay by wire transfer of immediately available funds to an account designated by Purchaser, the absolute value of the Remaining Purchase Price.

Section 3.2     Inventory Purchase Price Adjustment.

(a)     Price Adjustment.  The Purchase Price is premised on the aggregate Cost Value of the Merchandise being not less than One Hundred Eighty Three Million Seven Hundred Thousand Dollars ($183,700,000) (the "Inventory Target").  In the event that the aggregate Cost Value of the Merchandise, as determined pursuant to this Section 3.2, is less than or greater than the Inventory Target, the Purchase Price shall be decreased or increased based on Schedule 3.2(a) (in either case, the "Inventory Adjustment Amount").

(b)     Inventory Taking Procedures.  As soon as practicable after the Sale Hearing, but in no event more than ten (10) days after the Closing Date, Purchaser, Agent and Parent shall cause to be taken a Cost Value physical inventory of the Merchandise in accordance with Schedule 3.2(b).  The results of such Inventory Taking shall be provided to the Creditors Committee.

Section 3.3     Cash.  In addition to the Purchase Price, Purchaser shall purchase all cash in the Leased Premises with respect to the Purchased Leases and all deposits in the process of clearing at Seller's bank accounts on and as of the start of business on the Closing Date (the "Purchased Cash") and shall reimburse Sellers on the next Business Day following the Closing Date on a dollar for dollar basis therefor.  Purchaser also agrees to remit cash, as and when received, in respect of the amount of credit card accounts receivable (inclusive of holdbacks), as of the Closing Date.  Purchaser agrees that to the extent Sellers have paid Assumed Cure Amount in respect of the Celebrity Licenses prior to the Closing, Purchaser shall reimburse Sellers for such amounts so paid, but in no event exceeding the Celebrity License Payment Cap.

ARTICLE IV

CLOSING AND TERMINATION

Section 4.1    Closing Date.  Subject to the satisfaction of the conditions set forth in Section 10.1, Section 10.2 and Section 10.3 hereof (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereof (the "Closing") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York (or at such other place as the parties may designate in writing) at 12 p.m. (eastern time) on the date that is two (2) Business Days following the satisfaction or waiver of the conditions set forth in Article X (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by the parties hereto.  The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date." Unless otherwise agreed by the parties in writing, the Closing shall be deemed effective and all right, title and interest of Sellers to be acquired by Purchaser hereunder shall be considered to have passed to Purchaser as of 12:01 a.m. (eastern time) on the Closing Date.  Notwithstanding anything herein to the contrary, Purchaser shall be entitled to direct Agent to conduct GOB Sales at Store Closing Locations on the terms set forth in the Agency Agreement commencing on the first day following entry of the Sale Order.

Section 4.2    Deliveries by Seller.  At the Closing, Parent shall deliver, or cause to be delivered, to Purchaser:

(a)    a duly executed bill of sale in the form of Exhibit B hereto;

(b)    an executed assumption and assignment agreement for each Real Property Lease and/or Contract being assigned, in a form substantially similar to that attached hereto as Exhibit C;

(c)    a duly executed assignment and assumption agreement in the form of Exhibit E hereto and duly executed assignments of all trademark registrations and applications included in the Purchased Intellectual Property, in a form suitable for recording in the U.S. and relevant foreign trademark office, and assignments of all other Purchased Intellectual Property, in a form suitable for recording;

(d)    a duly executed assignment and assumption agreement in the form of Exhibit F hereto and duly executed assignments of the copyrights and applications included in the Purchased Intellectual Property, in a form suitable for recording;

(e)    the officer's certificate required to be delivered pursuant to Section 10.1(a) and Section 10.1(b);

(f)    all electronic data (including data relating to customers, sales history, inventory, accounts receivable, vendors, employees and accounts payable) relating to the Business operations that is located or stored on computer files;

(g)     an affidavit of non-foreign status from each Person treated as a Seller for United States federal income Tax purposes; and

(h)     all other instruments of conveyance and transfer (including applicable Transfer Tax forms and filings), in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Purchased Assets to Purchaser.

Section 4.3     Deliveries by Purchaser.  At the Closing, Purchaser shall deliver to Seller or the Escrow Agent, as provided in Section 3.1:

(a)     the Purchase Price, in immediately available funds, as set forth in Section 3.1 hereof;

(b)     executed counterparts of the bill of sale referred to in Section 4.2(a);

(c)     executed counterparts to the assignment and assumption agreements referred to in Section 4.2(b) and Section 4.2(c);

(d)     the officer's certificate required to be delivered pursuant to Section 10.2(a) and Section 10.2(b); and

(e)     such other documents, instruments and certificates to evidence the assignment of the Purchased Assets and the assumption of the Assumed Liabilities as Seller may reasonably request.

Section 4.4     Termination of Agreement.  This Agreement may be terminated prior to the Closing as follows:

(a)     by Purchaser or Parent, if the Closing shall not have occurred by the close of business on August 25, 2008 (the "Termination Date"); provided, however, that if the Closing shall not have occurred on or before the Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser or Parent, then the breaching party may not terminate this Agreement pursuant to this Section 4.4(a);

(b)     by mutual written consent of Parent and Purchaser;

(c)     by Purchaser, if any of the conditions to the obligations of Purchaser set forth in Section 10.1 or Section 10.3 shall have become incapable of fulfillment other than as a result of a breach by Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser;

(d)     by Parent, if any condition to the obligations of Parent set forth in Section 10.2 or Section 10.3 shall have become incapable of fulfillment other than as a result of a breach by Parent of any covenant or agreement contained in this Agreement, and such condition is not waived by Parent;

(e)　　by Purchaser, if there shall be a breach by Parent of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in <u>Section 10.2</u> or <u>Section 10.3</u> and which breach cannot be cured or has not been cured by the earlier of (i) five (5) Business Days after the giving of written notice by Purchaser to Parent of such breach and (ii) the Termination Date;

(f)　　by Parent, if there shall be a breach by Purchaser of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in <u>Section 10.2</u> or <u>Section 10.3</u> and which breach cannot be cured or has not been cured by the earlier of (i) five (5) Business Days after the giving of written notice by Parent to Purchaser of such breach and (ii) the Termination Date;

(g)　　by Parent or Purchaser if there shall be in effect a final nonappealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that the parties hereto shall promptly appeal any adverse determination which is not nonappealable at no cost to Purchaser (and pursue such appeal with reasonable diligence);

(h)　　by Purchaser or Parent, if the Bankruptcy Court shall enter an order approving a Qualified Bid, other than any Qualified Bid submitted by Purchaser as the winning bid at auction, subject to the limitations set forth in the Bidding Procedures Order;

(i)　　by Purchaser, if Parent or Sellers withdraw or seek authority to withdraw their motion seeking approval of the transactions contemplated by this Agreement, or announces any stand alone plan of reorganization or liquidation (or supports any such plan filed by any other party); or

(j)　　by Parent, at or at any time after commencement of the Auction, if Purchaser shall have failed to confirm in writing prior to or at the commencement of the Auction that the condition to Closing set forth in <u>Section 10.1(d)</u> has been satisfied or waived and Parent has entered into the Standby Agency Agreement.

Section 4.5　　<u>Procedure Upon Termination</u>.

(a)　　In the event of termination and abandonment by Purchaser or Parent, or both, pursuant to <u>Section 4.4</u> hereof, written notice thereof shall forthwith be given to the other party or parties, and this Agreement shall terminate, and the purchase of the Purchased Assets hereunder shall be abandoned, without further action by Purchaser or Parent.

(b)　　If this Agreement is terminated as provided herein each party shall redeliver all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the party furnishing the same.

Section 4.6　　<u>Effect of Termination</u>.

(a)　　In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this

Agreement after the date of such termination and such termination shall be without liability to Purchaser or Parent; provided, however, that the obligations of the parties set forth in this Section 4.6 and Section 8.6 and Section 8.8 hereof shall survive any such termination and shall be enforceable hereunder; provided, further, that upon any valid termination (other than pursuant to Section 4.4(h) or (i)), Agent and Parent each hereby agree to enter into the Standby Agency Agreement.

(b)     Nothing in this Section 4.6 shall relieve Purchaser or Parent of any liability for a breach of this Agreement prior to the date of termination.  The damages recoverable by the non-breaching party shall include all attorneys' fees reasonably incurred by such party in connection with the transactions contemplated hereby.

(c)     The Confidentiality Agreement shall survive any termination of this Agreement and nothing in this Section 4.6 shall relieve Purchaser or Parent of their obligations under the Confidentiality Agreement.

(d)     Notwithstanding Section 4.6(a), from and after the entry of the Bidding Procedures Order, if this Agreement is terminated pursuant to Section 4.4(a), (c), (d), (e), (g) or (j) then Sellers shall pay to Purchaser the Expense Reimbursement by wire transfer of immediately available funds promptly (but in any event within two (2) Business Days) following the occurrence of one of the termination events set forth in this paragraph.

(e)     Notwithstanding Section 4.6(a), from and after the entry of the Bidding Procedures Order, if this Agreement is terminated pursuant to Section 4.4(h) or (i), then Sellers shall pay to Purchaser the Expense Reimbursement and Termination Fee by wire transfer of immediately available funds upon the consummation of the transactions contemplated by the Qualified Bid approved by the Bankruptcy Court or upon consummation of any transaction consummated in lieu thereof, as the case may be, and such amounts shall be paid immediately from the proceeds of such transaction as allowed superpriority administrative expense claims under Sections 503(b) and 507(b) of the Bankruptcy Code, junior and subordinate to the interests, liens, claims, and superpriority claims of the Lenders and otherwise with priority over all administrative expense claims and ahead of all other secured or unsecured prepetition or postpetition obligations of the Sellers; provided, however, that if (i) a Qualified Bid results in consummation of a transaction other than with Purchaser, or (ii) the Sellers consummate a sale or disposition of all of or a substantial portion of, or the rights to dispose of all or a substantial portion of, their assets, by way of a sale pursuant to section 363 of the Bankruptcy Code or a transaction similar in form and substance to the Standby Agency Agreement, then the Expense Reimbursement and Termination Fee shall be senior to the interests, liens, claims and superpriority claims of the Lenders and shall be paid from the proceeds of the consummation of that transaction.

(f)     In the event of a termination of this Agreement pursuant to any provision of Section 4.4 (other than pursuant to Section 4.4(f)), Sellers shall immediately return to Purchaser the Deposit (together with interest thereon).

(g)     In the event of a termination of this Agreement pursuant to Section 4.4(f), Parent shall be permitted to keep the Deposit as liquidated damages and not as a penalty.

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF PARENT AND SELLERS

Parent and Sellers hereby represent and warrant to Purchaser that:

Section 5.1 <u>Organization and Good Standing</u>. Parent is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted. Parent is duly qualified or authorized to do business as a foreign corporation and is in good standing under the laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not have a Material Adverse Effect.

Section 5.2 <u>Authorization of Agreement</u>. Except for such authorization as is required by the Bankruptcy Court (as hereinafter provided for), Parent has all requisite power, authority and legal capacity to execute and deliver this Agreement and each Seller has all requisite power, authority and legal capacity to execute and deliver each other agreement, document, or instrument or certificate contemplated by this Agreement and to which it is a party or to be executed by such Seller in connection with the consummation of the transactions contemplated by this Agreement (the "<u>Seller Documents</u>"), to perform its respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Seller Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of each. This Agreement has been, and each of the Seller Documents will be at or prior to the Closing, duly and validly executed and delivered by each Seller which is a party thereto and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, the entry of the Bidding Procedures Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of such Seller in accordance with their respective terms, subject only to entry of the Sale Order.

Section 5.3 <u>Conflicts; Consents of Third Parties</u>.

(a) Except as set forth on <u>Schedule 5.3(a)</u>, none of the execution and delivery by Parent of this Agreement or by each Seller of the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by each Seller with any of the provisions hereof or thereof will conflict with, or result in any material violation of or material default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of such Seller; (ii) subject to entry of the Sale Order, any Contract or Permit to which such Seller is a party or by which any of the properties or assets of such Seller are bound; (iii) subject to entry of the Sale Order, any Order of any Governmental Body applicable to such Seller or any of the properties or assets of such Seller as of the date hereof; or (iv) subject to entry of the Sale Order, any applicable Law.

(b)     Except as set forth on Schedule 5.3(b), no material consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of any Seller in connection with the execution and delivery of this Agreement or the Seller Documents, the compliance by such Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by such Seller of any other action contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act and (ii) the entry of the Sale Order.

Section 5.4     Financial Advisors.  Except as set forth on Schedule 5.4, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for any Seller in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment from Purchaser in respect thereof.

Section 5.5     Title to Assets.  Subject to receipt of the approval of the Bankruptcy Court pursuant to the Sale Order, Parent and each of the Sellers have, or at the Closing will have, the right to deliver to Purchaser good and, as applicable, marketable title to, or a valid leasehold interest in, all of the Purchased Assets and GOB Assets free and clear of all Liens.

Section 5.6     Legal Compliance.

(a)     Sellers have, in connection with the operation of the Business, complied in all material respects with all applicable Laws (including rules, regulations, codes, plans, injunctions, judgments, orders, decrees, rulings, and charges thereunder) of federal, state, local, and foreign governments (and all agencies thereof), and no material action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand, or notice has been filed or commenced against any Seller alleging any failure so to comply.

(b)     To Sellers' Knowledge, all Merchandise is in material compliance with all applicable federal, state or local product safety laws, rules and standards.

Section 5.7     Property.

(a)     Schedule 5.7(a) lists: (i) the street address of each Real Property Lease, (ii) the identity of the landlord, tenant, and current occupant (if different from tenant) of each Real Property Lease, (iii) the term (referencing applicable commencement and expiration dates and renewal periods) and rental payment terms (including fixed, basic or minimum rent and percentage rent) of the Real Property Leases (and any subleases) pertaining to each such Leased Premises,  (iv) the current amount of CAM, real estate taxes, and all other amounts payable pursuant to the Real Property Leases other than fixed, basic or minimum rent and percentage rent payable thereunder, (v) the remaining amount of any tenant improvement allowance or other payment due from any landlord thereunder, (vi) the remaining amount of any free rent or abatement period remaining thereunder, (vii) the security deposit presently held by the landlord pursuant to the Real Property Lease and (viii) the month through which rent and additional rent has been paid to the landlord pursuant to the Real Property Lease.  Each of the foregoing items specified on Schedule 5.7(a) is true, correct, accurate and complete in all respects.

(b)　　　Except as otherwise disclosed on Schedule 5.7(b), with respect to each Real Property Lease no Seller has granted to any other Person any rights, adverse or otherwise, under such Real Property Lease.

(c)　　　No Seller is entitled to any offsets, abatements, deductions or credits against rent, additional rent or any other payment obligation under the Real Property Leases except as specified on Schedule 5.7(c).

(d)　　　Except as set forth on Schedule 5.7(d), no Seller has sublet, assigned or otherwise conveyed all or any portion of any Leased Premises or Real Property Lease to any other Person.

(e)　　　No Seller owns any real property.

(f)　　　Schedule 5.7(f) sets forth each item of Furniture and Equipment owned by Sellers.

Section 5.8　　　Intellectual Property.　Schedule 5.8 sets forth all material worldwide Intellectual Property and Intellectual Property Licenses owned and/or used by any Seller in connection with, arising from or in respect of the Business and identifies each Celebrity License and each Collegiate and Miscellaneous License.

Section 5.9　　　Insurance.　Schedule 5.9 sets forth all insurance policies relating to the assets, properties, business or operations of the Sellers and, with respect to each such insurance policy, the following information:

(a)　　　the name of the insurer, the name of the policyholder, and the name of each covered insured;

(b)　　　the policy number and the period of coverage; and

(c)　　　a summary of the scope (including an indication of whether the coverage was on a claims made, occurrence, or other basis) and amount (including a description of how deductibles and ceilings are calculated and operate) of coverage.

Section 5.10　　　Pricing.　Except as disclosed on Schedule 5.10, the selling price to the public by any and all means (except for Excluded Pricing Adjustments) of each and every item/unit of Sellers at all retail stores has been since June 1, 2008, and will be through the Closing Date, eight dollars and ninety-eight ($8.98) (the "Store Retail Price"); provided, however, that, the retail price of Distribution Center Merchandise and On-Order Merchandise received in the retail stores on or prior to the Closing Date shall be determined by taking the average retail price per each item of Merchandise as set forth in the Sellers' retail price files provided to Purchaser and Agent during due diligence (the "DC Retail Price").  As used herein, "Excluded Pricing Adjustments" shall mean  employee discounts, individual adjustments for damaged, defective, or "as-is" items, obvious ticketing or marking errors, instant (in-store) or similar customer specific, or employee non-product specific, discounts or pricing accommodations.

Section 5.11    Tax Matters.  All material amounts of Taxes payable by or with respect to any Seller, whether or not shown on any Tax Returns, have been timely paid, subject to the imposition of the automatic stay prior to payment being due.  No claim has been made by any Tax authority in a jurisdiction where a Seller does not file Tax Returns that such Seller is or may be subject to taxation in that jurisdiction as a result of the Purchased Assets or the Business.

Section 5.12    Cure Amounts.  Schedule 5.12 sets forth Seller's good faith estimation of the amounts payable in order to cure any defaults existing as of the date of the Original Agreement in respect of all of the Sellers Real Property Leases and other Contracts.

Section 5.13    No Other Representations or Warranties; Schedules.  Except for the representations and warranties contained in this Article V (as modified by the Schedules hereto), neither Parent nor any other Person makes any other express or implied representation or warranty with respect to the Sellers, the Business, the Purchased Assets, the Assumed Liabilities or the transactions contemplated by this Agreement, and Parent disclaims any other representations or warranties, whether made by Parent, any Affiliate of Parent or any of their respective officers, directors, employees, agents or representatives.

ARTICLE VI

REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Parent that:

Section 6.1    Organization and Good Standing.  Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

Section 6.2    Authorization of Agreement.  Purchaser has full power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (the "Purchaser Documents"), and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly authorized by all necessary corporate action on behalf of Purchaser.  This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 6.3    Conflicts; Consents of Third Parties.

(a)    Except as set forth on Schedule 6.3, none of the execution and delivery by Purchaser of this Agreement or the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the organizational documents of Purchaser, (ii) any Contract or Permit to which Purchaser is a party or by which Purchaser or its properties or assets are bound or (iii) any Order of any Governmental Body applicable to Purchaser or by which any of the properties or assets of Purchaser are bound or (iv) any applicable Law.

(b)    No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Purchaser in connection with the execution and delivery of this Agreement or the Purchaser Documents, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, or for Purchaser to conduct the Business, except for compliance with the applicable requirements of the HSR Act, except to the extent the failure to obtain such consents would not reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or to consummate the transactions contemplated hereby.

Section 6.4    Litigation.  There are no Legal Proceedings pending or, to the knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Body, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or to consummate the transactions hereby.  Purchaser is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or to consummate the transactions contemplated hereby.

Section 6.5    Financial Advisors.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

Section 6.6    Financial Capability.  Purchaser (i) has, and at the Closing will have, sufficient internal funds available to pay the Purchase Price and any expenses incurred by Purchaser in connection with the transactions contemplated by this Agreement, and (ii) has, and at the Closing will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder.

ARTICLE VII

BANKRUPTCY COURT MATTERS

Section 7.1    Competing Transaction.

(a)    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Parent of higher or better competing bids (each a "Competing Bid").  From the date hereof (and any prior time) and until the transaction contemplated by this Agreement is consummated, Parent is permitted to cause its representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates, agents and representatives) in connection with any Qualified Bid; provided, however, that any such contact, solicitation, or encouragement shall be undertaken solely in accordance with the terms of the Bidding Procedures Order.  Parent and Sellers shall use reasonable best efforts to seek entry of the Bidding Procedures Order.

(b)    Parent shall not and shall not permit any Seller to furnish information concerning Sellers, the Business, or the properties or assets of Sellers to any third party, except (i) in the Ordinary Course of Business, (ii) to any Governmental Body, or (iii) pursuant to a confidentiality agreement with terms and conditions no less restrictive than those contained in the Confidentiality Agreement.  Parent shall not release any third party from, or waive any provision of, any such confidentiality agreement to which Parent or any Seller is a party other than to the extent a similar release or waiver was requested by and granted to Purchaser.  Parent shall use its best efforts to promptly provide, or identify and make available to Purchaser any non-public information concerning Seller, the Purchased Assets or the Business provided to any other Person after the date of the Original Agreement which was not previously provided to Purchaser.

(c)    Following the date of the approval of the Sale Order (such Date, the "Sale Order Approval Date") and until such time as this Agreement has been terminated (other than a termination by Parent or Sellers in violation of this Agreement), Parent shall not, nor shall any Seller authorize or permit any Representative of any Seller to, (A) directly or indirectly solicit, initiate or encourage the submission of any offer or proposal concerning any Competing Bid, (B) directly or indirectly participate in any discussions or negotiations regarding, or furnish to any Person any information with respect to, or take any other action to facilitate the making of, any proposal or expression of interest that constitutes or is reasonably likely to lead to a Competing Bid including without limitation providing any information with respect to or directly or indirectly participating in or facilitating any amendment or modification to any Real Property Lease or other Contract, or (C) enter into any agreement with respect to any Competing Bid. The failure of Parent to comply with any aspect of the requirement set forth in this Section 7.1(c) shall result in Purchaser's immediate entitlement to payment of the Expense Reimbursement and the Termination Fee.

Section 7.2    Bankruptcy Court Filings.  As more fully set forth in Section 8.11, Purchaser agrees that it will promptly take such actions as are reasonably requested by Parent to assist in obtaining entry of the Sale Order and the Bidding Procedures Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other

documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  In the event the entry of the Sale Order or the Bidding Procedures Order shall be appealed, Parent and Purchaser shall use their respective reasonable efforts to defend such appeal.

## ARTICLE VIII

## COVENANTS

Section 8.1     Access to Information.  Parent agrees that, prior to the Closing Date, Purchaser shall be entitled, through its officers, employees and representatives (including, without limitation, its legal advisors and accountants), to make such investigation of the properties, businesses and operations of the Business and such examination of the books and records of the Business, the Purchased Assets and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records.  Any such investigation and examination shall be subject to restrictions under applicable Law.  Parent shall cause the officers, employees, consultants, agents, accountants, attorneys and other representatives of Parent and its Subsidiaries to cooperate with Purchaser and Purchaser's representatives in connection with such investigation and examination, and Purchaser and its representatives shall cooperate with Parent and its representatives and shall use their reasonable efforts to minimize any disruption to the Business.  Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require any Seller to disclose information that Parent reasonably determines is (x) subject to attorney-client privilege, or (y) would violate any confidentiality obligations to which Seller or any of its Subsidiaries is bound; provided, however, that the foregoing clause (y) shall be inapplicable unless Parent has provided notice to Purchaser that such information exists but is not being disclosed because the disclosure thereof would constitute a breach of such confidentiality obligation to a third party, the identity of such third party is set forth in such notice (if such identity is not otherwise confidential) and Parent uses commercially reasonable efforts to obtain the consent of such third party to permit Parent or the relevant Seller to disclose such information to Purchaser.

Section 8.2     Conduct of the Business Pending the Closing.  Prior to the Closing, except (1) as set forth on Schedule 8.2, (2) as required by applicable Law, (3) as otherwise expressly contemplated by this Agreement or the Agency Agreement, or (4) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed), Parent shall, and shall cause each Selling Affiliate to:

(i)     conduct the Business only in the Ordinary Course of Business;

(ii)     not, to the extent Purchaser would be responsible if such Employee were a Transferred Employee, (A) increase the compensation or fringe benefits of any present or former Employee, (B) hire any new Employee with an annualized salary in excess of Seventy Five Thousand Dollars ($75,000), (C) grant any severance or termination pay to any Employee, or (D) loan or advance any money or other property to any present or former Employee;

(iii)    maintain customary levels of insurance coverage (in accordance with past practice) with respect to the Purchased Assets, the GOB Assets and the Business;

(iv)    otherwise act in accordance with the Sale Order, Bidding Procedures Order and any other Orders issued by the Bankruptcy Court;

(v)    use its commercially reasonable efforts to (A) preserve the present business operations, organization, Intellectual Property and goodwill of the Business, and (B) preserve the present relationships with customers and suppliers of the Business and of the Sellers

(vi)    ticket or mark all items of Inventory received at the Leased Premises in a manner consistent with similar Merchandise located at the Leased Premises and in accordance with Seller's ordinary course past practices and policies relative to pricing and marking inventory;

(vii)    provide Purchaser with its historic policies and practices, if any, regarding product recalls on or prior to the Closing Date and shall notify Purchaser of any product recalls throughout the conduct of the GOB Sales;

(viii)    continue to operate the stores at the Leased Premises in all material respects in the Ordinary Course of Business by: (A) selling inventory during such period at customary prices consistent with the Ordinary Course of Business; (B) not promoting or advertising any sales or in-store promotions (including POS promotions) to the public (except for Sellers' pending advertisements as of the date of the Original Agreement and/or Sellers' promotions for the period through the Closing Date; (C) except as may occur in the Ordinary Course of Business, not returning inventory to vendors and not transferring inventory or supplies between or among the stores at the Leased Premises; and (D) except as may occur in the Ordinary Course of Business, not making any material management personnel moves or changes at the stores at the Leased Premises without prior notice to and consultation with (but not approval of) Purchaser;

(ix)    except as disclosed on Schedule 8.2(ix), maintain the selling price to the public of each and every item/unit of Merchandise at the Leased Premises at the Store Retail Price;

(x)    maintain the mix/assortment of all Merchandise at the Leased Premises (in the aggregate and not on a Store-by-Store basis), which is not to be materially inconsistent with the mix/assortment of Merchandise data provided by Sellers to Purchaser in connection with Sellers' due diligence process;

(xi)    not mark up or raise, or propose to mark up or raise, the price of any items of Merchandise, or remove or alter any tickets or, any indicia of clearance merchandise or any other kind of in-store pricing signage;

(xii)    at the direction of the Agent, transfer Merchandise from the Distribution Center to the Store Closing Locations, provided, however, that (a) the aggregate amount of all such Merchandise to be so transferred shall not exceed a Cost Value of One Million

Six Hundred Thousand Dollars ($1,600,000), and (b) such transfer must (x) occur such that all such Merchandise arrives at the Store Closing Locations no later than the day prior to the commencement of the GOB Sale in respect of such Store Closing Location, and (y) include Merchandise which corresponds with the mix and description set forth on Schedule 8.2(xii).

(xiii)     transfer any supplies to or from the Leased Premises so as to alter the mix or quantity of supplies at the Leased Premises from that existing on such date, other than in the Ordinary Course of Business; and

(xiv)     cooperate with Purchaser in attaining amendments to those Real Property Leases designated from time to time by Purchaser prior to the Sale Hearing (the "Designated Amendment Real Property Leases") on such terms and conditions as Purchaser may request in its sole discretion; provided, however, that not more than one hundred seventy (170) Real Property Leases may be so designated for amendment. The content of and any and all information relating to discussions among Purchaser, Sellers, their Affiliates or representatives and the Landlords, and the terms of any amendments resulting from such discussions shall be confidential and proprietary to Purchaser, and shall not be disclosed except pursuant to Parent's rights to make such disclosure pursuant to Article VII.

Section 8.3     Consents.  Parent shall use (and shall cause each of its Subsidiaries to use) its commercially reasonable efforts, and Purchaser shall cooperate with any reasonable request of Parent, to obtain at the earliest practicable date all consents and approvals required to consummate the transactions contemplated by this Agreement, including, without limitation, the consents and approvals referred to in Section 5.3(b) hereof; provided, however, that neither Parent nor any other Seller shall be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or legal proceedings to obtain any such consent or approval.

Section 8.4     Regulatory Approvals.

(a)     If necessary, Purchaser and Parent shall (a) make or cause to be made all filings required of each of them or any of their respective Subsidiaries or Affiliates under the HSR Act or other Antitrust Laws with respect to the transactions contemplated hereby as promptly as practicable and, in any event, within ten (10) Business Days after the date of the Original Agreement in the case of all filings required under the HSR Act and within four weeks in the case of all other filings required by other Antitrust Laws, (b) comply at the earliest practicable date with any request under the HSR Act or other Antitrust Laws for additional information, documents, or other materials received by each of them or any of their respective Subsidiaries from the Federal Trade Commission (the "FTC"), the Antitrust Division of the United States Department of Justice (the "Antitrust Division") or any other Governmental Body in respect of such filings or such transactions, and (c) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any of the FTC, the Antitrust Division or other Governmental

Body under any Antitrust Laws with respect to any such filing or any such transaction. Each such party shall use best efforts to furnish to each other all information required for any application or other filing to be made pursuant to any applicable law in connection with the transactions contemplated by this Agreement. Each such party shall promptly inform the other parties hereto of any oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction. No party hereto shall independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation, or other inquiry without giving the other parties hereto prior notice of the meeting (to the extent legally permissible) and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate. Subject to applicable law, the parties hereto will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under the HSR Act or other Antitrust Laws. Parent and Purchaser may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 8.4 as "outside counsel only" Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Parent or Purchaser, as the case may be).

(b)    Each of Purchaser and Parent shall use its best efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the transactions contemplated by this Agreement under the HSR Act, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and any other United States federal or state or foreign statutes, rules, regulations, orders, decrees, administrative or judicial doctrines or other laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, the "Antitrust Laws"). In connection therewith, if any Legal Proceeding is instituted (or threatened to be instituted) challenging any transaction contemplated by this Agreement is in violation of any Antitrust Law, each of Purchaser and Parent shall cooperate and use its best efforts to contest and resist any such Legal Proceeding, and to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other order whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents, or restricts consummation of the transactions contemplated by this Agreement, including by pursuing all available avenues of administrative and judicial appeal and all available legislative action, unless, by mutual agreement, Purchaser and Parent decide that litigation is not in their respective best interests. Each of Purchaser and Parent shall use its best efforts to take such action as may be required to cause the expiration of the notice periods under the HSR Act or other Antitrust Laws with respect to such transactions as promptly as possible after the execution of this Agreement. In connection with and without limiting the foregoing, each of Purchaser and Parent agrees to use its best efforts to take promptly any and all steps necessary to avoid or eliminate each and every impediment under any Antitrust Laws that may be asserted by any Federal, state and local and non-United States antitrust or competition authority, so as to enable the parties to close the transactions contemplated by this Agreement as expeditiously as possible; provided, however, that in no event shall Purchaser be required to commit to or effect, by consent decree, hold separate orders, trust or otherwise the sale or disposition of any of its assets or businesses in order to avoid the entry of, or to effect the dissolution of, any decree, order, judgment, injunction, temporary restraining order or other order

in any suit or preceding, that would otherwise have the effect of preventing or materially delaying the consummation of the transactions contemplated by this Agreement.

Section 8.5    Further Assurances.  Each of Parent and Purchaser shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement, (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement, and (iii) enter into a transition services agreement to permit Parent to satisfy its obligations in respect of systems, reporting, payroll services and related matters as required under the Agency Agreement.

Section 8.6    Confidentiality.  Purchaser acknowledges that the Confidential Information provided to it in connection with this Agreement, including under Section 8.1, and the consummation of the transactions contemplated hereby, is subject to the terms of the confidentiality agreement between Purchaser and Parent dated July 14, 2008 (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference. Effective upon, and only upon, the Closing Date, the Confidentiality Agreement shall terminate with respect to information relating solely to the Business or otherwise included in the Purchased Assets; provided, however, that Purchaser acknowledges that any and all other Confidential Information provided to it by Parent or its representatives concerning any Seller shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date.  For purposes of this Section 8.6, "Confidential Information" shall mean any confidential information with respect to, including, methods of operation, customers, customer lists, Products, prices, fees, costs, Technology, inventions, Trade Secrets, know-how, Software, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters.

Section 8.7    Preservation of Records.  Parent and Purchaser agree that each of them shall preserve and keep the records held by it or their Affiliates relating to the Business for a period of three (3) years from the Closing Date and shall make such records and personnel available to the other as may be reasonably required by such party in connection with, among other things, any insurance claims by, Legal Proceedings or tax audits against or governmental investigations of Parent or Purchaser or any of their Affiliates or in order to enable Parent or Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby.  In the event Parent or Purchaser wishes to destroy such records before or after that time, such party shall first give ninety (90) days prior written notice to the other and such other party shall have the right at its option and expense, upon prior written notice given to such party within such ninety (90) day period, to take possession of the records within one hundred and eighty (180) days after the date of such notice.

Section 8.8    Publicity.  Neither Parent nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other party hereto, which approval will not be unreasonably withheld or delayed, unless, in the sole judgment of Purchaser or Parent, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the

applicable rules of any stock exchange on which Purchaser or Parent lists securities, <u>provided</u> that the party intending to make such release shall use its best efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other party with respect to the text thereof.

Section 8.9     <u>Supplementation and Amendment of Schedules</u>.  Parent or as applicable, Purchaser, may, at its option, include in the Schedules items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material except to the extent a particular representation is qualified by materiality, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement.  Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent it is reasonably apparent on the face of such disclosure (and not by reference to the underlying documents) that such disclosed matter is relevant to each other Schedule.  From time to time prior to the Closing, Parent shall have the right to supplement or amend the Schedules with respect to any matter hereafter arising or discovered after the delivery of the Schedules pursuant to this Agreement.  No such supplement or amendment shall have any effect on the satisfaction of the condition to closing set forth in <u>Section 10.1(a)</u>; <u>provided</u>, <u>however</u>, if the Closing shall occur, then Purchaser shall be deemed to have waived any right or claim pursuant to the terms of this Agreement or otherwise, including pursuant to <u>Article XI</u> hereof, with respect to any and all matters disclosed pursuant to any such supplement or amendment at or prior to the Closing.  From time to time, Purchaser shall have the ability to amend the Schedules pursuant to <u>Section 2.5</u> and <u>Section 8.2</u>.

Section 8.10     <u>Court Order</u>.  Subject to <u>Article VII</u>, Parent shall use reasonable best efforts to obtain the Sale Order.  If a written objection is filed to the Sale Motion, which is an objection which would prohibit or otherwise prevent the Closing from occurring pursuant to the terms of this Agreement, Parent shall use best efforts to have such objection overruled.

Section 8.11     <u>Adequate Assurance of Future Performance</u>.  With respect to each Contract and/or Real Property Lease, Purchaser shall use commercially reasonable efforts to provide adequate assurance as required under the Bankruptcy Code of the future performance of the applicable Contract and/or Real Property Lease by Purchaser.  Purchaser agrees that it will promptly take all actions reasonably required by Parent or ordered by the Bankruptcy Court to assist in obtaining the Bankruptcy Court's entry of an order approving this Agreement, such as furnishing affidavits, non-confidential financial information, confidential information subject to a reasonable form of confidentiality agreement or other documents or information for filing with the Bankruptcy Court and making Purchaser's employees and representatives available to be interviewed by Parent's attorneys and to testify before the Bankruptcy Court and at depositions, with respect to demonstrating adequate assurance of future performance by Purchaser under the Contract and/or Real Property Lease.  If a written objection is filed to the Sale Motion, which is an objection which would prohibit or otherwise prevent the Closing from occurring pursuant to the terms of this Agreement, Purchaser shall use commercially reasonable efforts to have such objection overruled.

Section 8.12 <u>Purchaser Covenants after Closing; Access</u>. Purchaser covenants and agrees that it shall, from and after the Closing Date (unless otherwise agreed with Parent) do each of the following:

(a) upon reasonable advance notice, afford to Parent's officers, independent public accountants, attorneys, lenders, consultants and other representatives, reasonable access during normal business hours to the Purchased Assets and all records pertaining to the Purchased Assets. Parent expressly acknowledges that nothing in this Section is intended to give rise to any contingency to Parent's obligations to proceed with the transactions contemplated herein.

(b) not purse any avoidance actions or claims under chapter 5 of the Bankruptcy Code against trade vendors to the Sellers.

Section 8.13 <u>Change of Name</u>. Within five (5) Business Days following the Closing Date, Parent shall, and shall cause each of the Sellers to, file such amendments to its formation or organizational documents with the relevant Governmental Body in its jurisdiction of formation or organization and, where appropriate, those jurisdictions in which it is qualified to do business, as are necessary in order that the names (including trade names and d/b/a's) of Parent and each Seller no longer include the words "Steve and Barry's" or any variation or derivation thereof. Purchaser shall pay or reimburse Sellers for the costs of such filings.

Section 8.14 <u>Authorization of Parent as Seller Representative</u>.

(a) By entering into and executing this Agreement, Sellers irrevocably make, constitute and appoint Parent as their agent, effective as of the date of the Original Agreement, and authorize and empower Parent to fulfill the role of Sellers' representative hereunder, and each Seller appoints Parent as such Person's true and lawful attorney in fact and agent, for such Person and in such Person's name, place and stead for all purposes necessary or desirable in order for Parent to take all actions contemplated by this Agreement, with the ability to execute and deliver all instruments, certificates and other documents of every kind incident to the foregoing to all intents and purposes and with the same effect as such Seller could do personally, including to give and receive notices and communications; to object to such deliveries, to agree to, negotiate, enter into settlements and compromises of, and demand arbitration and comply with orders of courts and awards of arbitrators with respect to such claims; and to take all actions necessary or appropriate in the judgment of Parent for the accomplishment of the foregoing. The death, incapacity, dissolution, liquidation, insolvency or bankruptcy of any Seller shall not terminate the authority and agency of Parent as Sellers' representative pursuant to this section. The power-of-attorney granted in this Section is coupled with an interest and is irrevocable.

(b) Purchaser shall be entitled to rely exclusively upon any communication given or other action taken by Parent pursuant to this Agreement, and shall not be liable for any action taken or not taken in good faith reliance on a communication or other instruction from Parent.

## ARTICLE IX

## EMPLOYEES AND EMPLOYEE BENEFITS

Section 9.1     Employment.

(a)     Business Employee List.  With respect to the Business Employees, Parent has previously provided to Purchaser a list (the "Business Employee List") setting forth: (i) each such person's title or job/position; (ii) each such person's job designation (i.e., salaried or hourly); (iii) each such person's location of employment; (iv) each such person's annual base rate of compensation and target annual bonus amount in effect immediately prior to the Petition Date; and (v) each such person's status (i.e., active or approved leave of absence) and expected return date.  Not later than 10 days prior to the Closing Date, Parent shall provide Purchaser with an updated Business Employee List.

(b)     Transferred Employees.  Prior to the Closing, Purchaser shall deliver, in writing, an offer of employment to those Employees as determined by Purchaser in its sole discretion.  The new employment of each Employee who accepts Purchaser's offer of employment shall commence with effect from the Closing Date (or, with respect to any Business Employee on a leave of absence, as of the date such Business Employee commences active employment with the Purchaser) (collectively referred to herein as the "Transferred Employees").

(c)     Standard Procedure.  To the extent applicable, pursuant to the "Standard Procedure" provided in Section 4 of Revenue Procedure 2004-53, 2004-34, IRB 320, (i) Purchaser and Parent shall report on a predecessor/successor basis as set forth therein, (ii) Parent will not be relieved from filing a Form W-2 with respect to any Transferred Employees, and (iii) Purchaser will undertake to file (or cause to be filed) a Form W-2 for each Transferred Employee with respect to the portion of the year during which such Employee is employed by Purchaser that includes the Closing Date, excluding the portion of such year that such Employee was employed by Parent or its Subsidiaries, provided that, if Purchaser so elects at least twenty (20) days prior to the Closing Date, Purchaser and Parent shall apply the "Alternate Procedure" provided in Section 5 of Revenue Procedure 2004-53

(d)     Cooperation and Communications.  Parent and Purchaser agree to cooperate reasonably during the period prior to the Closing Date to ensure the continuity of the workforce of the Business.  Prior to the Closing Date, all general communications between the Purchaser and any group of Business Employees shall be coordinated with Purchaser.

Section 9.2     Employee Benefits.

(a)     Benefits.  Purchaser shall provide, or cause to be provided, for a period of six (6) months following the Closing Date or such longer period of time required by applicable Law, to the Transferred Employees bonuses and employee benefits, that are reasonably comparable, in the aggregate, to those provided to such Transferred Employees immediately prior to the Petition Date; provided, however, that Purchaser shall not have any obligation to give effect to any equity or equity-based plan, any key Employee retention plan or any compensation

or bonus plan, agreement or arrangement designed to retain employees during the pendency of the Bankruptcy Case.

(b)    For purposes of eligibility and vesting (but not benefit accrual) under the employee benefit plans of Purchaser providing benefits to Transferred Employees (the "Purchaser Plans"), Purchaser shall credit each Transferred Employee with his or her years of service with the Sellers and any predecessor entities, to the same extent as such Transferred Employee was entitled immediately prior to the Closing to credit for such service under any similar Employee Benefit Plan, provided, however, that such recognition of service shall not operate to duplicate any benefits of the Transferred Employees and shall not apply for any plan, program or arrangement under which similarly-situated employees of Purchaser or its Affiliates do not receive credit for prior service.  The Purchaser Plans providing health or other welfare benefits shall not deny Transferred Employees coverage on the basis of pre-existing conditions to the extent that such conditions were satisfied under the applicable welfare plan in which such Transferred Employee participated prior to the Closing Date and shall credit such Transferred Employees for any deductibles and out-of-pocket expenses paid in the year of initial participation in the Purchaser Plans.

(c)    Parent shall cause the rights of all Transferred Employees under each Employee Benefit Plan, and each outstanding award thereunder, to become fully vested, and to cease to be subject to forfeiture, as of the Closing Date.

(d)    To extent so elected by Purchaser in writing not less than five (5) Business Days prior to Closing, Parent shall, or shall cause each of the Selling Affiliates to: (i) on or prior to the Closing, establish new employee benefit plans substantially identical in all material respects (except for such changes as may be required by Law) to each of the Employee Benefit Plans designated in such Purchaser election (collectively, the "Prior Plans") solely for the benefit of the Transferred Employees (the "New Plans"); provided, however, that, for the avoidance of doubt, Sellers shall retain all Liabilities with respect to the Prior Plans; and (ii) transfer each of the Employee Benefit Plans (or part thereof) designated in such Purchaser election (collectively, the "Transferred Plans") to Purchaser (or such Affiliates of Purchaser as designated by Purchaser) at the Closing.  Purchaser shall at the Closing acquire any such Transferred Plans and, to the extent that any such New Plans are created on or prior to the Closing Date, such New Plans as Purchased Assets and assume all Liabilities thereunder as Assumed Liabilities. Notwithstanding anything herein to the contrary, Purchaser and its Affiliates shall not assume any liability arising before the Closing Date under any Transferred Plan or New Plan that is welfare benefit plan within the meaning of Section 3(3) of ERISA.

(e)    Nothing contained in this Article IX or elsewhere in this Agreement, express or implied,  shall be construed to prevent the termination of employment of any Transferred Employee or any change in the employee benefits available to, or other terms and conditions of employment applicable to, any Transferred Employee.  The provisions of this Article IX are solely for the benefit of the parties to this Agreement, and no current or former employee or any other individual associated therewith shall be regarded for any purpose as a third-party beneficiary of this Agreement.  In no event shall the terms of this Agreement be deemed to create or amend any employee benefit plan, program or arrangement of Purchaser or its Affiliates or to create any enforceable rights under any such plan, program or arrangement.

# ARTICLE X

# CONDITIONS TO CLOSING

Section 10.1    Conditions Precedent to Obligations of Purchaser.  The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in its sole discretion in whole or in part to the extent permitted by applicable Law):

(a)    (1) the representations and warranties of Parent and Sellers set forth in this Agreement, other those contained in Section 5.5, and in the Agency Agreement shall be true and correct as of the date of the Original Agreement and at and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date), without regard to any materiality or "Material Adverse Effect" qualifiers contained in such representations and warranties, in each case except for failures of such representations and warranties to be true and correct that, individually or in the aggregate, have not had and could not reasonably be expected to have a Material Adverse Effect; and (2) the representations and warranties contained in Section 5.5 shall be true and correct as of the date of the Original Agreement and at and as of the Closing Date as though made on the Closing Date, without regard to any Material Adverse Effect qualifier; and Purchaser shall have received a certificate signed by an authorized officer of Parent, dated the Closing Date, to the foregoing effect;

(b)    Parent and Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by the prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of Parent, dated the Closing Date, to the forgoing effect;

(c)    the Company shall have entered into the agreement with the Agent (the "Agency Agreement") providing for the disposal of the GOB Assets, a copy of which is attached hereto as Exhibit D, as may be amended from time to time;

(d)    each Designated Amendment Real Property Lease shall have been amended on such terms and conditions as shall be acceptable to Purchaser, in Purchaser's sole discretion; provided, however, that Purchaser shall inform Parent in writing prior to or at commencement of the Auction whether or not such condition is satisfied or waived;

(e)    all consents, approvals or conditions that are not eliminated by the Sale Order and that are required for the assignment and assumption of (i) the Celebrity Licenses set forth on Schedule 5.8, and (ii) the Collegiate and Miscellaneous Licenses (other than any Collegiate and Miscellaneous Licenses designated as Excluded Contracts), shall have been obtained or satisfied; provided, however, that this condition shall be deemed satisfied with respect to such consents, approvals and conditions referenced in the foregoing clause (ii) so long as the Collegiate and Miscellaneous Licenses with respect to which such consents, approvals or conditions have not been obtained or satisfied do not represent more than 50% of gross sales

from all Collegiate and Miscellaneous Licenses for the prior twelve (12) month period. The consents, approvals or conditions required to be obtained or satisfied pursuant to this Section 10.1(e) are referred to herein as "Required Consents";

(f)     all required notices shall have been given and filings made and, as the case may be, all applicable waiting periods shall have expired without adverse action by, and all favorable orders, consents and approvals in the form required to consummate the transactions contemplated by this Agreement and operate the Business shall have been received (if required by contract, applicable law or otherwise) from all federal, state and local governmental and regulatory agencies;

(g)     Sellers shall have provided evidence reasonably satisfactory to Purchaser that (i) Sellers have all right title and interest to and the ability to assign to Purchaser the Purchased Intellectual Property listed on Schedule 10.1(g)(i), and (ii) that the Intellectual Property set forth on Schedule Schedule 10.1(g)(ii) have been transferred to the Licensor in respect of the associated License;

(h)     since the Petition Date there shall not have occurred any development, event or change in facts or circumstances which has had or could reasonably be expected to have, individually or in the aggregate with all such other developments, events or changes, a Material Adverse Effect;

(i)     the Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order, in form and substance satisfactory to the Purchaser and all such orders shall be final and non-appealable, and the Sale Order shall provide, inter alia, the following:

(i)     Specific findings of fact and conclusions of law:

(A)     Purchaser will not consummate the transactions contemplated by the Agreement unless the Agreement specifically provides, and the Bankruptcy Court specifically orders, that none of Purchaser or its Affiliates, members or shareholders or the Purchased Assets will have any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any Lien or Excluded Liability;

(B)     Purchaser is a good faith purchaser of the Purchased Assets pursuant to Section 363(m) of the Bankruptcy Code;

(C)     Sellers gave due and proper notice of this Agreement and the transactions contemplated hereby to all persons entitled thereto;

(D)     Neither the Purchaser nor its Affiliates, successors or assigns shall, as a result of the consummation of the transaction contemplated by this Agreement: (a) be a successor to the Sellers or their estates; (b) have, de facto or otherwise, merged or consolidated with or into the Sellers or their estates; or (c) be a continuation or substantial continuation of the Sellers or any enterprise of the Sellers;

(E)     The consideration to be paid by Purchaser under this Agreement constitutes reasonably equivalent value (as that term is defined in each of the Uniform Fraudulent Transfer Act arid Section 548 of the Bankruptcy Code) and fair consideration for the Purchased Assets;

(F)     Neither Purchaser nor the Sellers are entering into the transactions contemplated by this Agreement fraudulently;

(G)     Sellers have provided adequate assurances to all parties to the Purchased Contracts which are to be assigned as part of the Sale Order;

(H)     All defaults under the Purchased Leases which are to be assigned as part of the Sale Order are deemed cured by payment of the Assumed Cure Amount;

(I)     All defaults under the Purchased Contracts which are to be assigned as part of the Sale Order are deemed cured by payment of the Assumed Cure Amount and Purchaser will not assume, be liable for, have any responsibility for or otherwise become obligated in respect of any claims arising prior to the Closing Date under any Purchased Lease or Purchased Contract, Designee Lease or Designee Contract, other than the Assumed Cure Amount; and

(J)     As of the Closing Date, (a) the transactions contemplated by this Agreement effect a legal, valid, enforceable and effective sale and transfer of the Purchased Assets to Purchaser with title to such assets free and clear of all liens and Excluded Liabilities, and (b) this Agreement and the transactions and instruments contemplated hereby shall be specifically performable and enforceable against and binding upon, and not subject to rejection or avoidance by, the Sellers or any chapter 11 trustee of the Sellers and their applicable estate.

(ii)     Specific Orders of the Bankruptcy Court:

(A)     Approving this Agreement and all of the terms and conditions hereof in all respects, and approving and authorizing the Sellers to consummate the transactions contemplated by this Agreement, including the sale of the Purchased Assets free and clear of all Liens and Excluded Liabilities;

(B)     Ordering that none of Purchaser or its Affiliates, members or shareholders or the Purchased Assets will have any Liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any lien or Excluded Liability;

(C)     Retaining core jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2) (2005), over resolution of any controversy or claim arising out of or relating to this Agreement, or the breach hereof as provided in <u>Section 8.10</u> of the Agreement;

(D)     Extending, as and to the extent necessary the time period under Section 365 of the Bankruptcy Code by which the Sellers must assume (or assume and assign) or reject any Contract to at least the last date under which Purchaser shall have the option to include such Contract in the Purchased Assets;

(E)     Ordering that, notwithstanding the provisions of Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d), the Sale Order is not stayed and is effective immediately upon entry;

(F)     Authorizing the Purchaser to direct Agent to commence GOB Sales at the Store Closing Locations at any time from and after the next Business Day following entry of the Sale Order;

(G)     Approving the Sellers' assumption of all Purchased Leases which are to be assigned to Purchaser or its designee as part of the Sale Order on or, subject to the Assignment Procedures (as defined in the Bidding Procedures Order), after the Closing Date pursuant to Section 365 of the Bankruptcy Code, and their assignment to Purchaser or its designee, as the case may be;

(H)     Approving the Sellers' assumption of all Purchased Contracts which are to be assigned to Purchaser or its designee as part of the Sale Order on or, subject to the Assignment Procedures (as defined in the Bidding Procedures Order), after the Closing Date pursuant to Section 365 of the Bankruptcy Code, and their assignment to Purchaser or its designee, as the case may be;

(I)     Approving and authorizing the Sellers to take all other and further actions necessary to implement the transactions contemplated by this Agreement;

(J)     Enjoining and forever barring the non-Seller party or parties to each Purchased Contract which is to be assigned on the Closing Date from asserting against Purchaser, any of its affiliates or any of the Purchased Assets: (i) any default existing as of or claim arising prior to the Closing Date, and (ii) any objection to the assumption and assignment of such non-Seller party's Assumed Contract;

(K)     Approving, in the event of a termination of this Agreement pursuant to Section 4.4(h) or Section 4.4(i), that the Termination Fee and Expense Reimbursement to be paid to Purchaser pursuant to Section 4.6(d) shall be superpriority administrative expense claims under Sections 503(b) and 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and ahead of all other secured or unsecured prepetition or postpetition obligations of the Sellers; and

(L)     incorporating those items set forth in Sections 2.1(b) of the Agency Agreement.

(j)     Parent shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2.

Section 10.2    Conditions Precedent to Obligations of Parent.  The obligations of Parent to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Parent in whole or in part to the extent permitted by applicable Law):

(a)    the representations and warranties of Purchaser set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, at and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date), and Parent shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;

(b)    Purchaser shall have designated a minimum of one hundred twenty five (125) Real Property Leases as Purchased Leases, which shall include the Distribution Center and the U.S. and overseas corporate headquarters;

(c)    Purchaser shall have delivered evidence to Parent that it has made offers of employment to such number of Employees as shall be reasonably necessary for the operation of the Leased Premises in respect of the Purchased Leases;

(d)    Purchaser shall have performed and complied in all respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and Parent shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect; and

(e)    Purchaser shall have delivered, or caused to be delivered, to Parent all of the items set forth in Section 4.3.

Section 10.3    Conditions Precedent to Obligations of Purchaser and Parent.  The respective obligations of Purchaser and Parent to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Parent in whole or in part to the extent permitted by applicable Law):

(a)    there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby and there shall not have been adopted any law or regulation making all or any portion of the transactions contemplated by this Agreement illegal;

(b)    the Bankruptcy Court shall have entered the Bidding Procedures Order, in form and substance reasonably acceptable to Parent and Purchaser;

(c)    the Bankruptcy Court shall have entered the Sale Order and any stay period applicable to the Sale Order shall have expired or shall have been waived by the Bankruptcy Court;

(d)     Sellers and Purchaser shall have entered into a transition services agreement, in form and substance satisfactory to each of Parent and Purchaser, to permit Parent to satisfy its obligations under the Agency Agreement; and

(e)     the waiting period applicable to the transactions contemplated by this Agreement under the HSR Act shall have expired or early termination shall have been granted.

Section 10.4     <u>Frustration of Closing Conditions</u>.  Neither Parent nor Purchaser may rely on the failure of any condition set forth in <u>Section 10.1</u>, <u>Section 10.2</u> or <u>Section 10.3</u>, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

## ARTICLE XI

## NO SURVIVAL

Section 11.1     <u>No Survival of Representations and Warranties</u>.  The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the parties shall have any liability to each other after the Closing for any breach thereof.  The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder, and each party hereto shall be liable to the other after the Closing for any breach thereof.

Section 11.2     <u>No Consequential Damages</u>.  Notwithstanding anything to the contrary elsewhere in this Agreement, no party shall, in any event, be liable to any other Person for any consequential, incidental, indirect, special or punitive damages of such other Person, including loss of future revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to the breach or alleged breach hereof.

## ARTICLE XII

## TAXES

Section 12.1     <u>Transfer Taxes</u>.  Purchaser shall be responsible for (and shall indemnify and hold harmless Parent and its directors, officers, employees, Affiliates, agents, successors and permitted assigns against) any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or governmental charges (including any interest and penalty thereon) payable in connection with the transactions contemplated by this Agreement ("<u>Transfer Taxes</u>") up to the amount of the Transfer Tax Cap.  To the extent that any Transfer Taxes are required to be paid by Parent (or such Transfer Taxes are assessed against Parent), Purchaser shall promptly reimburse Parent for such Transfer Taxes; <u>provided</u>, <u>however</u>, that Purchaser shall be under no obligation to reimburse Parent for any Transfer Taxes in excess of the Transfer Tax Cap.  To the extent that any Transfer Taxes in excess of the Transfer Tax Cap are paid by Purchaser (or such Transfer Taxes are assessed against Purchaser), Parent shall promptly reimburse Purchaser for such Transfer Taxes.  Parent and Purchaser shall reasonably cooperate and consult with each other prior to filing any Tax Returns in respect of Transfer Taxes; <u>provided</u>, <u>however</u>, Parent may initially pay any Transfer Taxes (for which Purchaser

shall promptly reimburse Parent up to the Transfer Tax Cap).  Parent and Purchaser shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for Transfer Taxes, and any such refunds shall be equitably apportioned between Parent and Purchaser based on the percentage of the Transfer Tax liability paid by each party.

Section 12.2    Prorations.  All real and personal property Taxes or similar ad valorem obligations levied with respect to the Purchased Assets for any taxable period that includes the Closing Date and ends after the Closing Date, whether imposed or assessed before or after the Closing Date, shall be prorated between Parent and Purchaser as of 12:01 a.m. (Eastern time) on the Closing Date or, in respect of any Real Property Lease, the date such Purchased Lease is assigned to the Purchaser.  If any Taxes subject to proration are paid by Purchaser, on the one hand, and Parent, on the other hand, the proportionate amount of such Taxes paid (or in the event of a refund of any portion of such Taxes previously paid is received, such refund) shall be paid promptly by (or to) the other after the payment of such Taxes (or promptly following the receipt of any such refund).

Section 12.3    Purchase Price Allocation.  Parent and Purchaser shall allocate the purchase price (including the Assumed Liabilities) among the assets acquired under Section 3.1 as Parent and Purchaser shall reasonably agree and, in accordance with such allocation, Purchaser shall prepare and deliver to Parent copies of Form 8594 and any required exhibits thereto (the "Asset Acquisition Statement").  Purchaser shall prepare and deliver to Parent from time to time revised copies of the Asset Acquisition Statement (the "Revised Statements") so as to report any matters on the Asset Acquisition Statement that need updating (including purchase price adjustments, if any) consistent with the agreed upon allocation.  The purchase price for the acquired assets shall be allocated in accordance with the Asset Acquisition Statement or, if applicable, the last Revised Statements, provided by Purchaser to Parent, and all income Tax Returns and reports filed by Purchaser and Parent shall be prepared consistently with such allocation, except to the extent a final determination by a Tax authority requires a different allocation.

Section 12.4    Cooperation.  Parent and Purchaser agree to furnish, or cause their Affiliates to furnish, to each other upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets or the Business (including access to books and records) as is reasonably necessary for the filing of all Tax Returns and other Tax filings, the making of any election related to Taxes, the preparation for any audit by any Tax authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax Return.  Parent and Purchaser shall reasonably cooperate, or cause their Affiliates to reasonably cooperate, with each other in the conduct of any audit or other proceeding related to Taxes and each shall execute and deliver such other documents as are necessary to carry out the intent of this Section 12.4.  Parent and Purchaser shall provide, or cause their Affiliates to provide, timely notice to each other in writing of any pending or threatened Tax audits, assessments or litigation with respect to the Purchased Assets or the Business for any Tax period for which the other party may have liability under this Agreement.  Parent and Purchaser shall furnish, or cause their respective Affiliates to furnish, to each other copies of all correspondence received from any Tax authority in connection with any Tax audit, assessment or litigation or information request with respect to any Tax period for which the other party or its Affiliates may have liability under this Agreement.

# ARTICLE XIII

## MISCELLANEOUS

Section 13.1    <u>Expenses</u>.  Except as otherwise provided in this Agreement, each of Parent and Purchaser shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby <u>provided</u>, <u>however</u>, that Purchaser shall be responsible for and shall indemnify Parent for any governmental charges relating to HSR Act filing fees, UCC-3 filing fees, ICC, DOT, real estate, title recording or filing fees and other amounts payable in respect of transfer filings in connection with the transactions contemplated by this Agreement other than in circumstances when the Expense Reimbursement is payable.

Section 13.2    <u>Injunctive Relief</u>.  Damages at law may be an inadequate remedy for the breach of Section 8.2 or <u>Section 8.6</u> of this Agreement and, accordingly, any party hereto shall be entitled to injunctive relief with respect to any such breach, including without limitation specific performance of the covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained therein.  The rights set forth in this <u>Section 13.2</u> shall be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

Section 13.3    <u>Submission to Jurisdiction; Consent to Service of Process</u>.

(a)    Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 13.7</u> hereof; <u>provided</u>, <u>however</u>, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)    Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by personal delivery of a copy thereof in accordance with the provisions of <u>Section 13.7</u>.

Section 13.4    Waiver of Right to Trial by Jury.  Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

Section 13.5    Entire Agreement; Amendments and Waivers.  This Agreement, the Agency Agreement, the Standby Agency Agreement and the Confidentiality Agreement (including the schedules and exhibits hereto and thereto) represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

Section 13.6    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State without regard to conflicts of laws principles thereof.

Section 13.7    Notices.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or (iii) one business day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to Seller, to:

S&B Industries Inc.
12 Harbor Park Drive
Port Washington, NY 11050
Facsimile: (516) 706-3292
Attention: Adam Mandlebaum

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Facsimile: (212) 310-8007
Attention: Simeon Gold, Lori R. Fife and Shai Waisman

If to Purchaser, to:

BH S&B Holdings LLC
c/o Bay Harbour Management LC
885 Third Avenue, 34th floor
New York, NY 10022
Facsimile: (212) 371-7497

With a copy (which shall not constitute notice) to:

Cadwalader Wickersham & Taft LLP
One World Financial Center
New York, NY 10281
Facsimile: (212) 504-6000
Attention: George Davis

Notices to the Sub-Agent shall be provided as set forth in the Agency Agreement.

Section 13.8 Severability. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

Section 13.9 Binding Effect; Assignment. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as provided below. No assignment of this Agreement or of any rights or obligations hereunder may be made by either Parent or Purchaser (by operation of law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void; provided, however, that Purchaser shall be permitted to assign its rights under this Agreement to acquire all or a portion of the Purchased Assets to one or more Affiliates or Agent. No assignment of any obligations hereunder shall relieve the parties hereto of any such obligations. Upon any such permitted assignment, the references in this Agreement to Purchaser shall also

apply to any such assignee unless the context otherwise requires.  In the event that a Chapter 11 trustee should be appointed for Parent, or in the event that Parent's Chapter 11 case should be converted to a case under Chapter 7, the obligations of Parent hereunder shall be binding upon such trustee or successor Chapter 7 estate.  Sellers and Agent agree that GECC shall be a third party beneficiary of this Agreement solely in respect of Parent's right to cause the execution of the Standby Agency Agreement, as contemplated by Section 4.6(a).

Section 13.10  Non-Recourse.  No past, present or future director, officer, employee, incorporator, member, partner or equityholder of Parent shall have any liability for any obligations or liabilities of Parent under this Agreement or the Seller Documents of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.

Section 13.11  Counterparts.  This Agreement may be executed in as many counterparts as may be required, which counterparts may be delivered by facsimile or electronic mail, and it shall not be necessary that the signature of, or on behalf of, each party, appear on each counterpart; but it shall be sufficient that the signature of, or on behalf of, each party, or that the signatures of the persons required to bind any party, appear on one or more such counterparts.  All such counterparts when taken together shall constitute a single and legally binding agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

S&B INDUSTRIES INC.
    on its own behalf, and in its capacity as
    agent for each of the Selling Affiliates listed
    in Exhibit A in accordance with Section 8.14
    of this Agreement


By:_____
    Name:
    Title:


BH S&B HOLDINGS LLC


By:_____
    Name:
    Title:


HILCO MERCHANT RESOURCES, LLC,
    on behalf of Sub-Agent


By:_____
    Name:
    Title:




CONSENTED AND AGREED TO
AS IT RELATES TO SECTIONS 2.5(c) and 4.6(e) HEREOF, BY:

GENERAL ELECTRIC CAPITAL CORPORATION


By:_____
Name
Title

# EXHIBIT A

## List of Affiliates of Parent that are Sellers

**4004 Incorporated**
**4004 LLC**
**Baller Brands LLC**
**Favored Brands LLC**
**Pro Air LLC**
**S&B Retail China LLC**
**S&B Retail India LLC**
**Star Band LLC**
**Steel Bolt Construction LLC**
**Stellar Brands LLC**
**Steve & Barry's Alabama LLC**
**Steve & Barry's Arizona LLC**
**Steve & Barry's Arkansas LLC**
**Steve & Barry's California LLC**
**Steve & Barry's Colorado LLC**
**Steve & Barry's Connecticut LLC**
**Steve & Barry's CP LLC**
**Steve & Barry's Florida LLC**
**Steve & Barry's Georgia LLC**
**Steve & Barry's GLC LLC**
**Steve & Barry's Hawaii LLC**
**Steve & Barry's Idaho LLC**
**Steve & Barry's Illinois LLC**
**Steve & Barry's Indiana LLC**
**Steve & Barry's International LLC**
**Steve & Barry's Iowa LLC**
**Steve & Barry's Kansas LLC**
**Steve & Barry's Kentucky LLC**
**Steve & Barry's LLC**
**Steve & Barry's Louisiana LLC**
**Steve & Barry's Maine LLC**
**Steve & Barry's Manhattan LLC**
**Steve & Barry's Maryland LLC**
**Steve & Barry's Massachusetts LLC**
**Steve & Barry's Michigan LLC**
**Steve & Barry's Midwest LLC**
**Steve & Barry's Minnesota LLC**
**Steve & Barry's Mississippi LLC**
**Steve & Barry's Missouri LLC**
**Steve & Barry's Nebraska LLC**
**Steve & Barry's Nevada LLC**
**Steve & Barry's New Jersey LLC**

**Steve & Barry's New Mexico LLC**
**Steve & Barry's New York LLC**
**Steve & Barry's North Carolina LLC**
**Steve & Barry's Oakland LLC**
**Steve & Barry's Ohio LLC**
**Steve & Barry's Oklahoma LLC**
**Steve & Barry's Pennsylvania LLC**
**Steve & Barry's South Carolina LLC**
**Steve & Barry's South Michigan LLC**
**Steve & Barry's Tennessee LLC**
**Steve & Barry's Texas LLC**
**Steve & Barry's Utah LLC**
**Steve & Barry's Virginia LLC**
**Steve & Barry's Washington LLC**
**Steve & Barry's West Virginia LLC**
**Steve & Barry's Wisconsin LLC**
**Stone Barn LLC**
**Stone Barn Trading LLC**
**Striking Brands LLC**
**Swift Building LLC**
**Symbolic Brands LLC**

**Schedule 1.1(e)**

**Excluded Contracts**

**[To be updated]**

**<u>Schedule 1.1(f)</u>**

**<u>Excluded Leases</u>**

**[To be updated]**

## SCHEDULE 1.1(h): Purchased Contracts

### Celebrity Endorsements

1.  Endorsement and License Agreement dated as of December 5, 2006 by and between Symbolic Brands LLC and Chickiii Productions, Inc as amended and modified by the First Amendment dated February 21, 2008 and as assigned by the Assignment and Assumption Agreement dated September 17, 2007 by and between 4004 Incorporated and Symbolic Brands LLC.  (Amanda Bynes)

2.  Endorsement and License Agreement dated as of February 27, 2007 by and between Baller Brands LLC and Ben Wallace as assigned by the Assignment and Assumption Agreement dated September 17, 2007 by and between 4004 Incorporated and Baller Brands LLC.  (Ben Wallace)

3.  Endorsement Agreement dated as of May 2, 2006 by and between Symbolic Brands LLC and Gerry "Bubba" Watson as assigned by the Assignment and Assumption Agreement dated September 17, 2007 by and between 4004 Incorporated and Symbolic Brands LLC. (Bubba Watson).

4.  Endorsement and License Agreement dated as of October 21, 2007 by and between Symbolic Brands LLC and Flying Pigz LLC.  (Laird Hamilton).

5.  Endorsement and License Agreement dated as of February 14, 2008 by and between Symbolic Brands LLC and Muhammad Ali Enterprises LLC. (Muhammad Ali)

6.  Endorsement and License Agreement dated as of July 27, 2006 by and between Striking Brands LLC and 45220, Inc. as assigned by the Assignment and Assumption Agreement dated September 17, 2007 by and between 4004 Incorporated and Striking Brands LLC. (Sarah Jessica Parker).

7.  Endorsement and License Agreement dated as of January 1, 2007 by and between Symbolic Brands LLC and Venusian at Large, LLC as assigned by the Assignment and Assumption Agreement dated September 17, 2007 by and between 4004 Incorporated and Symbolic Brands LLC. (Venus Williams).

# EXECUTORY CONTRACTS

| Contract Counterparty | Address | Description of Contract |
|---|---|---|
| Averitt Express, Inc. | 1415 Neal Street, Cookeville, TN 38502 | Trucking Carriers |
| Corporation Service Company | 2711 Centerville Rd Wilmington, DE 19808 | Corporations registered agents |
| Givex USA Corporation | 400-366 Adelaide Street West, Toronto, Ontario, Canada M5V1R9 | Gift card service providers |
| Healthy/Vending.com | 146 West Fulton Street, Long Beach, NY | Vending machine agreement |
| Interactive Communications International Inc. | 250 Williams Street, Suite M/100, Atlanta, GA 30303 | Gift card distribution agreement |
| Vector Security, Inc. | 10642 Wakeman Court, Manassas, Virginia 20110 | Alarm & monitoring services |
| Kovacs Security Systems, Inc. | 56 Crescent Drive, Searingtown, NY 11507 | Security alarm monitoring services |
| AL Systems, Inc. | 385 Franklin Avenue, Suite C, Rockaway, NJ 07866 | Purchase and license software solution |
| Avi FoodSystems, Inc. | 2590 Elm Road, Northeast, Warren, Ohio 44483-2997 | Vending machine program agreement |
| National Gift Card Corporation | 800 McHenry Ave., Suite A, Crystal Lake, IL 60014 | Reseller and distributor of gift cards |
| Long Island Jewish Medical Center | 270-05 76th Avenue, New Hyde Park, NY 11040 | Service agreement for travel related health expenses |
| General Electric Capital Corporation | 44 Old Ridgebury Road, Danbury, CT 06810-5105 | Master Lease Agreement - Agreements to be assumed include forklift agreement and surveillance camera agreement.  All other agreements under the Master Lease Agreement shall not be assumed and assigned. |

## NON-COLLEGIATE LICENSE AGREEMENTS

1. Equity Management License Agreement

2. Licensing Resource License Agreement

3. Settlement Agreement dated November 7, 2005 Agreement between All U, Inc. and Steve & Barry's LLC. (Various t-shirt designs)

4. License Agreement dated July 6, 2007 between Bigfoot 4X4, Inc. and Favored Brands LLC. (Bigfoot 4x4)

5. License Agreement dated December 14, 2005 between The Brooklyn Brewery Corporation and Favored Brands LLC as assigned by the Assignment and Assumption Agreement dated August 21, 2007 by and between 4004 Incorporated and Favored Brands LLC. (Brooklyn Brewery)

6. Settlement Agreement dated May 25, 2006 between Burma-Bibas, Inc. and Steve & Barry's LLC. (Various Hawaiian shirt patterns)

7. Product License Agreement dated June 7, 2007 between Cartoon Network Enterprises, Inc. and Favored Brands LLC. (Cartoon Network)

8. Settlement Agreement dated March 23, 2006 between COA Inc. and Steve & Barry's LLC. (Cheerleaders of America)

9. Trademark Licensing Agreement for Use of Marks Owned by the Children's Defense Fund dated April 18, 2008 between Children's Defense Fund and Striking Brands LLC and Steve & Barry's LLC.

10. License Agreement dated October 25, 2007 between CBS Consumer Products, CBS Broadcasting Inc. and Favored Brands LLC. (Classic Roster)

11. Reality Roster License Agreement dated September 24, 2007 between CBS Consumer Products, CBS Enterprises, A Division of CBS Inc, and Favored Brands LLC. (Reality Roster)

12. License Agreement dated September 24, 2007 between CBS Consumer Products and Favored Brands LLC. (Star Trek Roster)

13. License Agreement dated October 14, 2003 between Chrysler LLC (formerly Daimler-Chrysler Corporation) and 4004 Incorporated as modified and extended by Letter Amendment ("Amendment B") dated October 6, 2006. (Chrysler)

14. Short Form License Agreement dated May 20, 2007 between Classic Media Inc. and Favored Brands LLC. (Bullwinkle)

15. Short Form License Agreement dated May 20, 2007 between Classic Media Inc. and Favored Brands LLC. (Underdog – Classic Media)

16. License Agreement dated October 20, 2005 between Coors Global Properties, Inc. and Favored Brands LLC as assigned by the Assignment and Assumption Agreement dated August 21, 2007 by and between 4004 Incorporated and Favored Brands LLC. (Coors)

17. License Agreement dated August 28, 2007 between Scott Adams, Inc. and Favored Brands LLC. (Dilbert)

18. License Agreement dated November 29, 2004 between Daimler-Chrysler Corp. and 4004 Incorporated as modified and extended by Amendment #1 executed January 8, 2008. (Dodge)

19. Settlement and License Agreement dated September 4, 2007 between Don McMillan and Steve & Barry's LLC as modified by Amendment dated September 27, 2007.

20. License Agreement dated October 13, 2005 between Doug Herbert Racing, Inc. and 4004 Incorporated. (Doug Herbert)

21. License Agreement dated June 12, 2006 between Concord Brands, Ltd. and Favored Brands LLC as assigned by the Assignment and Assumption Agreement dated October 21, 2007 by and between 4004 Incorporated and Favored Brands LLC. (Dubble Bubble)

22. License Agreement dated December 27, 2007 by and between E.S. Originals, Inc. and Striking Brands, LLC. (Fabric Bottom Shoes)

23. License Agreement dated September 19, 2007 between CCM IP, S.A. and Favored Brands LLC. (FEMSA)

24. License Agreement dated March 20, 2008 between FremantleMedia North America, Inc. and Favored Brands LLC. (The Price is Right Classic Games)

25. License Agreement dated September 27, 2007 between Paws, Inc. and Favored Brands LLC. (Garfield)

26. License Agreement dated February 20, 2006 between General Mills, Inc. and Favored Brands LLC as assigned by the Assignment and Assumption Agreement dated August 21, 2007 by and between 4004 Incorporated and Favored Brands LLC. (General Mills)

27. License Agreement dated August 21, 2003 between General Motors Corporation and 4004 Incorporated as extended and modified by the First Amendment dated June 15, 2007 and as further modified by the Second Amendment dated April 4, 2008. (General Motors)

28. License Agreement dated September 18, 2006 between General Motors Corporation and 4004 Incorporated. (General Motors Archive)

29. Settlement Agreement dated October 19, 2005 between Good Sports, Inc. and Steve & Barry's LLC. (Certain shirt designs)

30. License Agreement dated January 23, 2007 between Hasbro Inc. and Favored Brands LLC as assigned by the Assignment and Assumption agreement dated August 21, 2007 by and between 4004 Incorporated and Favored Brands LLC, and as modified by the First Amendment dated November 28, 2007 and as further modified by the Second Amendment dated July 8, 2008. (Hasbro)

31. License Agreement dated January 3, 2006 between the Hershey Company and Favored Brands LLC as modified by Amendment dated August 21, 2007 and as assigned by the Assignment and Assumption Agreement dated August 21, 2007 by and between 4004 Incorporated and Favored Brands LLC. (Hershey)

32. License Agreement dated January 1, 2007 Agreement between Indianapolis Motor Speedway LLC and Favored Brands LLC as assigned by the Assignment and assumption

agreement dated January 1, 2006 by and between 4004 Incorporated and Favored Brands LLC and as extended by License Agreement dated January 1, 2007. (Indy 500)

33. License Agreement dated May 18, 2007 between DaimlerChrysler Company LLC and 4004 Incorporated. (Jeep)

34. Non-exclusive License Agreement dated April 11, 2007 between Just Born, Inc. and Favored Brands LLC as assigned by the Assignment and Assumption Agreement dated August 21, 2007 by and between 4004 Incorporated and Favored Brands LLC. (Just Born)

35. Settlement and License Agreement dated October 25, 2007 between Just Born, Inc. and Steve & Barry's LLC. (Peeps)

36. License Agreement dated October 10, 2006 between Kellogg Company and Favored Brands LLC as assigned by the Assignment and Assumption Agreement dated August 21, 2007 by and between 4004 Incorporated and Favored Brands LLC. (Kellogg)

37. License Agreement dated March 12, 2007 between Haggerty Enterprises and Favored Brands LLC as assigned by the Assignment and Assumption. (Lava Lamp)

38. License Agreement dated March 1, 2007 between WM. Hoest Enterprises, Inc. and Favored Brands LLC as assigned by the Assignment and Assumption Agreement dated August 21, 2007 by and between 4004 Incorporated and Favored Brands LLC. (Lockhorns)

39. License Agreement dated September 15, 2005 between Marvel Enterprises Inc. and Favored Brands LLC as assigned by the Assignment and Assumption agreement dated August 221, 2007 by and between 4004 Incorporated and Favored Brands LLC and as modified and extended by the Amendment dated January 19, 2008. (Marvel)

40. License Agreement dated December 28, 2007 between Mister Men Limited and Favored Brands LLC (Little Miss and Mister Men Limited)

41. License Agreement dated October 10, 2007 between Live Nation Motor Sports, Inc. and Favored Brands LLC. (Monster Jam)

42. License Agreement dated August 31, 2006 between the New York Metropolitan Transportation Authority and Favored Brands LLC as assigned by the Assignment and Assumption Agreement dated August 21, 2007 by and between 4004 Incorporated and Favored Brands LLC. (MTA)

43. Merchandise License Agreement dated July 5, 2007 between MTV Networks, a division of Viacom International Inc. and Favored Brands LLC. (MTV & VH1).

44. License Agreement dated October 2, 2007 between Nathan's Famous Systems, Inc and Favored Brands LLC. (Nathan's)

45. License Agreement dated September 1, 2007 between Societe des Produits Nestle S.A. and Favored Brands LLC. (Nestle)

46. Merchandising License Agreement dated September 25, 2007 between Paramount Licensing Inc. and Favored Brands LLC. (Paramount)

47. License Agreement dated January 1, 2008 between PepsiCo, Inc. and 4004 Incorporated. (Pepsi)

48. License Agreement dated April 1, 2007 between Pez Candy, Inc. and Favored Brands LLC. (Pez)

49. License Agreement dated February 5, 2007 between Act III Licensing and Favored Brands LLC as assigned by the Assignment and Assumption Agreement dated August 21, 2007 by and between 4004 Incorporated and Favored Brands LLC. (Princess Bride)

50. License Agreement dated July 18, 2007 between The Weinstein Company and Steve & Barry's LLC. (Project Runway)

51. License Agreement dated August 22, 2007 between Lions Gate Films, Inc. and Favored Brands LLC. (Reservoir Dogs)

52. Settlement and License Agreement dated May 24, 2007 between Capital Concepts, Inc. d/b/a bCreative, Inc. and Steve & Barry's LLC. (Retrospoofs)

53. License Agreement dated August 21, 2007 between Capital Concepts, Inc. d/b/a bCreative, Inc. and Favored Brands LLC. (b Creative Retrospoofs)

54. License Agreement dated April 1, 2008 between New Line Productions, Inc and Favored Brands LLC. (Semi-Pro)

55. License Agreement dated April 21, 2008 between Home Box Office, Inc. and Favored Brands LLC. (Sex and the City)

56. License Agreement dated August 27, 2007 between Shakespeare Company, LLC and Favored Brands LLC. (Shakespeare Fishing Supplies)

57. Merchandising License Agreement dated March 12, 2007 between Ce De Candy, Inc. and Favored Brands LLC as assigned by the Assignment and Assumption Agreement dated August 21, 2007 by and between 4004 Incorporated and Favored Brands LLC. (Smarties)

58. License Agreement dated April 27, 2007 between Hormel Foods, LLC and its licensing representative, Design Plus, and Favored Brands LLC. (Spam)

59. License Agreement dated December 15, 2005 Agreement between Speed Racer Enterprises, Inc and Favored Brands LLC as modified and extended by First Renewal Addendum dated October 1, 2007. (Speed Racer)

60. Corporate Donation and License Agreement dated April 14, 2008 between Talk About Curing Autism (TACA) and Symbolic Brands LLC.

61. License agreement dated August 23, 2007 between Ragdoll Worldwide Limited and Favored Brands LLC. (Teletubbies)

62. License Agreement dated September 1, 2005 between Tootsie Roll Industries, Inc. and Favored Brands LLC as modified by letter amendment dated December 2, 2006. (Tootsie Roll)

63. License Agreement dated October 1, 2006 between The Topps Company, Inc. and Favored Brands LLC as assigned by the Assignment and Assumption Agreement dated

August 21, 2007 by and between 4004 Incorporated and Favored Brands LLC. (Topps-Bazooka Joe)

64. License Agreement dated August 9, 2007 between Turtle Wax, Inc. and Favored Brands LLC. (Turtle Wax)

65. Corporate Donation and License Agreement dated November 20, 2007 between the United Nations Educational Scientific and Cultural Organization, an Inter-Governmental Organization of the United Nations System, and Steve & Barry's LLC. (UNESCO)

66. License Agreement dated September 13, 2007 between World Events Productions and Favored Brands LLC as modified by the Amendment dated by November 8, 2007. (Voltron)

67. License Agreement dated November 21, 2006 between Wham-O, Inc. and 4004 Incorporated as modified by the Letter Amendment dated January 19, 2007. (Wham-O)

68. Non-Exclusive License Agreement dated August 16, 2006 between WPT Enterprises, Inc. and Favored Brands LLC as assigned by the Assignment and Assumption Agreement dated August 21, 2007 by and between 4004 Incorporated and Favored Brands LLC. (World Poker)

69. License Agreement dated May 1, 2006 between World Wrestling Entertainment, Inc. and Favored Brands LLC as assigned by the Assignment and Assumption Agreement dated August 21, 2007 by and between 4004 Incorporated and Favored Brands LLC. (WWE)

# COLLEGIATE LICENSE AGREEMENTS

| Collegiate Licensing Agreements | |
|---|---|
| **Contract Counterparty** | **Type of Agreement** |
| Ohio State University | License Agreement |
| West Virginia University | License Agreement |
| Adelphi University | Logo License Agreement |
| Armstrong Atlantic State University | License Agreement |
| Ashland University | License Agreement |
| Augsburg College | Standard Form License Agreement |
| Aurora University | Standard Form License Agreement |
| Baldwin-Wallace College | Standard Form License Agreement |
| Bowie State university | Standard License Agreement |
| Student Association, Inc. | License Agreement |
| Central Texas College | Standard Form License Agreement |
| University of Chicago | License Agreement |
| SUNY Cortland College | Standard Form License Agreement |
| Long Island University CW Post Campus | Standard Form License Agreement |
| Dallas Baptist University | Standard Form License Agreement |
| Dartmouth College | License Agreement |
| Colorado Seminary, Owner and Operator of University of Denver | License and Manufacturing Agreement |
| Doane College | Standard Form License Agreement |
| Duquesne University of the Holy Spirit | Trademark License Agreement |
| College of Our Lady of the Elms | Standard Form License Agreement |
| Trustees of Fordham University | Fordham University Nonexclusive Trademark License |

| | |
|---|---|
| The Board of Regents of the University System of Georgia | Non-Exclusive License Agreement |
| Grambling State University | Grambling State University Licensing Contract |
| Trustees of Hamilton College | Standard Form License Agreement |
| College of Holy Cross | Non-Exclusive License Agreement |
| Indiana Tech | Standard Form License Agreement |
| Indiana Wesleyan University | Trademark License Agreement |
| The John Hopkins University | Agreement |
| Illinois Central College | Licensing Agreement |
| Trustees of Indiana University | Non-Exclusive License Agreement |
| Lamar University | Licensing Agreement |
| Michigan State University | Michigan State University Trademark License Agreement |
| Michigan Technological University | License Agreement |
| Minnesota State University Moorhead | Non-Exclusive Vendor License |
| Missouri State University | Non-Exclusive License Agreement |
| Massachusetts Institute of Technology | Trademark License Agreement |
| Mount Holyoke College | Trademark License Agreement |
| Georgia Southern University | License Agreement |
| Myers University | Non-Exclusive Licensor Agreement |
| Nebraska Wesleyan University | Standard Form License Agreement |
| University of New Haven | License Agreement |
| Campus Auxiliary Services of SUNY New Paltz | Standard Form License Agreement |

| | |
|---|---|
| University of North Carolina Pembroke | Standard Form License Agreement |
| Northern Michigan university | Revocable License to Use Certain Indicia of Northern Michigan University |
| Oklahoma City University | Standard Form License Agreement |
| Oswego College Foundation, Inc. | Non-Exclusive Merchandising Agreement |
| Robert Morris College | Trademark License Agreement |
| Saginaw Valley State University | Saginaw Valley State Non-Exclusive License |
| Shawnee State University | Non-Exclusive License Agreement |
| St. John Fisher College | Standard Form License Agreement |
| SUNY Institute of Technology at Utica/Rome | Standard Form License Agreement |
| Union College Bookstore | Standard Form License Agreement |
| Wilkes University | Trademark License Agreement |
| University of Wisconsin-Eau Claire | Agreement |
| University of Wisconsin-Oshkosh | Licensing Agreement |
| Yale University | Yale University Trademark License Agreement |
| Illinois Central College | Standard Form License Agreement |
| Cleveland State University | Collective Membership Mark License Agreement |
| New York Institute of Technology | License Agreement |
| Thomas Moore College | License Agreement |
| University of Tampa (Grant Donaldson) | License Agreement |
| Edinboro University (Bruce Whitehair) | License Agreement |

| | |
|---|---|
| Howard University | Trademark License Agreement |
| University of Massachusetts | Non-Exclusive License Agreement |
| Bluefield College | Non-Exclusive License Agreement |
| Wiley College | Standard Form License Agreement |
| West Liberty State College | Non-Exclusive License Agreement |
| Columbus State University Foundation | License Agreement |
| University of Buffalo | Non-Exclusive License Agreement |
| College of Saint Rose | Non-Exclusive License Agreement |

**Additional Collegiate Licensing Agreements:**

| Contract Counterparty | Type of Agreement |
|---|---|
| Arkansas Northeastern | Licening Agreement |
| Central Oklahoma, University of | Licening Agreement |
| University of Scranton | Licensing Agreement |
| Concord University | Licening Agreement |
| Geneseo | Licening Agreement |
| Illinois Wesleyan | Licening Agreement |
| IUPUI | Licening Agreement |
| Ithaca College | Licening Agreement |
| Kansas, University of | Licening Agreement |
| Kutztown State University | Licening Agreement |
| Northwood University | Licening Agreement |
| Stetson University | Licening Agreement |
| Texas - San Antonio | Licening Agreement |
| Virginia Military Institute | Licening Agreement |
| Virginia Polytechnic Institute | Licening Agreement |
| West Virginia University Institute of Technology | Licening Agreement |
| Austin Peay State University | Licening Agreement |
| Bradley University | Licening Agreement |
| Central Arkansas, University of | Licening Agreement |

| | |
|---|---|
| Eastern Kentucky University | Licening Agreement |
| East Tennessee State University | Licening Agreement |
| Oakland University | Licening Agreement |
| University of Nevada-Law Vegas | Licening Agreement |
| Ball State | Licening Agreement |
| Langston University | Trademark Agreement |
| Loyola College | Standard License Agreement |
| University of Mary Hardin-Baylor | Standard Form License Agreement |
| Prairie View A&M University | License Agreement |
| Southwest Baptist University | Standard Form License Agreement |
| Texas Southern University | Non Exclusive License |
| Trustees of the University of Pennsylvania | Trademark License Agreement |
| Webster University | Standard Form License Agreement |
| College of William & Mary | Standard License Agreement |
| Board of Regents of the University of Wisconsin System, University of Wisconsin | Standard Form License Agreement |
| Wittenberg University | Standard Form License Agreement |
| Hampton University | Standard Licensing Agreement |
| Hope College | Letter Agreement |
| Morehouse College | Licensing Agreement |
| University of Nebraska at Omaha | Non-Exclusive License Renewal Agreement |
| University of Wisconsin Green Bay | Revocable License |
| Brown University | Trademark License Agreement |
| Foundation for Cal State San Bernardino | Agreement |

| | |
|---|---|
| Regents of the University of California | License Agreement |
| Carnegie Mellon University | License Agreement |
| College of Misericordia | Standard Form License Agreement |
| Hood College | Standard Form License Agreement |
| Houston Baptist University | Standard Form License Agreement |
| John Carroll University | Licensing Agreement |

# SCHEDULE 2.5 (a): Purchased Leases

| | | |
|---|---|---|
| **Exhibit B-1** <br> **(Leases)** | | |
| **Store #** | **Location Name** | **Landlord** |
| 12 | Jersey Gardens Mall | JG Elizabeth, LLC |
| 15 | Lakeside Mall | Lakeside Mall LLC |
| 17 | Fairlane Town Center | Fairlane Town Center LLC |
| 20 | Oakland Mall | Urbancal Oakland Mall, LLC |
| 21 | Cincinnati Mills | Cincinnati Mills, L.L.C. |
| 29 | Century III Mall | Century III Mall, L.P |
| 30 | Walden Galleria | Pyramid Walden Company, L.P. |
| 31 | Millcreek Mall | Cafaro Management Company |
| 32 | Northtown Mall | Glimcher Northtown Venture, LLC |
| 35 | South Mall | PR Financing Limited Partnership |
| 37 | Broadway Mall | Vornado Broadway Mall LLC |
| 38 | Potomac Mills | Mall at Potomac Hills, LLC |
| 44 | Palisades Center | EKLECCO Newco, LLC |
| 57 | North Riverside Park Mall | North Riverside Park Associates |
| 60 | Battlefield Mall | Battlefield Mall, LLC |
| 64 | Grapevine Mills | Grapevine Mills Limited Partnership |
| 65 | Madison Square Mall | Madison Square Associates, Ltd. |
| 67 | Lynnhaven Mall | Lynnhaven Mall L.L.C. |
| 68 | Silver City Galleria | Silver City Galleria L.L.C. |
| 69 | Ontario Mills | Ontario Mills II Limited Partnership |
| 70 | The Block at Orange | Orange City Mills Limited Partnership |
| 71 | Crossroads Mall | MMP Crossroads, LLC |
| 76 | West Towne Mall | Madison/West Towne, LLC |
| 79 | Eastpoint Mall | Thor Eastpoint Mall, LLC |
| 80 | Great Mall | GM Olathe LLC |
| 86 | Southridge Mall | BRE/Grange - Greendale, L.L.C. |

| 100 | Burnsville Center | Burnsville Minnesota, LLC |
|-----|------------------|--------------------------|
| 106 | Manhattan Mall | VNO 100 West 33rd Street, LLC |
| 110 | Katy Mills | Katy Mills Mall Limited Partnership |
| 111 | Oak Hollow Mall | High Point Development Limited Partnership |
| 119 | The Source Mall | W & S Associates, L.P. |
| 120 | Osceola Square Mall | Towne & Country Center Limited Liability Company |
| 127 | Spring Hill Mall | Spring Hill Mall L.L.C. |
| 131 | The Parks @ Arlington | Parks at Arlington, L.P. |
| 133 | Carousel Center | Carousel Center Company L.P. |
| 141 | The Mall at Turtle Creek | Mall at Turtle Creek, LLC |
| 142 | University Center | GS II University Centre LLC |
| 144 | Franklin Mills | Franklin Mills Associates Limited Partnership |
| 147 | Glenway Crossing | DDR DownREIT LLC |
| 149 | Hickory Hollow Mall | Hickory Hollow/SB, LLC |
| 160 | Menlo Park Mall | Shopping Center Associates |
| 161 | Horton Plaza | Horton Plaza, L.P. |
| 165 | Macomb Mall | Thor Macomb Mall, LLC |
| 166 | Glenbrook Commons | HRI/ Glenbrook Commons, LLC |
| 167 | Gallery Shopping Center | Kimco Greenville 676, Inc. |
| 174 | Supermall of the Great Northwest | Glimcher Supermall Venture, LLC |
| 179 | Knolllwood Mall | Knollwood Company, L.P. |
| 181 | Ward Parkway | Coventry II DDR Ward Parkway, LLC |
| 186 | Salmon Run | Salmon Run Shoppign Center |
| 187 | Northtown Mall | Price Spokane Limited Partnership |
| 188 | Village Shopping Center | Davenport Center Limited Partnership |
| 189 | Lansing Mall | Lansing Mall Limited Partnership |

| 194 | Deptford Commons | Deptford Commons L.L.C. |
|---|---|---|
| 198 | Washington Square Mall | Washington Square Mall, LLC |
| 199 | Chapel Hill Mall | CHM/Akron, LLC |
| 202 | Summit North | Summit North Investments LLC |
| 204 | Richmond Town Square | Richmond Town Square Mall, LLC |
| 207 | Sardis Road | Spirit Master Funding III, LLC |
| 208 | Military Drive | Spirit Master Funding III, LLC |
| 212 | Biltmore Square | Biltmore Eight, LLC |
| 213 | Florence Plaza | HK New Plan Exchange Property Owner I, LLC |
| 215 | Evergreen Plaza | Evergreen I Associates LLC |
| 216 | Festival Center | HK New Plan Exchange Property Owner I, LLC |
| 218 | Mall at 163rd | ERT 163rd Street Mall, LLC |
| 219 | Everett Mall | Steadfast Everett Mall, LLC |
| 221 | Chapman Ford Crossing | NP of Tennessee, L.P. |
| 222 | Sunshine Square | HK New Plan Marwood Sunshine Cheyenne LLC |
| 223 | The Beverly Connection | Bevcon II, LLC |
| 224 | Columbia Place | Columbia Place/Anchor, LLC |
| 225 | Corum Station I Shopping Center | Corum Station LLC |
| 226 | New Park Mall | Alameda Mall Associates and GGP-Newpark L.L.C. |
| 227 | Integrity Way Retail Center | JDS Appleton LLC |
| 228 | Northpark Mall | Northpark Mall / Joplin, LLC |
| 229 | River Oaks Center | Fox Valley/ River Oaks Partnership |
| 232 | Beaver Valley | PR Beaver Valley Limited Partnership |
| 233 | Honey Creek Mall | Honey Creek Mall, LLC |
| 235 | Brookhill V | Brookhill V Acquisition, LLC |
| 236 | Deerbrook Mall | Deerbrook Anchor Acquisition, L.P. |

| | | |
|---|---|---|
| **237** | Southland Mall | Southland Mall, L.P. |
| **242** | Perimeter Place | G & M Chattanooga and Slovis Chattanooga LLC |
| **244** | Van Winkle Shopping Center | Van Winkle, LLC |
| **245** | The Cannery at Delmonte Square | VNO Patson Cannery LP |
| **246** | Vancouver Plaza | The Cafaro Northwest Partnership |
| **247** | Lakeview Square Mall | Lakeview Square Limited Partnership |
| **249** | Rockvale Square Outlets | Rockvale Outlet Center, L.P. |
| **250** | Shops at the Village | Midwest Expansion II, LLC |
| **251** | Cromwell Field Shopping Center | Cromwell Field Associates, LLLP |
| **253** | Washington Park Plaza | Rose Valley Lake, LLC |
| **261** | City Place Mall | City Place Limited Partnership |
| **264** | Barry Towne Center | Zona Rosa Development, LLC |
| **269** | Irving Mall | Simon Property Group (Texas), L.P. |
| **270** | Discover Mills | Sugarloaf Mills Limited Partnership |
| **272** | Eastridge Mall | Eastridge Shopping Center L.L.C. |
| **273** | Promenade at Belden | Tri Development Corporation |
| **274** | Brentwood Square Shopping Center | Gordman 84th Street, LLC |
| **278** | Agawam Towne Center | Marcel Sander, as Trustee of The 53 Springfield Street Realty Trust, Agawam Plaza, LLC and Agawam Development, LLC |
| **286** | 1004 East Southmore | Pasadena ATM, LLC |
| **288** | West Shore Plaza | Shore Plaza LLC |
| **290** | Loma Vista | Afton Meadows LLC |
| **292** | Horizon Outlet Center | Port Huron Factory Shops LLC |

| | | |
|---|---|---|
| **294** | Aviation Mall | Pyramid Mall of Glens Falls Newco LLC |
| **295** | Liberty Tree Mall | Mall at Liberty Tree, LLC |
| **297** | Courtland Town Center | TDC Courtland Leaseco, L.L.C |
| **299** | Regency Mall | Racine Joint Venture II, LLC |
| **302** | Greenwood Mall | Greenwood Mall, L.L.C. |
| **304** | Norwin Hills | NH Hills, LLC and NH MP Hills, LLC, as tenants-in-common |
| **305** | The Great Mall of the Bay Area | Milpitas Mills Limited Partnership |
| (n/a) | 692 Broadway | Vornado 692 Broadway LLC |

## Schedule 3.2(a)

The Purchase Price shall be increased or decreased, as applicable, by an amount equal to 83% of the difference between the Inventory Target and the actual aggregate Cost Value of the Merchandise as determined in accordance with Schedule 3.2(b).

## Schedule 3.2(b)

(a)     In order to test the validity of the aggregate Cost Value of the Merchandise as reflected on Sellers' current books and records, on or within ten (10) days after the Sale Commencement Date (the "Inventory Completion Date"), Sellers and Purchaser shall cause to be taken a SKU physical inventory (the "Inventory Taking") of the Merchandise located in (i) the Distribution Center and (ii) fifty (50) of the Sellers' retail store locations (which for purposes hereof may include Store Closing Locations), each with a representative sampling of stores located in each district (each a "Test Store" and collectively, the "Test Stores").  Each of Sellers and Purchaser shall select thirty (30) Test Stores, which designation shall be made no later than the Closing Date; provided, however, each of Sellers and Purchaser shall exclude five (5) Test Stores as designated by the other party; provided further that Sellers and Purchaser agree that no more than twenty percent (20%) of the Test Stores shall constitute urban stores. The date of the Inventory Taking at each Test Store shall be referred to as the "Inventory Date" for such Test Store.  Parent and Agent shall jointly employ RGIS or another mutually acceptable inventory taking service to conduct the Inventory Taking (and, if applicable, the Additional Inventory Taking, as defined below). The Inventory Taking shall be conducted in accordance with the procedures and instructions to be mutually agreed by Parent, Agent and Sub-Agent, in good faith and made a part of this Agreement (the "Inventory Taking Instructions").   Each of Sellers and Purchaser shall be responsible for 50% of the fees and expenses of the Inventory Taking Service, plus 100% of the payroll and benefits of any Seller employee and/or Transferred Employee used during the Inventory Taking other than Sellers' representatives observing such Inventory Taking.  Except as provided in the immediately preceding sentence as concerns allocation of the costs of the Inventory Taking Service, Sellers and Purchaser shall each bear their respective costs and expenses relative to the Inventory Taking.  Sellers, Purchaser, Agent, Sub-Agent, the Committee and Lenders shall each have the right to have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking Service.  Purchaser and Sellers also agree that during the conduct of the Inventory Taking in the Test Stores and Distribution Center, as applicable, shall be closed to the public and no sales or other transactions shall be conducted until the Inventory Taking has been completed in such location.  Sellers and Purchaser further agree that until the Inventory Taking in each particular Inventoried Store (as defined below) is completed, neither Purchaser nor Seller shall (i) transfer any Merchandise to or from that Inventoried Store, and/or (ii) remove any hang tags, price tickets, or inventory control tags affixed to any Merchandise (b) The Inventory Taking, including, but not limited to, the determination of the aggregate Cost Value of the Merchandise, shall be reconciled by Purchaser and Sellers within ten (10) days after its completion, and the Sellers and Purchaser shall use their reasonable best efforts to accomplish such reconciliation within such ten (10) day period; provided, further, that the final inventory report shall be completed not later than thirty (30) days after the Closing Date.  In the event there is any dispute with respect to the reconciliation of the aggregate Cost Value of the Merchandise following completion of the Inventory Taking, such dispute shall be promptly (and in no event later than the third business day following the request by either Parent or Agent) submitted to the Bankruptcy Court for resolution.

(b)     The results of the Inventory Taking at the Test Stores and the Additional Test Stores, if any (the "Test Store Results") shall be used to determine the aggregate Cost Value of the Merchandise on the Closing Date, as well as any adjustment as may be required to the calculation of the Purchase Price, as follows:

(i)     the actual physical count for the Distribution Center shall be used  for purposes of calculating the aggregate Cost Value of the Merchandise at the Distribution Center;

(ii)     the actual Test Store Results for the Test Stores and Additional Test Stores, if any (collectively, the "Inventoried Stores", and collectively with the Distribution Center the "Inventoried Locations"), as adjusted by Gross Rings (as defined below) for the period between the Closing Date and the applicable Test Store Inventory Date (the "Gross Rings Period") shall be used for purposes of calculating the aggregate Cost Value of the Merchandise at the Test Stores;

(iii)     for purposes of calculating the aggregate Cost Value of the Merchandise at Seller locations that do not constitute either the Distribution Center or the Inventoried Stores (the "Non-Inventoried Stores"), the actual Test Store Results at the Inventoried Stores shall be compared to the "roll-forward" book value of the Merchandise at the Inventoried Stores as of the Closing Date (as adjusted for any Gross Rings during the Gross Rings Period) (the "Adjusted Book Inventory"), in order to calculate an average variance against the Closing Date book value (the "Variance").  Sellers and Purchaser shall apply the Variance to Adjusted Book Inventory of the Merchandise located at the Non-Inventoried Stores in order to arrive at the aggregate Cost Value of the Merchandise in such Non-Inventoried Stores; provided however; for the purposes of calculating the Variance, the Inventoried Stores having the three (3) highest and three (3) lowest variance percentages shall be excluded;

(iv)     In the event that the initial Variance at the Inventoried Stores is greater than three percent (3%) of the adjusted book value of the Merchandise in the Inventoried Stores, then either Parent or Agent shall have the right to request an Inventory Taking at up to ten (10) additional retail store locations (each and "Additional Test Store" and collectively the "Additional Test Stores", to be mutually and reasonably agreed upon by the parties (the "Additional Inventory Taking"), to establish whether an adjustment to the Variance is required, with the costs and fees associated with the Additional Inventory Taking, to be paid by the party requesting such Additional Inventory Taking.

(c)     Sellers and Purchaser agree that they will, and agree to cause their respective representatives to, cooperate and assist in the preparation and the calculation of the aggregate Cost Value of the Merchandise included in the Sale, including, without limitation, the making available to the extent necessary of books, records, work papers and personnel.

(d)     With respect to the Inventoried Stores and the Distribution Center, the parties agree to establish procedures to account for any in-transit Merchandise still reflected in the book value of the shipping store or Distribution Center, as applicable.

(e)     During the Gross Rings Period Purchaser shall keep a strict count of register receipts and reports to determine the actual Cost Value of the Merchandise sold by SKU in each Inventory Location.  All such records and reports shall be made available to the Sellers during regular business hours upon reasonable notice. Any Merchandise sold during the Gross Rings Period shall be included in Merchandise using the actual Cost Value of the Merchandise sold plus a 3.5% shrink provision.

(f)     Other than with respect to Excluded Defective Merchandise and/or Unprinted Merchandise, in lieu of any other adjustments to the Cost Value of Merchandise under this Agreement (*e.g.*, adjustments for Defective Merchandise, clearance merchandise, near-mates, sample merchandise and/or Excluded Price Adjustments), the aggregate Cost Value of the Merchandise shall be adjusted (*i.e.*, reduced) by means of a single global downward adjustment equal to one and one-half percent (1.5%) of the aggregate Cost Value of the Merchandise (the "Global Inventory Adjustment").

## Schedule 3.2(b)(2)

**[None]**

## Schedule 6.3

## Conflicts

**None.**