**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In re:                                                                            :         Chapter 11
　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　STONE BARN MANHATTAN LLC, f/k/a            :         Case No. 08-12579 (ALG)
　　　Steve & Barry's LLC, <u>et</u> <u>al.,</u>                                       :
　　　　　　　　　　　　　　　　　　　　　　　　　　　　:         (Jointly Administered)
　　　　　　　　　　　　　　　　　Debtors.               :
　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
-------------------------------------------------------------x

## MEMORANDUM OF DECISION

A P P E A R A N C E S:

SILVERMAN ACAMPORA LLP
　　　　By:  Adam L. Rosen, Esq.
　　　　　　　　Robert Nosek, Esq.
Conflicts Counsel for the Debtors
100 Jericho Quadrangle, Suite 300
Jericho, NY 11753

REED SMITH LLP
　　　　By: Alexander Terras, Esq.
　　　　　　　Debra S. Turetsky, Esq.
Attorneys for General Electric Capital Corporation
599 Lexington Avenue
29th Floor
New York, NY 10022

COOLEY GODWARD KRONISH, LLP
　　　　By: Cathy Hershcopf, Esq.
　　　　　　　Brent I. Weisenberg, Esq.
Attorneys for the Official Committee of
　　Unsecured Creditors of the Debtors
1114 Avenue of Americas
New York, NY 10036

ARENT FOX LLP
　　　　By: Schuyler G. Carroll, Esq.
　　　　　　　Robert M. Hirsh, Esq.
Attorneys for the Official Committee of
　　Unsecured Creditors of BH S&B Holdings LLC
1675 Broadway
New York, NY 10019

CAHILL GORDON & REINDEL LLP
    By: Richard A. Stieglitz Jr., Esq.
Attorneys for BH S&B Holdings LLC,
   Debtors and Debtors in Possession in Case Nos. 08-14604 - 08-14611
80 Pine Street
New York, NY 10005


ALLAN L. GROPPER
UNITED STATES BANKRUPTCY JUDGE

      The above-captioned Debtors have moved under Rule 9019 of the Federal Rules of Bankruptcy Procedure for approval of a settlement (the "Settlement") with General Electric Capital Corporation and NMHG Financial Services, Inc. (collectively, "GECC"). The Settlement resolves claims GECC has asserted in the Debtors' bankruptcy cases in connection with leases of non-consumer personal property.[1] The Settlement is supported by the Official Committee of Unsecured Creditors in these cases, but it is opposed by the Official Committee of Unsecured Creditors of BH S&B Holdings, LLC and its affiliates (respectively, the "BH S&B Committee" and "BH S&B"), debtors in separate Chapter 11 cases filed in this Court and assigned to Judge Martin Glenn. The BH S&B Committee's objection urges the Court to reject the Settlement because it allegedly provides GECC with a windfall that may adversely affect the BH S&B bankruptcy estates.

      The Debtors and the Official Committee of Unsecured Creditors in these cases challenge the BH S&B Committee's standing to oppose the Settlement, contend that the doctrine of judicial estoppel bars the BH S&B objection, and urge the Court to approve the Settlement under the standards of Rule 9019.

      For the reasons set forth below, the Settlement is approved.

---

[1] The leased equipment included forklifts, computers, and surveillance cameras.

**BACKGROUND**

The Debtors, a chain of approximately 276 apparel and accessories discount stores, filed petitions for relief under Chapter 11 of the Bankruptcy Code on July 9, 2008. The Debtors proposed to sell substantially all of their assets, and on August 5, 2008, the Court approved an amended bidding procedures motion which, among other things, authorized BH S&B to act as a "stalking horse" bidder pursuant to a proposed Asset Purchase Agreement (the "APA") executed between the Debtors and BH S&B. (Order Authorizing Bidding Procedures and Stalking Horse Agreement, ECF Doc. No. 369.)[2]

GECC objected to the APA on August 13, 2008. It argued that the APA was not specific as to whether the Debtors intended to assume and assign four pre-petition leases with GECC or whether the APA included as assets to be sold the equipment subject to those leases. (ECF Doc. No. 430.) The Debtors amended the APA in response to the objection and specified that (i) the GECC leases were among a group of so-called "bubble leases" that were not assumed, assigned or rejected under the APA; (ii) the Debtors would be precluded from assuming or rejecting the bubble leases before January 31, 2009 unless authorized to do so by BH S&B, as purchaser under the APA; (iii) the Debtors would remain liable for payment to GECC under the bubble leases until they were assumed or rejected; and (iv) BH S&B would use the equipment and reimburse the Debtors for amounts payable to GECC under the bubble leases until rejection or assumption, or until January 31, 2009.[3] (Order Approving Asset Purchase Agreement,

---

[2] Hilco Merchant Resources, LLC was also a signatory of the APA, as agent in charge of conducting going-out-of-business sales. However, its participation in the transaction is not relevant to the matters dealt with herein.

[3] Further amendments were made to the APA in connection with the resolution of other objections, but these are irrelevant to the issues herein.

Exh. 3, § 2.5(h) and Schedule 1.1(h), ECF Doc. No. 628.) On August 22, 2008, after a two-day hearing, with no dispute that there was a need for an immediate sale and persuaded by the evidence on the record that a sale to BH S&B was in the best interests of all stakeholders, the Court approved the amended APA and the sale of most of the Debtors' assets to BH S&B. (Sale Hr'g Tr. 45:2-46:3, Aug. 22, 2008, ECF Doc. No. 1015.) The parties closed on the sale four days later.

After the sale closed, BH S&B defaulted on its obligations under the APA, generally and specifically with respect to the GECC equipment. Although there is no dispute that BH S&B continued to use GECC's equipment, it did not make the payments to the Debtors that were due under the APA, and it did not direct the Debtors with respect to assumption or rejection of the GECC leases. The Debtors also failed to make their respective payments to GECC. On October 9, 2008, GECC filed a motion in these cases to compel the Debtors to pay as administrative expenses the amounts due under the four leases.[4] (ECF Doc. No. 962.) The Debtors filed an opposition to GECC's motion on November 13, 2008, stating that BH S&B was responsible for the amounts and needed to be included as an interested party. (ECF Doc. No. 1077.) Before this motion was heard, however, on November 19, 2008, BH S&B and its affiliates themselves filed voluntary bankruptcy petitions under Chapter 11 of the Bankruptcy Code. (Case Nos. 08-14604 – 08-14611 (MG).) Two days later, the Debtors filed with both Judge Glenn and the undersigned a motion to reject the APA, arguing that the BH S&B debtors had placed them in an untenable position in that:

---

[4] The motion also sought to compel assumption or rejection of the GECC leases. At the direction of BH S&B, the Debtors rejected some of the leases on November 21, 2008 (ECF Doc. No. 1121) and on December 23, 2008. (ECF Doc. No. 1202.) The remaining leases were rejected as of February 28, 2009. *Id.*

4

> they either had to (i) reject all the 'bubble' leases and executory contracts immediately on account of the BH S&B Debtors' past and continuing breaches under the APA and potentially expose their estates to litigation by the BH S&B Debtors, or (ii) not reject the 'bubble' leases and executory contracts until January 31, 2009, thereby exposing their estates to over ten million dollars of administrative claims for which the BH S&B Debtors refuse to pay.

(Debtors' Mot. To Reject APA, ¶ 2, ECF Doc. No. 1131.)

The Debtors and BH S&B thereafter reached a compromise (the "Global Settlement") on the motions to reject the APA. (Agreement and Order ¶ 25, ECF Doc. No. 1133.) In exchange for the Debtors' withdrawal of the motions, BH S&B agreed, among other things, to establish an escrow account in the sum of $6,000,000 that the Debtors would control and use to cover unpaid administrative claims relating to the bubble leases, including the four leases with GECC. (*Id.* at ¶ 3-5.) The Global Settlement also provided that once all applicable administrative claims had been satisfied, any remaining funds in the escrow account would revert to BH S&B's bankruptcy estates. (*Id.* at ¶ 6.) Judge Glenn and the undersigned approved the Global Settlement at a joint hearing held on November 24, 2008.

Notwithstanding the Global Settlement, GECC's motion to compel payment of rent was still outstanding. GECC and the Debtors thereafter resolved their dispute by agreeing to the Settlement that is before the Court for approval. The Settlement provides GECC with (i) immediate payment of $403,202.74 for unpaid lease obligations, payable from the escrow account that BH S&B established in the Global Settlement; and (ii) an administrative expense claim of $80,000, payable as part of a liquidation plan to be filed under Chapter 11 of the Bankruptcy Code.[5] (*Id.* at ¶ 6.) In exchange, GECC agreed to

---

[5] The Debtors' have already paid GECC $162,903.22 of the agreed amount, but the Stipulation provides for the disgorgement of those moneys if the Settlement is not approved.

5

withdraw its proofs of claim filed in the Debtors bankruptcy cases—unsecured claims in the aggregate amount of $3,076,897.66, with $517,092.94 asserted as having administrative expense priority status (Claims Nos. 4746 - 4748)—and to waive any other claim it may hold against the Debtors. (*Id.*)  The Debtors filed a motion to approve the Settlement on January 30, 2009.  (ECF Doc. No. 1340.)

On March 5, 2009, the BH S&B Committee, which had been appointed on November 26, 2008 (Case No. 08-14604, ECF Doc. No. 95), filed the sole objection to the Settlement. (ECF Doc. No. 1517.)  The objection argues that the GECC leases are disguised security agreements, that GECC did not have the right to payment of rent under the leases, and that GECC may hold only general unsecured claims against the Debtors. Since the Settlement is to be paid from the escrow account to which BH S&B has a reversionary right, it is argued, the Settlement may improperly deplete the BH S&B estates and should be rejected.[6]

The Debtors, joined by their Creditors' Committee, counter that the BH S&B Committee lacks standing to challenge the Settlement, as the Settlement has no direct economic impact on BH S&B's estates.  Even if GECC's leases were found to be disguised security agreements, they contend, GECC would be a secured creditor entitled to adequate protection payments under § 361 of the Bankruptcy Code, because it filed protective UCC-1 financial statements regarding the subject property.  Unless GECC's adequate protection payments were lower than rent due under the leases, BH S&B's estates would not benefit from the reclassification of the leases.  In any event, according

---

[6] The BH S&B Committee also filed a motion for declaratory judgment (ECF Doc. No. 1577) and an adversary proceeding (Adv. No. 09-01140) against the Debtors seeking to declare the GECC leases as security agreements.  *See* Section 1-201(37) of the Uniform Commercial Code, which distinguishes between so-called "true leases" and leases intended to grant a security interest.

6

to the Debtors and Creditors' Committee, BH S&B's asserted reversionary right is illusory because projections show that BH S&B's escrow account is underfunded. In the alternative, the Debtors and Creditors' Committee argue that all parties are judicially estopped from claiming that the GECC agreements are not true leases.

The Court held a hearing to consider the Settlement on April 14, 2009. Representatives of the BH S&B Debtors appeared and made it clear that the BH S&B Committee was acting with their approval and on behalf of their estates.[7] After argument, the Court gave the parties leave to file further briefs on the effect of § 365(d)(5) of the Bankruptcy Code in cases where leases are challenged as disguised security arrangements.

Based on the record before the Court and on the findings of fact and conclusions of law set forth herein, the Settlement is approved.

## DISCUSSION

*I.     Standing*

In every federal case, a litigant's standing is a threshold question. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The Court's analysis starts, as it must, with the question whether the BH S&B estates have standing to object to the Settlement. Section 1109(b) of the Bankruptcy Code provides a party in interest standing to "appear and be heard on any issue in a case in this chapter." 11 U.S.C. § 1109(b). Although the term "party in interest" is not defined by the Bankruptcy Code or Rules, courts construe its meaning broadly "to insure fair representation of all constituencies impacted in any significant way by a Chapter 11 case." *In re Johns-Manville Corp.,* 36 B.R. 743, 754

---

[7] There is no question that the BH S&B Committee has authority from Judge Glenn to commence and prosecute on behalf of those estates causes of action such as those they purport to assert here. (Case No. 08-14604, ECF Doc. No. 286).

7

(Bankr.S.D.N.Y.1984); *see also In re Marin Motor Oil, Inc.,* 689 F.2d 445, 453 (3d Cir.1982); *cert. denied,* 459 U.S. 1207 (1983). "The basic test under section 1109(b) is 'whether the prospective party in interest has a sufficient stake in the outcome of the proceeding so as to require representation.'" *In re Public Service Co. of New Hampshire*, 88 B.R. 546, 550-51 (Bankr.D.N.H. 1988), quoting *In re Amatex Corp.,* 755 F.2d 1034, 1042 (3d Cir.1985). It is generally understood that "a pecuniary interest . . . directly affected by the bankruptcy proceeding" provides standing under § 1109(b). *Nintendo Co. v. Patten (In re Alpex Computer Corp.)*, 71 F.3d 353, 356 (10th Cir. 1995); s*ee also Term Loan Holder Committee v. Ozer Group, LLC (In re Caldor Corp.)*, 303 F.3d 161 (2d Cir. 2002).

In the present case, the BH S&B estates have a direct interest in the escrow account from which the Settlement is proposed to be funded. Such an interest is sufficient to give the BH S&B estates a "pecuniary interest" and a "direct stake" in the present controversy. The Debtors argue that the escrow account may prove to be underfunded, but the evidence of record is not sufficient to make this determination today. In any event, the Debtors in these cases also purport to hold contingent administrative claims against the BH S&B estates for expenses (such as those in connection with the bubble leases) not paid from the escrow account because of inadequate funding. (Debtors' Joint Reply to BH S&B Committee's Objection to Settlement, Exh. B, ECF Doc. No. 1077.) This contingent claim also confers standing on the BH S&B estates with respect to the proposed payment from the escrow account.

*II.     The Settlement*

In considering approval of a settlement under Rule 9019, a bankruptcy court must make an

> educated estimate of the complexity, expense and likely duration of litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process, in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-425 (1968). Although approval of a settlement rests in the Court's sound discretion, *In re Arrow Air, Inc.*, 85 B.R. 886, 891 (Bankr. S.D. Fla. 1988), the debtor's business judgment should not be ignored. *Depo v. Chase Lincoln First Bank, N.A. (In re Depo)*, 77 B.R. 381, 384 (N.D.N.Y. 1987), *aff'd*, 863 F.2d 45 (2d Cir. 1988).

In the Second Circuit, courts consider the following factors when determining whether to approve a settlement:

(i)     the balance between the litigation's possibility of success and the settlement's future benefits;

(ii)    the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment;

(iii)   the paramount interest of the creditors, including each affected class' relative benefits, and the degree to which creditors do not object to or affirmatively support the proposed settlement;

(iv)    whether other parties in interest support the settlement;

(v)     the competence and experience of counsel supporting the settlement; and

9

>   (vi)    the extent to which the settlement is the product of arm's length bargaining.

*In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007). The foregoing analysis, however, does not require a court to conduct a mini-trial to "decide the numerous questions of law and fact raised . . . but rather to canvass the issues" raised by the parties, *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir.), *cert denied*, 464 U.S. 822 (1983), and decide whether a proposed settlement falls "below the lowest point in the range of reasonableness." *In re Teltronics Services, Inc.*, 762 F.2d. 185, 189 (2d Cir. 1985).

The BH S&B Committee does not dispute that the Settlement satisfies *Iridium* factors (ii), (v) and (vi). Indeed, the fact that more litigation would follow rejection of the Settlement (*Iridium* factor (ii)) is confirmed by the BH S&B Committee's own description of the relief it seeks—"rent payment to be held in escrow pending the outcome of the litigation." (Brief in Support of Objection of BH S&B Committee, p. 5, ECF Doc. No. 1622.) With respect to *Iridium* factor (v), all counsel appearing on this motion are sophisticated, and the record is devoid of evidence that the Settlement was not produced by arm's length negotiations (*Iridium* factor (vi)).

The present controversy centers on *Iridium* factors (i), (iii) and (iv). Analysis of factors (iii) and (iv) clearly supports the Settlement. Notice of the Settlement was duly served on the creditor list in these cases, but the only objection received was that of the BH S&B Committee. It is therefore clear that the Settlement has the support of the creditors most directly affected by it and that there is no opposition from within these estates (*Iridium* factors (iii) and (iv)). The principal issue is with *Iridium* factor (i).

The first factor identified by the *Iridium* Court compares the benefits offered by the Settlement against the likelihood of success in further litigation. The benefits that the Debtors derive from the Settlement, in addition to a cessation of the costs of further litigation, are easy to ascertain: (i) cash savings of at least $33,890 ($517,092 - $483,202); and (ii) a reduction of at least $2.5 million of unsecured debt ($3,076,897.66 – $517,092.94). Although these benefits are not enormous in the context of these cases, they are more than sufficient when compared with the Debtors' chances of success in litigation with GECC.

We start with § 365(d)(5) of the Bankruptcy Code, which is a redesignation of former § 365(d)(10).[8] It provides that the

> trustee shall timely perform all of the obligations of the debtor . . . first arising from or after 60 days after the order for relief in a case under chapter 11 of this title under an unexpired lease of personal property . . . until such lease is assumed or rejected notwithstanding section 503(b)(1) of this title, unless the court, after notice and a hearing and based on the equities of the case, orders otherwise with respect to the obligations or timely performance thereof.

11 U.S.C. § 365(d)(5). Section 365(d)(5) represents a Congressional determination that lessors of non-consumer personal property should receive current "payments and the performance of all other obligations that initially become due more than 60 days after the order for relief." 140 Cong. Rec. S14462 (daily ed. Oct. 6, 1994). Section 365(d)(5) thus strikes "a balance between the debtor-in-possession's need for time to reject non-beneficial personal property leases without creating administrative claims against the

---

[8] "The provision requiring a trustee to timely perform all of the obligations of the debtor under an unexpired lease of personal property was added to the Bankruptcy Code in 1994 as § 365(d)(10). BAPCPA amended § 365 by renumbering former § 365(d)(10) as § 365(d)(5). However, BAPCPA did not alter or amend the language of former § 365(d)(10)." *In re Jim Palmer Equipment, Inc.*, 2008 WL 5869690 * 5, n. 6 (Bankr.D.Mont. Nov. 25, 2008) (internal quotations omitted). Although some of the case law cited in this opinion refers to § 365(d)(10), it is equally authoritative under § 365(d)(5). For clarity all references herein are to § 365(d)(5).

11

estate, and the lessor's right to get paid for the leased goods." *In re Furley's Transport, Inc.*, 263 B.R. 733, 740 (Bankr.D.Md. 2001). There is authority that lessors of non-consumer personal property can resort to either §§ 365(d)(5) or 503(b)(1) of the Bankruptcy Code to assert administrative claims against a debtor for lease payments due after the filing of a bankruptcy case. *See In re Raymond Cossette Trucking, Inc.*, 231 B.R. 80 (Bankr.D.N.D. 1999); *In re Furley's Transport*, 263 B.R. at 740.[9]

The BH S&B Committee's only response is that the GECC leases could be reclassified as security agreements, and that this would entitle GECC to an unsecured claim for the post-petition use of its equipment, not to the rights of a lessor under § 365(d)(5). Based on the record before the Court, it is doubtful that matters are as simple as the BH S&B Committee contends. Even if the leases were found to be security agreements, GECC apparently protected itself by filing financing statements, and thus GECC would have had the rights of a secured creditor, entitled to adequate protection of its security interest in the equipment. But even if it had not done so, the BH S&B Committee does not explain why the parties are not judicially estopped from seeking to reclassify the GECC leases.

Judicial estoppel precludes a party who has been successful in asserting a position in a legal proceeding from assuming the contrary position in a later proceeding, "especially if it be to the prejudice of the party who has acquiesced in the position formerly taken . . . ." *Davis v. Wakelee*, 156 U.S. 680, 689 (1895). It "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S.

---

[9] Section 503(b)(1) provides that "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . including the actual, necessary costs and expenses of preserving the estate . . . ."

12

742, 749, (2001), quoting *Pegram v. Herdrich*, 530 U.S. 211, 227, n. 8 (2000). The judicial estoppel doctrine seeks to "protect judicial integrity by avoiding the risk of inconsistent results in two proceedings." *Bates v. Long Island R.R. Co.,* 997 F.2d 1028, 1038 (2d Cir.1993). Its application, in the court's sound discretion, requires a determination that

> First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position . . . . A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*New Hampshire v. Maine*, 532 U.S. at 750-51 (internal quotation marks and citations omitted).

Clearly, a claim that GECC's leases are disguised security agreements would be inconsistent with the APA, where the Debtors and BH S&B expressly agreed, in the face of GECC's objection, to treat the agreements as leases. Such a claim would also be inconsistent with the lease rejection applications filed with the Court by the Debtors at the direction of BH S&B. Further, this Court approved both the APA and the rejection applications, and in so doing, implicitly accepted the characterization given in those documents to the GECC agreements. GECC as a consequence did not pursue its objection to the APA or seek other relief thereafter. On the record before the Court, both the Debtors and BH S&B would be judicially estopped from arguing that the GECC leases are disguised security agreements.

The issue of judicial estoppel is particularly important in these cases because of conflicting authority regarding the rights of a lessor under § 365(d)(5) when a lease is challenged as being a disguised security agreement. In *In re The Elder-Beerman Stores*

13

*Corp.*, 201 B.R. 759 (S.D.Ohio 1996), the debtors had entered into a series of transactions where "each agreement [was] on its face unambiguously titled a lease." 201 B.R. at 762. After filing for bankruptcy under Chapter 11, the debtors did not reject the leases, but continued to use the leased equipment without paying for it, and, in response to a motion to compel payment filed by the lessor, argued that the transactions were disguised security agreements. *Id.*

The Court, after analyzing the case law preceding the adoption of § 365(d)(10) and the statute's legislative purpose, noted that Congress had placed on debtors the burden of demonstrating "that something less than the rent due under the contract should be awarded." *Id.* at 763. The court concluded:

> [t]he question then before the court is whether a debtor may avoid its obligations under § 365(d)(10) [now § 365(d)(5)] during the pendency of a challenge to the nature of the underlying transactions. The court finds that in the limited circumstances extant in this case, that is where the debtor is faced with agreements unambiguously titled as "leases," the debtor may not circumvent the requirements of § 365(d)(10) while challenging the nature of the agreements.
>
> As legislative history indicates, § 365(d)(10) is designed to grant the debtor limited "breathing room." To allow the debtor to extend this abeyance period on commercial personal property lease obligations while bringing challenges to the nature of the leases would be to allow the debtor to circumvent the 60-day limitation built into § 365(d)(10).

*Id.* at 764.

Similarly, in *In re Mirant Corp.*, 2004 WL 5643668 (Bankr.N.D.Tex. Sept. 15, 2004), the debtors resisted a so-called motion to compel timely payment of rent filed under §§ 365(d)(3) and 365(d)(5), arguing, among other things, that the underlying transactions were disguised security agreements. The Court, noting that the documents in question were labeled as leases, adopted the reasoning of *Elder-Berman Store* and stated

14

that "[i]n the absence of evidence at least sufficient to rebut the natural assumption that a document is in fact what it purports to be, the court [was] not prepared to relieve compliance" with § 365(d)(5) of the Code. *Id.* at 3.

A Bankruptcy Court in this Circuit has rejected the holding in *Elder-Beerman Stores,* concluding that as a prerequisite to the application of § 365(d)(5), it is necessary "to determine first whether the agreement denominated as a lease is indeed a true lease." *In re Circuit-Wise, Inc.*, 277 B.R. 460, 464 (Bankr.D.Conn. 2002). Ruling in favor of the debtor, the Court stated that the language of the statute required "that a person or entity must be a lessor and not the holder of a security interest" since Congress had enacted the statute "with knowledge of the then-existing precedents construing the term lease as used in Sections 365(d)(3) and (4) as meaning only true or bona fide leases." 277 B.R. at 462-63.

Not surprisingly, the BH S&B Committee urges this Court to adopt the *Circuit-Wise* holding. The BH S&B Committee also asserts that neither *Elder-Beerman Stores* nor *Mirant* would "justify a result contrary to the relief requested by the BH S&B Committee in the Objection." (Brief in Support of Objection of BH S&B Committee, p. 4, ECF Doc. No. 1622.) Unlike *Mirant*, the BH S&B Committee reasons, here the presumption that a document is what it purports to be can be easily rebutted "given the 1$ option prices" to purchase the equipment at the end of the lease terms. *Id.* at p. 5. As for the holding in *Elder-Beerman Stores*, the Committee contends that "the bankruptcy court permitted the rent payment to be held in escrow pending the outcome of the litigation" and the "BH S&B Committee asked for similar alternative relief . . . ." *Id.*

15

The dispositive problem with the BH S&B Committee's argument is that it is flatly contradictory to the position the parties took previously. GECC relied on this position, and it was not unreasonable for the parties to provide for current payment to GECC, particularly in light of the *Elder-Beerman Stores* and *Mirant* decisions. This arrangement provided the Debtors and BH S&B with the ability to close the APA without having to litigate with GECC, or purchase or surrender GECC's equipment, which would have increased the transaction's costs and potentially would have impaired the operations of the stores to be managed by BH S&B. The APA also precluded GECC from moving for relief from the stay or otherwise asserting the rights of a secured creditor entitled to adequate protection under § 363(e).[10] As events evolved, BH S&B defaulted on its obligations under the "bubble leases" and left the Debtors with a significant contingent liability, but BH S&B should not be able to add further insult to injury by saddling the Debtors with losing litigation with GECC.

As stated above, to decide the present motion, the Court need only canvass the record and the issues presented and determine whether the Settlement is reasonable. *In re Teltronics,* 762 F.2d at 189. On the present record, the critical fact is that the Committee's argument is contrary to the position taken by the parties in the APA and motions that this Court has heard and determined. Pursuit of further litigation against GECC could not outweigh the benefits of the Settlement, and the first factor in the *Iridium* analysis is satisfied.

The BH S&B Committee has also filed a motion and an adversary proceeding seeking a declaratory judgment that GECC's agreements are for security rather than true

---

[10] Section 363(e) of Bankruptcy Code requires that adequate protection be provided to entities which have an interest in property used by a debtor-in-possession and "applies to property that is subject to any unexpired lease of personal property." *See* 11 U.S.C. § 363(e).

16

leases. Approval of the Settlement moots both the motion and the adversary proceeding. Finally, the BH S&B Committee argues that the Debtors should not use the escrow accounts established in the Global Settlement to fund the Settlement. The escrow accounts, however, were created "for the timely payment of Expenses incurred [and unpaid] after November 19, 2008" by BH S&B's operation of the Debtors' stores. (Agreement and Order ¶ 3, ECF Doc. No 1133.) This aspect of BH S&B Committee's argument is also without merit.

## CONCLUSION

For the reasons stated above, the Settlement is approved. The Debtors are directed to settle orders disposing of the Motion and the adversary proceeding on five days' notice.

Dated: New York, New York
      May 22, 2009

                                  */s/ Allan L. Gropper*
                                  UNITED STATES BANKRUPTCY JUDGE